**In re TEXAS EASTERN TRANSMISSION CORPORATION PCB CONTAMINATION INSURANCE COVERAGE LITIGATION.**

MDL No. 764.

United States District Court, E.D. Pennsylvania.

July 9, 1992.

---

Peter J. Nickles, Coleman S. Hicks, Covington & Burling, Washington, DC, for Texas Eastern Transmission Corp.

Lawrence E. Carr, Jr., Margaret H. Warner, Carr, Goodson & Lee, P.C., Washington, DC, for Fidelity and Cas. Co. of New York, Boston Old Colony Ins. Co.

Mary Ann D'Amato, Robert M. Flannery, Mendes & Mount, New York City, for Certain Underwriters at Lloyd's of London, Ins. Co. of Ireland.

Regina A. Mapes, White & Williams, Philadelphia, PA, for Insurance Co. of North America.

Stephen Sonderby, Haskell & Perrin, Chicago, IL, for Continental Cas. Co.

Ignatius John Melito, Siff, Rosen & Parker, P.C., New York City, for First State Ins. Co.

Leonard L. Rivkin, John L. Rivkin, Erica Garay, Rivkin, Radler, Bayh, Hart & Kremer, Uniondale, NY, John C. Sullivan, Manta & Welge, Philadelphia, PA, for Associated Elec. & Gas Ins. Services, Ltd.

Stephen Cuyler, Michael J. Jones, Cuyler, Burk & Matthews, Morristown, NJ, for Employers Mut. Ins. Co.

Karen L. Douglas, Merlo, Chapello & Douglas, Ltd., Chicago, IL, for Prudential Reinsurance Co.

Edward M. Dunham, Jr., Miller Marvin Dunham Doering & Schreiber, Philadelphia, PA, for Aetna Cas. & Sur. Co.

David Richman, Pamela Ullman, Pepper, Hamilton & Scheetz, Philadelphia, PA, for The Home Ins. Co.

Marjorie Mintzer, Sheft & Sheft, New York City, Mitchell S. Pinsly, Margolis, Edelstein, Scherlis, Sarowitz & Kraemer, Philadelphia, PA, for American Home Assur. Co., Highlands Ins. Group, Ins. Co. of the State of Pennsylvania, Lexington Ins. Co., Ranger Ins. Co., Republic Ins. Co., Stonewall Underwriters, Inc.

Lorraine M. Armenti, McElroy, Deutsch & Mulvaney, Morristown, NJ, Thomas C. DeLorenzo, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA, for Intern. Ins. Co.

Lise Luborsky, Duane, Morris & Heckscher, Philadelphia, PA, for Pennsylvania Ins. Guar. Ass'n.

K. Thomas Shahriari, Gilberg & Kurent, Washington, DC, James M. Prahler, Partenheimer & Didomenicis, Philadelphia, PA, for Nat. Sur. Corp.

## TABLE OF CONTENTS

I. Introduction ............................................................. page 1300
II. Procedural History .................................................... page 1300
III. Summary Judgment Standard ...................................... page 1301
IV. Motions to Strike .................................................... page 1302
 A. Motion to Strike Texas Eastern's Motion for Summary Judgment page 1302
 B. Motion to Strike Certain Evidence Offered by Texas Eastern in Support of its Motion for Summary Judgment page 1302

C. Supplemental Motion to Strike page 1303
V. Choice of Law page 1305
VI. Governing Principles of Insurance Law page 1306
 A. Texas Rules of Insurance Contract Construction page 1306
 B. Texas Rules Concerning the Burden of Proof page 1306
VII. Imputation of Employee Knowledge page 1307
VIII. Facts page 1308
 A. Preliminary Issues page 1308
 B. Factual Background page 1308
 1. Texas Eastern's Corporate History page 1309
 2. Texas Eastern's Operational History page 1309
 3. Texas Eastern's Knowledge of PCBs in its Lubricant page 1310
 4. The Change–Out Program page 1313
 5. Tracking Environmental Legislation page 1313
 6. PCB Contamination in the Natural Gas Pipeline page 1314
 7. PCB Cleanup page 1315
 8. The Results of Weston's Survey page 1315
 9. Texas Eastern's Problems Become Public Knowledge page 1317
 10. Texas Eastern's Negotiations with EPA page 1318
 11. Texas Eastern's Notice to its CGL Carriers page 1319
IX. Occurrence page 1320
 A. The Policy Language page 1320
 B. Texas Law page 1320
 C. The Applicable Facts page 1323
 1. Knowledge that the Lubricant was Escaping into the Environ-
 ment page 1324
 2. Knowledge that the Lubricant Contained PCBs page 1327
 D. The Alternative Theory of an Occurrence page 1328
X. Damages page 1329
 A. Equitable Relief as Damages page 1330
 B. Compliance Costs as Property and/or Bodily Injury Damage page 1334
 C. Civil Fines and Penalties page 1335
 1. Choice of Law—Fines and Penalties page 1335
 2. New Jersey Fines page 1338
 3. Pennsylvania Fines page 1338
 4. EPA Fines page 1339
XI. Owned Property Exclusion page 1339
XII. Pollution Exclusion page 1345
XIII. Late Notice page 1350
 A. The Policy Terms page 1351
 B. Accrual of Texas Eastern's Obligation to Notify its CGL Insurers page 1351
 1. 1981 page 1351
 2. 1982 page 1352
 3. 1983 page 1352
 4. 1984 page 1352
 5. 1985 page 1353
 6. 1986 page 1354
 7. 1987 page 1355
 C. Texas Law page 1356
 D. The Applicable Facts page 1358
 E. Prejudice page 1361
XIV. Duty to Defend page 1364
 A. The Policy Language page 1364
 B. Texas Law page 1364

*OPINION*

VanARTSDALEN, Senior District Judge.

## I. INTRODUCTION

Texas Eastern Transmission Corporation (Texas Eastern), the owner-operator of a natural gas pipeline system extending from natural gas well fields in Texas, Louisiana, and the Gulf of Mexico to the New York metropolitan area, brought suit against approximately twenty-one insurance companies[1] (the Carriers) that provided Texas Eastern with primary and excess comprehensive general liability (CGL) insurance coverage between 1958 and the present.[2] Texas Eastern seeks to recover the expense that it will incur in the governmentally mandated environmental cleanup of polychlorinated biphenyl[3] (PCB) contamination at multiple locations on Texas Eastern's property along the transmission line. The total costs are estimated to exceed $750 million. After more than two years of discovery, the parties have now filed cross-motions for summary judgment.

## II. PROCEDURAL HISTORY

The present litigation consolidates three lawsuits, each seeking declaratory judgment as to the respective duties and liabilities of the Carriers to defend and/or indemnify Texas Eastern against claims and settlements made by and with the United States Environmental Protection Agency (EPA), various state agencies, and private parties.[4]

On December 11, 1987, Fidelity & Casualty Company of New York (Fidelity or F &

C), Texas Eastern's primary CGL carrier throughout all relevant periods, filed Case No. 87–2925T against Texas Eastern in the United States District Court for the Northern District of Texas (Northern District action). The Northern District action was a diversity case establishing federal subject-matter jurisdiction pursuant to 28 U.S.C. § 1332.

On March 11, 1988, Associated Electric & Gas Insurance Services Limited (Aegis) and National Surety Corporation filed Civil Action No. 88–2126 in the United States District Court for the Eastern District of Pennsylvania (Eastern District action) against Texas Eastern, F & C, and Texas Eastern's other CGL insurers. Jurisdiction was based on 28 U.S.C. §§ 1330(a), 1603(a), and 1605(a)(2) of the Foreign Sovereign Immunities Act (FSIA), because one of the insurers, the Insurance Company of Ireland (one of the London Market Insurers), was an instrumentality of a foreign state.

On March 21, 1988, Texas Eastern filed an action in Texas state court, in Houston (Texas state court action), against all of its insurers.[5] The Texas state court action was removed to the United States District Court for the Southern District of Texas on the basis of the FSIA and was docketed in that court as Civil Action No. 88–1910.

In May 1988, the Northern District action was transferred by the Judicial Panel on

---

1. The insurance companies include Fidelity & Casualty Company of New York, Associated Electric & Gas Insurance Services Limited, Aetna Casualty & Surety Company, American Home Assurance Company, Boston Old Colony Insurance Company, Continental Casualty Company, First State Insurance Company, Highlands Insurance Company, The Home Insurance Company, The Insurance Company of North America, Insurance Company of the State of Pennsylvania, Lexington Insurance Company, Midland Insurance Company (in receivership), National Surety Corporation, Prudential Reinsurance Company, Ranger Insurance Company, Republic Insurance Company, Stonewall Insurance Company, United States Fire Insurance Company, Certain Underwriters at Lloyd's, London, and Certain London Market Insurance Companies.

2. Texas Eastern and the individual Carriers filed a Joint Submission of Texas Eastern Policies in which they stipulated to the existence of approxi-

mately fifty-seven insurance policies. Texas Eastern and the London Market Insurers filed a Stipulation in which they agreed to the existence of an additional fifty-three insurance policies.

3. A polychlorinated biphenyl is defined as "Any of a family of industrial compounds produced by chlorination of biphenyl, noted chiefly as an environmental pollutant that accumulates in animal tissue with resultant pathogenic and teratogenic effects." *Webster's II New Riverside University Dictionary* 912 (1984).

4. Texas Eastern has also asserted claims seeking damages for breach of contract against all of its insurers.

5. Texas Eastern originally filed this action in New Jersey state court on December 21, 1987. The suit was subsequently dismissed on March 17, 1988, on the ground of *forum non conveniens.*

Multidistrict Litigation to this court for consolidation for pretrial purposes with the Eastern District action, pursuant to 28 U.S.C. § 1407; the case was docketed in the Eastern District of Pennsylvania as Civil Action No. 88–5039. The cases were then designated "Texas Eastern Transmission Corporation, PCB Contamination Insurance Coverage Litigation, Case Number MDL 764." In July 1988, the United States District Court for the Southern District of Texas transferred the action pending before it to this district, where it was docketed as Civil Action No. 88–5707. The grounds for the transfer were not stated, but presumably the transfer was based on 28 U.S.C. § 1404(a). That case has been consolidated for all purposes with MDL 764. (MDL 764 Order No. 4, Document No. 23.)

After extensive (and perhaps exhaustive) discovery, the parties filed cross-motions for either partial or total summary judgment. Texas Eastern moved for partial summary judgment on six major issues seeking the following legal rulings: (1) the pollution exclusion in its insurance policies does not bar coverage for long-term pollution; (2) all of its insurance policies were triggered due to the latent nature of the PCB contamination; (3) the Carriers' defenses of late notice and misrepresentation should be stricken; (4) the cleanup costs it has and will incur are recoverable as "damages"; (5) F & C breached its duty to defend Texas Eastern in the underlying lawsuits; and (6) the underlying lawsuits asserted claims for bodily injury, property damage, and personal injury.

The Carriers moved jointly for partial or complete summary judgment on the following issues seeking the following legal rulings: (1) no insurable occurrence ever accrued; (2) the costs incurred by Texas Eastern were not incurred as "damages" because of bodily injury or property damage; (3) Texas Eastern provided late notice of its claims to all Carriers; (4) civil fines and penalties are not insurable as "damages"; (5) the owned property exclusion in Texas Eastern's insurance policies bars coverage for damage to Texas

Eastern's own property; and (6) the pollution exclusion in Texas Eastern's insurance policies bars coverage for all costs incurred to remediate the PCB contamination. In addition, twelve of the Carriers individually filed separate motions for partial or total summary judgment in which some of the other Carriers joined. Finally, the Carriers jointly filed several motions to strike exhibits offered by Texas Eastern in support of its motion for summary judgment.

I held hearings on the summary judgment motions on January 13, 14, and 15, 1992. After consideration of the briefs and the arguments made during the hearings, I have reached numerous conclusions and decisions which are hereafter set forth. I have decided most, but not all, of the issues raised. I have determined that all of the Carriers are entitled to summary judgement on all claims against them because of Texas Eastern's late notice. Other primary issues have been decided in order to avoid extensive further appeals and litigation in the event that a different result occurs on appeal.[6]

### III. SUMMARY JUDGEMENT STANDARD

A court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Williams v. Borough of West Chester*, 891 F.2d 458, 463–64 (3d Cir.1989). In a motion for summary judgment, the court may examine evidence beyond the pleadings. The court must always consider the evidence, and the inferences therefrom, in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir.1987).

The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *First Nat'l Bank v.*

---

**6.** To the extent that I have declined to rule on any outstanding motion in this case, the motion should be considered denied as moot.

*Lincoln Nat'l Life Ins. Co.*, 824 F.2d 277, 280 (3d Cir.1987). Once the moving party has satisfied this burden, the nonmoving party must demonstrate that genuine disputes exist concerning each essential element of its case on which it bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). For a dispute to be "genuine," a reasonable jury must be able to return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If the nonmoving party's evidence is " 'merely colorable' or is 'not significantly probative,' summary judgment may be granted" in favor of the moving party. *Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.*, 812 F.2d 141, 144 (3d Cir.1987) (quoting *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11). In essence, it is my duty to determine whether the nonmoving party has submitted evidence which "presents a sufficient disagreement to require submission to a jury or whether [the evidence] is so one-sided that [the moving party] must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512.

I have gone to great lengths to give Texas Eastern the benefit of every doubt in interpreting the thousands of pages of record evidence submitted by all parties. I have taken this course because the Carriers' summary judgment motion heavily relies on factual findings, while Texas Eastern's summary judgment motion, by its own admission, relies more on interpretations of the law than on express factual findings. In the interest of fairness, I have made extensive findings concerning the "undisputed facts." *See infra* part VIII.[7]

## IV. MOTIONS TO STRIKE

### A. *Motion to Strike Texas Eastern's Motion for Summary Judgment*

▇ The Carriers contend that Texas Eastern's motion for summary judgment is merely a request for hypothetical legal rulings calculated to induce me to reveal my position on particular legal disputes and thereby enable Texas Eastern to better prepare its case for trial. As an example, the Carriers cite Texas Eastern's motion for partial summary judgment on the issue of whether gradual discharge, dispersal, release, or escape of pollutants can be "sudden and accidental" within the meaning of a pollution exclusion clause. In the Carriers' view, Texas Eastern's motion is more appropriate to a Rule 16 conference or a motion *in limine*, where evidentiary rulings are appropriately requested and received.

Texas Eastern responds that seeking legal rulings which narrow the issues for trial are entirely proper in Rule 56 motions, and that its motion need not necessarily allow the court to pronounce final judgment on a particular claim, as long as the court's decision finally disposes of at least some portion of that claim. In addition, Texas Eastern asserts that it need not proffer substantial factual support for its summary judgment motion because it primarily focuses on legal issues which are matters of law for the court to decide and, thus, do not require an extensive factual background.

Federal Rule of Civil Procedure 56(a) expressly entitles a party to move for summary judgment "in the party's favor upon all [claims] or any part thereof." In my view, Rule 56 is broad enough to allow Texas Eastern to move for summary judgment on issues which are crucially important to this litigation, and about which no factual dispute exists. The interpretation of insurance policy language is just such an issue. The Carriers' motion to strike will therefore be denied.

### B. *Motion to Strike Certain Evidence Offered by Texas Eastern in Support of its Motion for Summary Judgment*

The Carriers have also moved to strike certain evidence relied on by Texas Eastern to support its motion for summary judgment. First, the Carriers move to strike exhibits 8–31, 47, [4]8, and 50 offered by Texas Eastern in the Declaration of Laird Hart. Exhibits

---

7. In this regard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

8–18 are private third-party complaints filed against Texas Eastern, alleging injuries arising out of PCB contamination, not specifically identified in Texas Eastern's First Amended Complaint. They were the subject of Texas Eastern's motion for leave to file a Second Amended Complaint which I held in abeyance. (Order No. 42, Document No. 443.) In a memorandum and order filed contemporaneously with this opinion, I have denied Texas Eastern's motion for leave to amend its complaint and therefore conclude that evidence of the private third-party complaints is not properly before me. Exhibits 8–18 will therefore be stricken.

Exhibits 19–27 present a more difficult question. Texas Eastern has offered evidence of the drafting history of one form of a pollution exclusion used in many of the insurance policies at issue in this litigation.[8] For the reasons set forth in my discussion of the "Pollution Exclusion" issue, *infra* part XII, I have decided that consideration of this evidence is permissible under Texas law and, thus, the Carriers' motion to strike exhibits 19–31 will be denied.

Exhibits 47 and 48 are excerpts from the depositions of Texas Eastern expert witnesses John A. Cherry and Bradford S. Cushing. The Carriers object to this evidence on the ground that the excerpts are insufficient to allow me to determine the experts' qualifications, or the facts and data upon which the opinions are based. Additionally, the Carriers believe that this evidence sets forth mere conclusions and does not offer any evidence of the experts' thought processes or rationale. Texas Eastern has responded by providing some of the deposition transcript missing from its initial proffer. (*See* TApp.[9] 222; TApp. 223.) I am satisfied that when considered together with the additional deposition testimony, this evidence is properly before the court and the motion to strike will therefore be denied.

Exhibit 50 consists of two affidavits sworn by Karen Hammerstrom, an EPA employee, which were submitted in support of EPA's enforcement action against Texas Eastern. Texas Eastern relies heavily on these affidavits to prove that at least some of its response costs are the direct result of actual or threatened third-party harm to property or persons. Although the affidavits were not created specifically for this litigation, they appear to be reliable and relevant, and appear to satisfy the requirements of Federal Rule of Civil Procedure 56(e). As such, they are properly before me. The Carriers' motion to strike the Hammerstrom Affidavits will therefore be denied.

Second, the Carriers object to any reliance on Texas Eastern's "Statement of General Background Facts" filed contemporaneously with, and in support of, its motion for summary judgment because, in general, it does not cite to record evidence. It is settled law that all evidence relied upon in deciding a motion for summary judgment must be reducible to admissible evidence. Texas Eastern admitted at oral argument that its "Statement of General Background Facts" was not "admissible evidence" and, as such, I have not relied on it in deciding these motions for summary judgment. The Carriers' motion to strike Texas Eastern's "Statement of General Background Facts" will therefore be granted.

### C. *Supplemental Motion to Strike*

The Carriers have moved to strike certain additional evidence offered by Texas Eastern. First, the Carriers seek to strike paragraphs 4, 5, 7, and 8 of the Declaration of H. Douglas Church, located at TApp. 191, on the ground that the information contained therein is not based on Mr. Church's personal knowledge. The information in these paragraphs relates to Texas Eastern's historical practices concerning PCB use and containment. The Carriers contend that Mr. Church cannot have personal knowledge of events which occurred before 1985, the date

---

8. Exhibits 28–31 are documents concerning the intent of various insurance carriers (not necessarily parties to this litigation) regarding the language of the pollution exclusion. For the purposes of this motion, I will consider them as part of the proffered pollution exclusion evidence.

9. I will refer to Texas Eastern's Appendix filings as "TApp." and to the Carriers' Appendix filings as "App." Both Appendices were filed in support of the summary judgment motions.

when he first became responsible for dealing with Texas Eastern's PCB-related problems.

Texas Eastern responds that although Mr. Church does not have first-hand personal knowledge of all the events to which he attested, he acquired personal knowledge by reviewing relevant documents and discussing the issues with senior management[10] and other personnel from Texas Eastern's Operations, Engineering, Environmental, and Legal departments. (Church Decl., TApp. 191 at ¶ 4.) The Carriers have in turn challenged the quality of Mr. Church's efforts to "get up to speed" on these important issues. (Ins.' Reply in Supp. of Suppl.Mot. to Strike at 4–5.)

Federal Rule of Evidence 602 prohibits a witness from testifying about an issue unless the witness has personal knowledge of the matter. The Carriers complain that Mr. Church's knowledge cannot be personal to him because it was acquired from third parties. This argument proves too much. All perception is inferential to some degree. As the Seventh Circuit recently noted:

> Knowledge acquired through others may still be personal knowledge within the meaning of Fed.R.Evid. 602, rather than hearsay, which is the repetition of a statement made by someone else.... Such a statement is different from a statement of personal knowledge merely based, as most knowledge is based, on information obtained from other people.

*Agfa–Gevaert, A.G. v. A.B. Dick Co.,* 879 F.2d 1518, 1523 (7th Cir.1989).

Mr. Church acknowledges that he relied on various sources to acquire his knowledge of the events to which he attests. He does not, however, offer his statement solely on the authority of those statements, but rather vouches for the statements' truth himself. Mr. Church's alleged reliance on documents distinguishes this case from one in which a declarant relies solely on the "say-so" of third parties. *See, e.g., Kaczmarek v. Allied*

*Chem. Corp.,* 836 F.2d 1055, 1060–61 (7th Cir.1987). I conclude that the Church Declaration is sufficiently based on personal knowledge and is therefore admissible evidence that can be relied on in deciding these motions for summary judgment.

Next, the Carriers have moved to strike paragraphs 6 and 8 of the Declaration of Steve L. Horton, found at TApp. 194. In paragraph 6, Mr. Horton states that after discussions with environmental representatives of other pipeline companies, it is his understanding that no other pipeline company has been required by EPA or any state authority to install the same source control equipment that Texas Eastern is required to install under the terms of the EPA Consent Decree. (Horton Decl., TApp. 194 at ¶ 6.) The Carriers and Texas Eastern agree that this statement is hearsay if it is offered to prove the truth of the matter, that is, that no other company has, in fact, been required to install the above-mentioned source control equipment.

Texas Eastern contends that this evidence is being offered only to establish what Steve Horton, Texas Eastern's Vice President of Environmental Affairs, believed other companies have been required to do. Without ruling on the relevance of Mr. Horton's opinion, I will deny the motion to strike; however, Mr. Horton's statement is admissible only to establish what he believed has been the practice in the industry.

In Paragraph 8, Mr. Horton states that the residual value of a computer and software, purchased by Texas Eastern exclusively to help carry out the required activities under the Consent Decree, will be little or none when the activities are completed. (Horton Decl., TApp. 194 at ¶ 8.) The Consent Decree involves a ten-year cleanup program. (App. 385 at 16.) Thus, Mr. Horton is merely stating that in his opinion, a computer purchased today will have little value ten years from now.

---

10. Both parties have referred to a generic group of high level Texas Eastern employees as "senior management." Although never defined, I understand this term to refer to employees at Texas Eastern who are, or were, responsible for making important policy and management decisions concerning Texas Eastern's corporate activities. This group is not solely limited to officers and directors, but also includes high level managers responsible for the oversight of Texas Eastern's daily pipeline operations.

The Carriers believe that Texas Eastern should offer expert testimony on this issue, or at least lay testimony of someone with expertise in the computer industry. Given the nature of this testimony, I believe that Mr. Horton's duties make him sufficiently knowledgeable about the computer and the work to which it is committed so as to permit his lay testimony to be admitted under Federal Rule of Civil Procedure 701. Of course, the fact that he is not an expert in this area may affect the persuasiveness of his testimony.

The Carriers also move to strike the excerpts of the deposition testimony of Texas Eastern expert Davis L. Ford concerning Texas Eastern's waste management practices. (TApp. 31; TApp. 206.) The grounds for striking the testimony are the same as those asserted in the Carriers' original motion to strike the deposition testimony of experts Cushing and Cherry. Texas Eastern has supplemented its offer with additional deposition testimony sufficient to allow its admission as evidence. (*See* TE's Opp'n to Suppl.Mot. to Strike at 13–14; Ex. F.) The Carriers' argument that the subject matter of Mr. Ford's testimony is not helpful because it fails to consider Texas Eastern's PCB use goes to the weight, not the sufficiency, of the evidence.[11]

Finally, the Carriers move to strike TApp. 127 and 129. These exhibits are part of the evidence offered by Texas Eastern concerning circumstances surrounding the drafting of the pollution exclusion which appears in a number of the insurance policies at issue in this case. Having decided that consideration of such evidence is proper under Texas law to help determine whether the term "sudden" is, or is not, ambiguous, I conclude that the evidence is properly before me. For all of these reasons, the Carriers' supplemental motion to strike will be denied in its entirety.

**11.** The Carriers' motion to strike Ford's report concerning Texas Eastern's waste management practices, (TApp. 203), on the ground that the report will not be helpful in deciding the motions for summary judgment, will also be denied for the same reason.

## V. CHOICE OF LAW

The parties agree that Texas law applies [12] to all of the issues in this multidistrict litigation except those concerning the insurability of civil fines and penalties, where the Carriers contend that the law of the state which imposed the fine or penalty should apply. I will address the choice of law issue regarding civil fines and penalties in my discussion of that issue. (*See infra* part X.C.1.) Otherwise, Texas law will be applied throughout this opinion.

It is axiomatic that the decisions of a state's highest court are the ultimate authority regarding state law. *Connecticut Mut. Life Ins. Co. v. Wyman,* 718 F.2d 63, 65 (3d Cir.1983). If the state's highest court has not ruled on the issue in question, it is my duty to predict how the state court would rule. *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1167 (3d Cir.1981). In making these predictions, I have relied, to the best of my ability, on lower Texas state court decisions, well-reasoned authority from other jurisdictions, and other relevant sources.

With respect to my use of sources other than the Texas Supreme Court, I have relied first on lower court decisions from the Texas state courts. Intermediate state court decisions are presumptive evidence of state law. *Commercial Union Ins. Co. v. Bituminous Casualty Corp.,* 851 F.2d 98, 100 (3d Cir.1988). As the Third Circuit recently stated:

> Although we are not bound in a diversity case to follow decisions of a state intermediate appellate court, we are instructed that such decisions are "not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise."

**12.** I take this opportunity to observe the difficulty and irony of a federal district court judge sitting in Pennsylvania predicting what the Supreme Court of Texas would do if faced with particular questions, given that two of the three cases consolidated in this action originated in Texas and concern activities which primarily occurred there.

*Northern Ins. Co. v. Aardvark Assocs., Inc.,* 942 F.2d 189, 193 (3d Cir.1991) (quoting *West v. American Tel. & Tel. Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940)).

I have also relied on decisions from other jurisdictions, as well as other miscellaneous sources, to aid in my predictions in instances where the lower courts have either (1) not decided an issue, or (2) have decided an issue with insufficient rationale to be a good indicator of what the Texas Supreme Court would conclude if faced with a similar question. Although I cannot guarantee that I have predicted correctly, I have relied on my own understanding of the law, and on the insurance and contract principles which Texas courts have historically considered important, to reach the conclusions which follow.

## VI. GOVERNING PRINCIPLES OF INSURANCE LAW

A. *Texas Rules of Insurance Contract Construction*

Under Texas law, insurance policies are governed by the same rules of construction which apply to contracts generally. *National Union Fire Ins. Co. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991); *Barnett v. Aetna Life Ins. Co.,* 723 S.W.2d 663, 665 (Tex.1987); *Garrison v. Fielding Reinsurance, Inc.,* 765 S.W.2d 536, 538 (Tex.Ct.App. 1989) (writ denied). "When terms of an insurance policy are unambiguous, they are to be given their plain, ordinary and generally accepted meaning unless the instrument itself shows that the terms have been used in a technical or different sense." *Garrison,* 765 S.W.2d at 538.

When the terms of an insurance policy are ambiguous, a court should apply the construction that favors the insured and permits recovery. *Yancey v. Floyd West & Co.,* 755 S.W.2d 914, 918 (Tex.Ct.App.1988) (writ denied). A term is ambiguous when the language of a policy is susceptible to more than one reasonable construction. *Yancey,* 755 S.W.2d at 918. "Where the clause of the insurance policy subject to dispute involves exceptions or limitations on the insurer's liability under the policy, even more stringent construction than usual is required." *Id.* (cit-

ing *Glover v. National Ins. Underwriters,* 545 S.W.2d 755, 761 (Tex.1977)). The court must adopt the insured's construction of an exclusionary clause "as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Hudson Energy Co.,* 811 S.W.2d at 555. However, courts should refrain from creating an ambiguity where none exists. *Yancey,* 755 S.W.2d at 918. In this regard, "a policy which is otherwise clear is not rendered ambiguous simply because it requires the insured to read the policy thoroughly and carefully." *LaBatt Co. v. Hartford Lloyd's Ins. Co.,* 776 S.W.2d 795, 800 (Tex.Ct.App.1989). Additionally, mere disagreement over the interpretation of an instrument does not make it ambiguous. *Cohen v. Rains,* 769 S.W.2d 380, 389 (Tex.Ct. App.1989) (writ denied). Indeed, a court must avoid a construction of the policy which renders a portion of the contract meaningless. *Liberty Mut. Ins. Co. v. American Employers Ins. Co.,* 556 S.W.2d 242, 245 (Tex.1977); *Ideal Mut. Ins. Co. v. Last Days Evangelical Ass'n, Inc.,* 783 F.2d 1234, 1238 (5th Cir.1986). If no ambiguity exists, parol evidence is inadmissible to create an ambiguity. *Entzminger v. Provident Life & Accident Ins. Co.,* 652 S.W.2d 533, 537 (Tex.Ct. App.1983). However, in determining whether a contract term is ambiguous, a court should consider the contract terms in light of the surrounding circumstances. *Sun Oil Co. (Del.) v. Madeley,* 626 S.W.2d 726, 731–32 (Tex.1981).

B. *Texas Rules Concerning the Burden of Proof*

Pursuant to Texas law, the insured bears the burden of establishing that the claimed loss is within the coverage of the policy. *Employers Casualty Co. v. Block,* 744 S.W.2d 940, 944 (Tex.1988). The insured also bears the burden of proving that it complied with all conditions precedent to coverage. *Trevino v. Allstate Ins. Co.,* 651 S.W.2d 8, 11 (Tex.Ct.App.1983) (writ refused n.r.e.).

▮ Texas law also requires the insured to prove that the loss does not fall within an exclusion or exception where the insurer

pleads such exclusion or exception to coverage. *Sherman v. Provident Am. Ins. Co.,* 421 S.W.2d 652, 654 (Tex.1967); *American Home Assurance Co. v. Brandt,* 778 S.W.2d 141, 143 (Tex.Ct.App.1989) (writ denied); *Britt v. Cambridge Mut. Fire Ins. Co.,* 717 S.W.2d 476, 482 (Tex.Ct.App.1986) (writ refused n.r.e.). I recognize that this is a minority rule, but it appears to be the settled law in Texas.[13] Finally, if it is determined that the policy provides coverage for only a portion of the insured's loss, the burden of apportioning the damages between covered and noncovered losses is on the insured. *Winn v. Continental Casualty Co.,* 494 S.W.2d 601, 606 (Tex.Civ.App.1973).

## VII. IMPUTATION OF EMPLOYEE KNOWLEDGE

■ When individual parties are involved in litigation, the determination of what a party knew or intended is rarely a simple matter. Engaging in a *post hoc* analysis of what an individual was thinking requires powers of clairvoyance which most mortals do not possess. This difficult task is even more formidable when a corporate party is involved. A corporation operates solely through its individual employees. The employees' knowledge and intentions must therefore ordinarily be deemed the knowledge and intentions of the corporation. As Judge Dalton observed:

> A corporation can only act through its employees and, consequently, the acts of its employees, within the scope of their employment, constitute the acts of the corporation. Likewise, knowledge acquired by employees within the scope of their employment is imputed to the corporation. In consequence, a corporation cannot plead innocence by asserting that the information obtained by several employees was not acquired by any one individual employee who then would have comprehended its full import. Rather, the corporation is considered to have acquired the collective knowledge of its employees and is held responsible for their failure to act accordingly. *United States v. T.I.M.E.—D.C., Inc.,* 381 F.Supp. 730, 738 (W.D.Va.1974). When dealing with a corporation as large as Texas Eastern, imputation requires an inquiry into the minds of literally thousands of people, and in this case, spanning a time period of three to four decades.

The difficulty of this task does not relieve the parties (or me) of the duty to attempt to reconstruct what Texas Eastern "knew" at the relevant times. If a corporation were able to escape this imputation of knowledge, it would always be in a position to limit its liability by professing corporate ignorance. At the other extreme, the imputation of every bit of knowledge known to each individual employee—from the Chief Executive Officer to the most recently hired recruit—would likely paralyze a corporation as upper level management attempted to keep informed of all information known to all of the corporation's employees.

Cognizant of this dilemma, courts have created a compromise approach which limits the information imputed to the corporation to that which was learned in the course of an employee's employment-related activities, and which is known by an employee of a sufficient level of corporate responsibility to justify charging the corporation with that knowledge. Texas law is in accord with this approach. Texas Eastern is a corporation and each employee is an agent for the corporation. In accordance with Texas agency law, knowledge which an employee or other agent acquires in the course of employment is imputed to the principal. *Green Tree Acceptance, Inc. v. Holmes,* 803 S.W.2d 458, 460 (Tex.Ct.App.1991) (writ denied). Texas law makes it clear that this rule of imputation does not depend upon whether the principal actually shares the agent's knowledge, *Williams v. Jennings,* 755 S.W.2d 874, 883 (Tex.Ct.App.1988) (writ denied), because a principal should not be entitled to the benefits of the agent's services without being

---

**13.** Texas Eastern does not have the burden of proof on the Carriers' affirmative defense of misrepresentation. *See Koral Indus., Inc. v. Security–Connecticut Life Ins. Co.,* 788 S.W.2d 136, 141 (Tex.Ct.App.), *writ denied,* 802 S.W.2d 650 (Tex. 1990). Because I will grant summary judgment to the Carriers on the issue of "Late Notice," I do not reach the merits of the misrepresentation claim.

charged with the agent's knowledge. *Wellington Oil Co. v. Maffi*, 150 S.W.2d 60, 63 (Tex.1941).

Texas Eastern is thus charged with the knowledge of its employees as long as that knowledge was gained in the course of the individual employee's employment-related activities. Of course, not all of Texas Eastern's employees will have knowledge of particular events, but this does not prevent the corporation from being charged with the knowledge of those who do.

Texas Eastern has raised an objection to being charged with the collective knowledge of its many employees for the purpose of determining the intent of the corporation. In *Kern Oil & Refining Co. v. Tenneco Oil Co.*, 792 F.2d 1380, 1386–87 (9th Cir.1986), *cert. denied*, 480 U.S. 906, 107 S.Ct. 1349, 94 L.Ed.2d 520 (1987), the court concluded that under Texas law, a corporation's subjective intent could not be established by imputing the collective knowledge of its employees. In *Tenneco*, the court reviewed a district court's determination that an overpayment of money was recoverable by the payor corporation, because it was made based on a mistake of fact, and thus was involuntarily made.

Under Texas law, if a party to a contract makes an overpayment, even though it is under no legal obligation to do so, it cannot recover the money if it was voluntarily paid with full knowledge of the relevant facts. *Tenneco*, 792 F.2d at 1386. The payee argued that the corporate party could not claim that its payment was made under a mistake of fact when its employees collectively knew all of the relevant facts. The Ninth Circuit concluded that the collective knowledge could not be imputed because Texas law required that the overpayment be truly voluntary, that is, done intentionally or purposefully or by choice of one's own accord or by the free exercise of the will; the collective knowledge was insufficient to charge the corporation with this action. *Id.*

It is apparent to me that the *Tenneco* court assumed that Texas law required the corporation to subjectively intend to make the overpayment. *Tenneco* is distinguishable from the present litigation because, as will be explained in this opinion, Texas insurance law is not concerned with the subjective intentions of the insured, but with the objective ones. In an objective analysis, the focus of the inquiry is what the corporation is likely to have known, and not necessarily what the corporation in fact intended. Under these circumstances, I believe the Texas Supreme court would require the corporation to be charged with the collective knowledge of its employees.[14]

As I previously observed, information known to corporate employees should not be blindly imputed to the corporation. An inquiry should be made as to whether the employee had a sufficient level of corporate responsibility to justify charging the corporation with that particular bit of knowledge. I do not understand this requirement to mean that an employee must have climbed to a particular rung on the corporate ladder, as Texas Eastern has argued, before an employee's knowledge will be imputed. Rather, I believe this to mean that the knowledge must be substantially related to the task which the corporation has assigned the employee to perform. Therefore, information known to an employee which relates to the performance of the employee's job will be imputed to Texas Eastern.

## VIII. FACTS

A. *Preliminary Issues*

◾ Both Texas Eastern and the Carriers have submitted versions of the "undisputed" facts. The Carriers initially filed the "Insurers' Statement of Material Facts As To Which No Genuine Issue Exists" (SOF). Texas Eastern responded to the Carriers' filing with "Texas Eastern's Response To The Insurers' Statement Of Material Facts As To Which No Genuine Issue Exists"

---

14. Other courts have recognized the subjective/objective distinction. *See, e.g., United States v. LBS Bank—New York, Inc.*, 757 F.Supp. 496, 501 n. 7 (E.D.Pa.1990) ("Although knowledge possessed by employees is aggregated so that a corporate defendant is considered to have acquired the collective knowledge of its employees ... specific intent cannot be aggregated similarly.")

(TRSOF), in which Texas Eastern either disputed the Carriers' assertions or admitted them. Texas Eastern contemporaneously filed its own version of the material facts in "Texas Eastern Statement Of Facts" (TSOF). Finally, the Carriers' filed a response to the TRSOF.

The Carriers' response to the TRSOF raised several important issues. First, the Carriers objected to the filing of the TSOF *after* Texas Eastern had filed its motion for summary judgment. In the Carriers' view, Texas Eastern bore the initial burden of "identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believe[d] demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. By failing to meet this burden in its initial filing, the Carriers contend that Texas Eastern gained an unfair advantage by waiting until the Carriers had "tipped their hand before it too committed itself." (Ins.' Reply to TRSOF at 2 n. 1.)

The Carriers are clearly correct in their assertion that a party seeking summary judgment must file, in support of its motion, a statement of the facts which is supported by record evidence. However, this is not a case where a party has *failed* to file such a statement, but one in which a party has failed to file its statement contemporaneously with its original motion.

Texas Eastern filed a response to the SOF, and its own TSOF, on September 9, 1991, almost two months after its initial filing of the summary judgment motion, filed on July 12, 1991. There is no dispute that taken together, the TRSOF and the TSOF satisfy the *Celotex* requirement of identifying those portions of the pleadings which Texas Eastern believes demonstrate the absence or existence of a genuine issue of material fact.

In light of the voluminous filings in this case, I conclude that while it would have

been more appropriate for Texas Eastern to have filed its statement of facts with its summary judgment motion, the Carriers have not been significantly prejudiced by Texas Eastern's late filing. All of the filings in this case were made pursuant to a Case Management Order, which clearly sets forth the timetable for opposition and reply briefs. Texas Eastern filed its statement and response well within the allowable time. For these reasons, I will consider both the TRSOF and the TSOF in the disposition of these motions.[15]

The second issue raised by the Carriers in their reply brief is the sufficiency of the record evidence upon which Texas Eastern relies to "dispute" many of the Carriers' factual assertions. Having reviewed Texas Eastern's responses, I conclude that the Carriers have raised numerous meritorious objections. Because many of the factual assertions are immaterial to my decision on the pending motions, I will not restate each of these objections in detail.

In the factual section which follows, I have set forth what I conclude to be the "undisputed" facts. These facts will be relied upon in deciding the cross-motions for summary judgment. Many of the facts have been admitted by Texas Eastern or by the Carriers. Some of the facts, however, have been disputed by the parties, but after a thorough investigation of the record evidence, the disputes have been found not to be "genuine." The facts below reflect many of the Carriers' above-mentioned objections. In many instances, but not all, I will discuss the reasons for my conclusion that no genuine dispute exists.

### B. *Factual Background* [16]

#### 1. *Texas Eastern's Corporate History*

Texas Eastern was incorporated in Delaware on January 30, 1947. In that year, it

---

**15.** The TSOF should not be confused with Texas Eastern's "Statement of General Background Facts" which I have previously concluded cannot be relied on because it lacks sufficient references to record evidence. (*See supra* pp. 1303–1304.)

**16.** In each paragraph of the TRSOF, Texas Eastern repeated the Carriers' original allegation as it

appeared in the SOF, and then stated its response. My citations to the TRSOF refer not to the Carriers' statements, but to Texas Eastern's. For example, if Texas Eastern did not dispute a proposition, or disputed it on different grounds,

**1310**

acquired the War Emergency Pipeline from the United States Government and converted it from liquid service to a natural gas pipeline system. (TRSOF ¶ 1.)

The Texas Eastern Corporation was incorporated in Delaware in 1976. It was incorporated as the parent holding company of Texas Eastern and other subsidiaries. In 1989, the Texas Eastern Corporation was acquired by Panhandle Eastern Corporation. The real party in interest in this litigation is Texas Eastern, not its parent holding company or any of the unidentified subsidiaries, and I will refer solely to Texas Eastern in this opinion.

By 1987, Texas Eastern operated a natural gas transmission network which included as its primary operation a pipeline approximately 9,500 miles in length from supply areas in Texas, Louisiana, and the Gulf of Mexico to the New York Metropolitan area.[17] (TRSOF ¶ 5.) Approximately 65 stations at various locations along the pipeline system used turbine-driven centrifugal compressors to increase the pressure of the natural gas being transmitted. (TRSOF ¶ 2.)

### 2. Texas Eastern's Operational History

In late 1957 or early 1958, Texas Eastern identified a problem with the lubricating oil used at its centrifugal compressor stations. It was suspected that the extreme heat of the turbines caused the oil to ignite; the ignitions caused a number of dangerous fires. (TSOF ¶¶ 4, 5.) In response to the fires, Texas Eastern conducted an extensive study of commercially available fire-resistant lubricants and, in 1958, selected Monsanto Chemical Corporation's (Monsanto) OS–81 [18] as a replacement. (TRSOF ¶¶ 6, 8.) The lubricant (apparently almost all PCB) had PCB concentrations of approximately 88%–90%. (TRSOF ¶ 13.)

Texas Eastern immediately began installing the new lubricant in some of its turbine-driven centrifugal compressors. (TRSOF ¶¶ 17, 18.) By 1970, Texas Eastern had installed the lubricant in 24 compressor units, at 19 compressor stations, located in approximately 8 or 9 states. (TRSOF ¶ 19.)

Texas Eastern used the Monsanto lubricant in its centrifugal compressors as both a lubricant and a seal oil. (TRSOF ¶ 31.) As a seal oil, the lubricant provided a pressurized seal against the natural gas compressed inside the compressor cases, which prevented the natural gas from escaping into the atmosphere. (TRSOF ¶ 32.) The centrifugal compressors were designed as "closed systems" and should therefore have operated without a noticeable leakage of oil. (TRSOF ¶ 35; TSOF ¶¶ 31–33.) Texas Eastern was aware, however, that the lubricating oil was "used" or "consumed" by the compressors, thereby requiring a routine replacement of the oil. (TRSOF ¶¶ 37, 38.) Texas Eastern prepared and maintained a "Compressor Department Annual Report" which detailed the amount of lubricant consumption at each compressor station. (TRSOF ¶ 37.) [19]

---

a citation to that paragraph in the TRSOF refers to Texas Eastern's acceptance of the proposition. Sometimes Texas Eastern claims to have disputed a proposition, but I find that the only dispute raised by Texas Eastern is immaterial. In that situation, I have treated the fact as undisputed by Texas Eastern, and have therefore included a TRSOF cite as an admission by Texas Eastern that the fact is indeed undisputed. On certain occasions, when Texas Eastern's dispute is material, I have cited to the TRSOF for the text of Texas Eastern's response itself. When I wish to cite to a fact alleged to be undisputed by the Carriers, but materially disputed by Texas Eastern, I have cited to the SOF instead. Likewise, when I wish to cite to a fact alleged to be undisputed by Texas Eastern, I have cited to the TSOF. In short, any citation beginning with "T" can be understood to mean that Texas Eastern has agreed to, or has not materially disputed, the proposition stated.

**17.** The pipeline passes through, among others, the following states: Texas, Louisiana, Mississippi, Arkansas, Alabama, Tennessee, Kentucky, Missouri, Illinois, Indiana, Ohio, West Virginia, Pennsylvania, Maryland, and New Jersey. (TE's First Am.Compl. at ¶ 39.)

**18.** The lubricant purchased from Monsanto has been known in its various formulations as OS–81 (beginning in 1958), MCS–153 (beginning in 1961), and Turbinol–153 (beginning in 1970). (TRSOF ¶ 13.) All appear to have contained high PCB concentrations.

**19.** The compressors consumed a substantial amount of lubricant. For example, of the 210,713 gallons of lubricant purchased from Monsanto, Texas Eastern's compressors consumed 175,856 gallons of the lubricant from 1958 to 1977. (TRSOF ¶ 39.)

The parties vigorously dispute the reason for the large consumption of the lubricant oil. Texas Eastern contends that many senior employees believed that most of the lost lubricant was simply vaporized by the extreme heat of the turbine-driven centrifugal compressors, in the same way that oil is consumed in an automobile. (TSOF ¶ 31.) The Carriers concede that some of Texas Eastern's employees may have believed that lubricant was being consumed in this manner. However, the Carriers have produced evidence which establishes that key Texas Eastern personnel were aware that the compressor system was designed in a manner that all but guaranteed that some lubricant would leak out of the compressors, come into contact with the natural gas, and enter into the pipeline.[20]

For example, Texas Eastern's Superintendent of Compressor Stations, E.C. Riall, testified that he was aware, at the time he was working for Texas Eastern, that the passage of some amount of lubricant into the compressor case was "an inherent design of centrifugal compressors." (Dep. of Eugene Riall, App. 56 at 186). *See also* App. 14 at 358–59 (deposition testimony of Texas Eastern's Assistant Chief Engineer, Conrad W. Marvin, stating that Texas Eastern understood that the seal oil leaked as early as 1949).

There were occasional accidents and malfunctions involving the compressor unit systems, which explains how some of the lubricant was lost; the vaporizing of lubricant provides a second potential explanation. These explanations are insufficient, however, to explain the disappearance of the majority of the used lubricant, and Texas Eastern has offered insufficient evidence to refute the testimony of its own employees. Those Texas Eastern employees who testified that they understood that the seal oil system was not working perfectly and that a significant

amount of lubricant was thereby lost, must therefore be believed.[21]

Texas Eastern's contention that the compressor seal systems were designed as "closed systems" with no leakage or "consumption" of lubricant oil is immaterial because there is no credible evidence which tends to establish that all Texas Eastern employees were working under this assumption or, more importantly, that this assumption was correct. Texas Eastern's reliance on the fact that its senior management was unaware of the extent of the seal oil failures, and the amount of oil which leaked into the pipeline, is equally unavailing. Texas Eastern's managers, charged with running the individual compressor stations, knew that lubricant oil was escaping down the pipeline and Texas Eastern is therefore charged with that knowledge. Texas Eastern cannot hide behind its senior management's ignorance of the basic aspects of its compressor stations' daily operations. For all of these reasons, there is no material dispute that Texas Eastern was aware, for many years, that some of the lubricant oil was escaping from the turbine-compressors and entering the natural gas pipeline.

The centrifugal compressors operating on Texas Eastern's natural gas pipeline were routinely started-up and shut-down during the course of normal pipeline operation. (TRSOF ¶ 48.) During start-up, the compressor was purged of air and pressurized, and natural gas present in the compressor case was vented to the atmosphere through the compressor vent stacks. (TRSOF ¶ 49.) During shut-down, the compressor case was depressurized and the natural gas within the compressor case was again vented to the atmosphere. (TRSOF ¶ 50.)

During start-up, any lubricant present in the compressor case was vented into the environment from the compressor vent

**20.** Texas Eastern admits that there was a large leakage of lubricant from the compressor units into the natural gas pipeline. The only material dispute concerns when Texas Eastern became aware of this fact.

**21.** Further supporting this conclusion is the fact that Texas Eastern tested at least one epoxy, used to coat the inside of the natural gas pipeline, for

compatibility with OS–81, and replaced the "O" rings in its compressor units with ones compatible with the Monsanto lubricant. (TRSOF ¶¶ 46, 47.) Texas Eastern admits to taking these measures as a precaution to guard against the possibility that lubricant would escape into the pipeline. (TRSOF ¶ 47.)

stacks along with the air and natural gas. During shut-down, any lubricant present in the compressor case was similarly vented along with the natural gas. Although the parties disagree as to whether Texas Eastern was aware at the times relevant to this litigation that lubricant was being vented and lost into the environment in this manner, they do agree that at least some of Texas Eastern's operational employees understood that lubricant was sometimes being vented into the air (and settling on the ground) along with the natural gas. (TRSOF ¶ 54.)

Pipeline liquids, consisting of hydrocarbon distillates [22] and water, routinely entered Texas Eastern's natural gas pipeline. (TRSOF ¶ 57.) The lubricant that escaped from the compressor cases and entered the pipeline mixed with those fluids already present in the pipeline. From the time it began operations in 1947, Texas Eastern used its compressor stations as sites for the collection, removal, storage, and disposal of those pipeline liquids.[23] (TRSOF ¶ 56.) Texas Eastern primarily used two methods for the removal of pipeline liquids: gas/liquid separation equipment (scrubbers and strainers) and cylindrical devices known as "scrapers" or "pigs." [24] (TRSOF ¶ 63.)

The liquids accumulated by scrubbers, strainers, scrapers, and pigs were routinely [25]

discharged into unlined earthen pits at the compressor stations.[26] (TRSOF ¶¶ 71, 77; TSOF ¶ 74.) The PCB-based lubricant, carried along in the pipeline liquids, was thereby discharged into the unlined earthen pits. (TRSOF ¶ 73.)

Texas Eastern used its pits to collect, contain, and prevent the escape of pipeline liquids to other areas including neighboring third-party property. (TSOF ¶ 74.) The pipeline liquids were generally burned, but in some cases were hauled away, or were applied by Texas Eastern employees to kill weeds or control dust on dirt roads.[27] (TSOF ¶ 75; TRSOF ¶¶ 84–86, 101, 106.) Texas Eastern personnel understood that some of the liquids were absorbed into the ground, but it is disputed whether this was an intended method of disposal or simply a fact about which Texas Eastern was aware. (*See* App. 113 at 002021610; App. 118 at 002021192; App. 119 at 002021024—All three Effluent Discharge Survey reports indicating that absorption of pipeline liquids was known to occur.)

The pits proved to be imperfect containment vessels, however, and during the period between 1958 and 1976, Texas Eastern was aware of instances where pipeline liquids escaped from the pits and migrated onto other

22. Pipeline distillates can be harmful to the human body and to vegetation depending on the nature and extent of the exposure. It was therefore undesirable to allow the distillates to come into contact with property on which vegetation growth was desirable. In this regard, Texas Eastern personnel considered pipeline liquids to be pollutants if they escaped in undesirable quantities from their containment pits.

23. This was no small task. Texas Eastern removed twenty million gallons of liquid from its pipeline during the thirty year period 1957 through 1987. (TRSOF ¶ 62.)

24. Pigs are shafts with attached brushes and/or rubber cups that, when inserted into a pipeline segment, make contact with the pipeline wall, and push the liquids forward to collection areas in the pipeline.

25. There is some dispute as to whether Texas Eastern's personnel "routinely" dumped pipeline liquids within the scope of their employment or merely dumped the liquids "as needed." This is a distinction without a difference. It is clearly

established that Texas Eastern personnel repeatedly dumped pipeline liquids into the unlined earthen pits whenever the responsibilities of their jobs required such dumping.

26. The pits were generally about ten to thirty feet in diameter on isolated portions of the compressor station sites. The pits were typically lined with clay or dug in hard, compact, nonporous ground. (TSOF ¶ 77.) The pits were ordinarily surrounded by an earthen berm, made from the material excavated in the process of digging the pit, that served as a precaution against accidental overflow. (TSOF ¶ 78.)

27. Although Texas Eastern disputes the Carriers' contention that Texas Eastern "disposed" of its pipeline liquids into the pits, there is no doubt that in most instances Texas Eastern intended the pits to be the pipeline liquids' final resting place. For example, at some compressor station locations, the earthen pits had built-in pilot lights that automatically ignited any incoming liquids. (TSOF ¶ 79.) No evidence has been produced to explain what saleable or other value existed for the burnt remains of Texas Eastern's pipeline liquids.

areas of Texas Eastern's property or the property owned by neighboring third parties. (SOF ¶¶ 114–152; TSOF ¶¶ 52–62.) In 1973, Texas Eastern voluntarily conducted an "Effluent Discharge Survey" of all compressor station facilities. (TRSOF ¶ 132.) The purpose of the study was to identify potential problem areas by soliciting information from each compressor station location that had, or may have had, effluent discharges, particularly those that may have had liquids drain off Texas Eastern's own property. (TRSOF ¶ 133.)

The survey results indicated that some of the lubricant used in the compressors was migrating from Texas Eastern's property to the property of third parties. (TRSOF ¶¶ 135, 137, 143–45.) These instances were considered isolated occurrences and were generally remedied once Texas Eastern was made aware of their existence. The survey also establishes that Texas Eastern was fully aware of both potential and actual occurrences of off-site migration of pipeline liquids, and once Texas Eastern understood that the pipeline liquids contained PCBs, Texas Eastern should have been aware of the potential for off-site PCB migration.

Although Texas Eastern personnel were warned of the potential for overflow from the pits due to rainfall, and were instructed to guard against it, Texas Eastern was aware that overflows occasionally occurred. (TRSOF ¶ 147.) Texas Eastern was also aware of the potential for movement of the pipeline liquids from the compressor stations to other property from various sources, including the earthen pits and the pig receivers. (TRSOF ¶ 151.) In 1975, Texas Eastern drafted a "Water Pollution Prevention and Control Plan" for the purpose of controlling this undesirable spread of pipeline liquids. (TRSOF ¶¶ 150–51, 231–32.)

### 3. Texas Eastern's Knowledge of PCBs in its Lubricant

In February 1970, Monsanto sent correspondence to its customers alerting them to an increasing concern over the adverse environmental impact of Monsanto's PCB-containing products and Monsanto's intention to reformulate those products. (SOF ¶ 183.)

Monsanto recommended that PCBs no longer be used in applications which would lead either directly or indirectly to the contamination of food and water supplies for humans or animals. (TRSOF ¶ 184; TSOF ¶ 12.) Following its own advice, Monsanto terminated its sale of certain products containing PCBs to certain of its customers.

After informing its customers of the decision to terminate the sale of certain products, however, Monsanto published a promotional booklet about Turbinol–153, stating that it had a history of safe use as both a lubricant and control fluid in commercial pipeline gas turbines. (TSOF ¶ 14; App. 27 at 2.) Texas Eastern was aware of this booklet. (TSOF ¶ 14.) On January 7, 1972, however, Monsanto proposed that Texas Eastern sign a hold harmless agreement promising to indemnify Monsanto for any future liability arising out of the sale of Turbinol–153 after January 15, 1972. (TRSOF ¶ 187; App. 186.) Monsanto further informed Texas Eastern that because Turbinol contained "major amounts" of certain polychlorinated biphenyl products (PCBs), it would no longer sell any Turbinol to Texas Eastern after June 30, 1972. (TRSOF ¶ 189; App. 186.)

Texas Eastern elected not to sign the hold harmless agreement, but it did attempt to purchase Monsanto's remaining stock of lubricant oil available for sale before the January 15, 1972 deadline. (App. 190.) Monsanto apparently refused to sell Texas Eastern any more PCB-based lubricant. (*Id.*) In May 1972, Texas Eastern began a program referred to as the "phase-out" or "change-out" program to replace the PCB-based lubricant with non-PCB-based oil. (TRSOF ¶ 199.)

### 4. The Change–Out Program

Because Turbinol–153 and the replacement oil were compatible, the change-out program did not necessarily require Texas Eastern to flush the turbine driven compressors of the PCB-based lubricant and replace it with non-PCB-based oil. (App. 194 at 3.) Complete flushing was advisable from an ecological standpoint, however, presumably because anything less would have resulted in Texas Eastern's continued use of a lubricant con-

taining PCBs. On April 12, 1972, Texas Eastern chose the replacement for Monsanto's Turbinol–153. (App. 214 at 2.) In May 1972, Texas Eastern began installation of the replacement lubricant. (*Id.*)[28]

The speed with which Texas Eastern conducted its change-out program is a subject of dispute between the parties. The Carriers contend that the speed depended upon the rate of consumption of the PCB-based oil in the turbine compressor units. (SOF ¶ 203.) Texas Eastern responds that it intended to convert its compressors to non-PCB-based lubricants as quickly as possible, but that it was restrained by the technical difficulty of the change-out and the difficulty of finding an appropriate replacement lubricant. (TSOF ¶¶ 21–26.)

Ultimately, the rate at which Texas Eastern completed the change-out probably depended on all of these factors. There can be no dispute, however, that Texas Eastern was, at least initially, concerned with utilizing as much of its remaining inventory of Turbinol–153 as it could. (Dep. of Walter Woods, App. 42 at 754–59; App. 195 at 010028581.) To achieve this end, Texas Eastern made its change-out decisions based, at least in part, on the lubricant consumption rates of various compressor stations—choosing to change those compressor stations with higher consumption rates last. (App. 203; Dep. of Eugene Riall, App. 56 at 109–12; App. 200.)

As early as August 1972, Texas Eastern was aware of evidence indicating that a break-down product of the Monsanto Oil was in the compressor units and the pipeline, contaminating the non-PCB-based replacement lubricant. (App. 213.) In July 1976, Texas Eastern's testing confirmed that some of the replacement lubricant was contaminated with PCBs. (TRSOF ¶ 223.) In the same year, one Texas Eastern employee wrote a memorandum in which he indicated that he understood that using the PCB lubricant meant that the oil was being spread throughout the entire pipeline system. (App. 211.) This evidence indicates that Texas Eastern

was on notice, during this time period, that the change-out program had not completely solved its PCB lubricant problems.

Throughout the change-out program, Texas Eastern continued to dump pipeline liquids into the unlined earthen pits at its compressor stations. Texas Eastern was aware that the amount of liquids accumulating in its pits was increasing and raised some concerns as to whether the pits were adequate containment vessels. (App. 221.) One explanation for this increase is that Texas Eastern's management discouraged burning in the disposal pits as early as 1972, (App. 220 at 010020659), and implemented a formal "no burn" policy in 1975. (App. 221; TRSOF ¶ 235.) This required Texas Eastern to rely more heavily on evaporation and siphoning to reduce the amount of liquid in the pits. (App. 221)

By July 11, 1975, Texas Eastern's Operating Department abandoned the policy of disposing pipeline liquids into the unlined pits in order to comply with environmental regulations being established by the various states in which Texas Eastern operated. (App. 223.) Subsequently, Texas Eastern commenced a program to install diffuser tanks at the compressor stations to replace the unlined earthen pits as the receptacles for the pipeline liquids. The replacement program was substantially completed by 1985. (TRSOF ¶ 237.) After a pit was replaced by a diffuser tank, the pit was backfilled by pushing in the surrounding berm with a bulldozer and grading the area to its natural contours. (App. 165 at 12.)

### 5. *Tracking Environmental Legislation*

In the early 1970s, PCBs became generally known as a potential hazard to human health and the environment. Not surprisingly, Congress and numerous state legislatures moved to regulate the uses of the toxic substance. Texas Eastern was aware of this legislative activity. (TRSOF ¶¶ 241–47.) Acting pursuant to the authority granted it by the Toxic

---

**28.** Once removed from a compressor unit, the PCB-based oil was used for "make-up" (replacement) in those units which continued to use the PCB-based lubricant. (TSOF ¶ 24.) Three units were changed out in 1972, and an additional three units were changed out in 1973. (TSOF ¶¶ 24, 25.)

Substances Control Act (TSCA),[29] EPA promulgated a final rule on May 31, 1979, which, *inter alia,* prohibited the use of PCBs in concentrations above 50 parts per million (ppm), except in totally enclosed systems. (App. 279, 44 Fed.Reg. 31544.) The rule, however, authorized the continued use of PCBs above the 50 ppm limit in natural gas pipeline compressors until May 1, 1980, in systems which were not totally enclosed. (App. 279, 44 Fed.Reg. 31551.)

In September 1978, Texas Eastern understood that it was impermissible to dispose of liquid mixtures of PCBs in excess of 500 ppm in landfills. (App. 236.) The only permissible disposal method was to incinerate the waste in an EPA approved incineration facility. (TRSOF ¶ 250; App. 236.) Employees at Texas Eastern were also aware of EPA requirements regarding PCB storage facilities. (TRSOF ¶ 254; App. 237.) With these rules in mind, Texas Eastern constructed and used storage buildings, at various compressor stations, to store drums containing the PCB-based lubricant. (TRSOF ¶ 255.) Due to the danger of storing large amounts of petroleum oil on its property, Texas Eastern advised its first-party property insurers, in December 1978, about the storage buildings, but did not give notice to its third-party liability carriers. (App. 242; App. 245; TRSOF ¶ 258.)

### 6. *PCB Contamination in the Natural Gas Pipeline*

In January 1981, Texas Eastern learned that PCBs were detected in a Long Island residential gas meter. (TRSOF ¶ 263.) A subsequent investigation by Texas Eastern, in a 36 location sampling program, conclusively revealed that Texas Eastern's pipeline liquids were contaminated with PCBs. (App. 276.) The Brooklyn Union Gas Company informed Texas Eastern that it would seek, from Texas Eastern, reimbursement of the costs incurred for cleaning up the PCB contamination, (App. 267), and Texas Eastern provided notice of these claims to Aegis, its excess liability carrier, (TApp. 148), but not to its other third-party liability insurance carriers. (TRSOF ¶ 266.)

As a result of Texas Eastern's testing and the discovery of PCBs in its pipeline liquids, Texas Eastern met with EPA officials, on March 27, 1981, to discuss Texas Eastern's remedial plans. (App. 277.) According to a Texas Eastern internal memorandum, Texas Eastern's Vice President of Operations, F.L. Cohagan, told EPA's John Seitz that Texas Eastern planned to test all of its pipeline liquids for PCBs before disposal, and that Texas Eastern would use accumulator tanks (instead of open pits) for collecting liquids at the compressor stations. (*Id.*) J. Clifton Williams, Texas Eastern's Director of Technical Services, testified at his deposition that Mr. Cohagan also explained to Mr. Seitz that the pits would continue to be used until all of the accumulator tanks had been installed. (Dep. of J. Clifton Williams, TApp. 7 at 644–48, 659–60.)

By letter dated May 27, 1981, EPA informed Texas Eastern that it was establishing a four-part program to reduce the risk from PCBs in gas pipeline systems: (1) to ensure the proper handling of PCBs removed from the pipeline, (2) to obtain information on ways to prevent further movement of PCBs into other systems, (3) to implement the best option identified in step two, and (4) to obtain information on the possible methods for removing any remaining PCBs from the system. (App. 282.) Subsequently, Texas Eastern sent its response to EPA's letter outlining its proposed plan for handling the PCB liquids in its pipeline. (App. 281.) Texas Eastern and EPA agreed upon a plan for the cleanup in late 1981 or early 1982. (TRSOF ¶ 284.)

### 7. *PCB Cleanup*

On July 23, 1982, EPA instituted an enforcement proceeding against Texas Eastern pursuant to the Toxic Substances Control Act alleging that Texas Eastern was using PCBs in violation of 15 U.S.C. § 2614(1) & 40 C.F.R. § 761.20(a). (App. 287.) The gravamen of the violation was Texas Eastern's continued use of compressor fluids containing PCB concentrations exceeding 50 ppm in its turbine driven compressors. (*Id.*) On Au-

**29.** 15 U.S.C. § 2601 *et seq.*

gust 3, 1982, Texas Eastern entered into a Consent Order, Consent Agreement, and Compliance Schedule with EPA addressing the use of lubricant contaminated with PCBs in its pipeline system. (App. 288; App. 289; App. 290.) Texas Eastern did not provide notice of these activities to its third-party liability carriers.

The agreements, both formal and informal, entered into by Texas Eastern and EPA did not cover the remediation of the unlined earthen pits. Texas Eastern does not dispute the fact that at some of its compressor stations, Texas Eastern continued to use the pits to "dispose," or at a minimum, to "temporarily store," (TSOF ¶ 86), pipeline liquids known by Texas Eastern to be contaminated with residual PCBs. In fact, Texas Eastern admits that it was necessary to continue using the pits until appropriate accumulator tanks could be installed at all of the compressor station sites known to contain contaminated lubricant, pipeline liquids, or both. (Dep. of J. Clifton Williams, TApp. 7 at 644–48, 659–60.)

For example, as of August 27, 1982, Texas Eastern's St. Francisville, Louisiana station received pipeline liquids into its pits containing PCBs in a concentration ranging from 7 ppm to 2700 ppm. (App. 293.) In addition, sampling in pits on its Transwestern Pipeline System (a wholly owned subsidiary of Texas Eastern) in Corona, New Mexico made Texas Eastern aware that PCBs were present at those sites and had migrated into the soil from an unlined earthen pit. (TRSOF ¶ 298.) Although Texas Eastern contends that it was not aware of any off-site migration of the PCBs, the estimated cost of "decontamination" at the Corona compressor station alone was in excess of $500,000. (App. 298.) After Texas Eastern attempted to remediate the Corona site in 1983, it was apparent to Texas Eastern employees responsible for the remediation attempt that the PCBs had migrated from the lubricant into the sides and bottom of the disposal pit. (TRSOF ¶ 298.)

As Texas Eastern gradually stopped discharging pipeline liquids into its pits, it routinely backfilled them with earthen fill. (App. 165 at 12.) At Texas Eastern's St. Francisville, Louisiana; Union Church, Mississippi; and Clinton, Mississippi stations Texas Eastern closed the pits by (1) skimming the oil off the surface of the pipeline liquids and carting it away for incineration, (2) draining the water out of the pit and filtering it for low level PCB contamination, (3) solidifying PCB sludge by mixing it with fly-ash, and (4) installing a plastic cover to prevent any percolation through the solidified mass. (App. 305.) The pits were then marked so that they could be easily located at a later date. (App. 2 at 88–89.)

On November 29, 1984, EPA Region 9 issued a civil administrative complaint against the Transwestern Pipeline Company (Transwestern) for improperly marking, storing, and disposing of PCB-laden waste oils into unlined earthen pits in Arizona. (App. 307.) At this time, Texas Eastern was completing, or had completed, the sale of Transwestern to Houston Natural Gas (HNG). (Dep. of Bolivar Andrews, App. 309 at 159–61.) In April 1985, Transwestern entered into a Consent Agreement and Final Order with EPA. (App. 306.) Around this time, Texas Eastern entered into an agreement with HNG to amend the contract of sale so that Texas Eastern would bear some financial responsibility for the costs of remediating PCBs from pits in the Transwestern System. (App. 311.) Texas Eastern did not provide notice of this agreement to its third-party liability carriers.

As a result of the Transwestern Complaint, Texas Eastern undertook a survey of its pit use along its entire pipeline system. (TRSOF ¶ 312.) In August 1985, EPA issued a Notice of Non–Compliance to Texas Eastern's Delmont, Pennsylvania compressor station for violations of TSCA regulations concerning the marking, storage, disposal, and record keeping of PCBs. (App. 317.) A subsequent meeting was held with EPA on August 29, 1985, and Texas Eastern advised EPA that it was preparing to close the earthen pits formerly used to contain PCB-laden pipeline liquids at stations where the pits had been replaced by liquid separators and/or accumulator bottles. (App. 319.) EPA advised Texas Eastern that it should submit information regarding the location, site, predominant usage, current status, and closure

date of some of the pits. (TRSOF ¶ 320.) Presumably, Texas Eastern then understood that it could no longer use the pits to hold, even temporarily, any pipeline liquids containing more than 50 ppm of PCBs.

Texas Eastern admits that it realized, by late 1985, that it would have to formulate a remediation plan for the unlined earthen pits—something it had previously believed to be unnecessary. (Dep. of Howard Homeyer, App. 315 at 134.) To facilitate the creation of the plan, Texas Eastern hired Roy F. Weston, Inc. (Weston), a national environmental consulting firm, to determine the nature and extent of the PCB contamination around the pits. (App. 323.) Simultaneously, Henry H. King, President of Texas Eastern, consulted with Steve Mulliken, Director of Texas Eastern's Risk Management Department, regarding the possibility of insurance coverage for the earthen pit remediation. Mr. King reached the initial conclusion that CGL insurance policies would not cover the estimated 40 to 50 million dollars that the remediation program would cost. (TRSOF ¶ 325; App. 324; Dep. of Henry King, App. 318 at 121–22.)

In November 1985, Texas Eastern employees met with employees of Weston to discuss Weston's work schedule. (TRSOF ¶ 333.) At this time in late 1985, the manager of Texas Eastern's Environmental Protection Department, Robert Salzer, understood that many of the pits and landfills at the compressor stations were not in compliance with federal regulations regarding the storage and disposal of PCBs. (Dep. of Robert Salzer, App. 105 at 49–50, 453–63.)

### 8. The Results of Weston's Survey

In January 1986, Weston and Texas Eastern held a progress meeting to discuss the results of Weston's initial sampling of six compressor station sites.[30] (App. 340.) On February 18, 1986, Weston provided Texas Eastern with a draft report entitled "Compressor Station Disposal Pit Investigation." (App. 341.) This report included the results of Weston's initial six-site survey. (Id.) Weston concluded that

[b]orings drilled adjacent to but outside of the pit perimeters indicated very low to no PCB content, and, thus, minimal migration of PCBs from the pits. However, the PCB presence in the drainage swales and surface water bodies indicates that the potential for off-site migration exists.

(App. 341 at 001363937.) The report did not, however, conclusively find evidence of off-site migration although reasonable minds might differ about this characterization of the report. (Dep. of Bradford Cushing, TApp. 106 at 294, 374–75, 539, 670–71.)

In the months following the delivery of Weston's initial report, Texas Eastern's senior management received a number of general briefings concerning the PCB "situation." Examples include (1) a February 27, 1986 Board of Directors meeting at the Ocean Reef Club in Key Largo, Florida, (App. 343), (2) a February 28, 1986 Public Policy Committee meeting, (Dep. of Fred Wichlep, App. 344 at 213–18), and (3) a March 5, 1986 meeting of the Executive Committee of the Board of Directors, (App. 345). In late April 1986, Texas Eastern's senior management was briefed about the estimated cost and duration of a pit remediation effort. (App. 347; App. 348.)

On April 1, 1986, EPA requested additional information from Texas Eastern regarding its use of earthen pits located at various compressor stations. (TRSOF ¶ 345.) Texas Eastern responded on April 25, 1986, and provided EPA with a final version of Weston's pilot program report (six-site survey) dated April 21, 1986. (TRSOF ¶ 348.) In Texas Eastern's April 25, 1986 letter to EPA, it admitted that it had used the earthen pits for the collection of pipeline liquids at certain compressor stations until the fall of 1985. (TRSOF ¶ 349.)

Texas Eastern subsequently met with EPA officials on April 30, 1986, to discuss the status of Weston's pit investigation, and to discuss a draft "action plan" prepared by Texas Eastern for the remediation of the

---

**30.** The survey was conducted at six compressor station sites and included eight pits. The parties have refereed to the study as both the "six" and the "eight" site survey, and I will refer to it as the "six-site survey."

compressor station sites. (TRSOF. ¶ 350.) Texas Eastern represented to EPA officials that it would continue its efforts to identify and control PCBs found at the Texas Eastern sites which may have been exposed to PCBs. (App. 350.) Texas Eastern also expressed a desire to reach an agreement on a remediation plan, possibly in the form of a consent decree, (App. 76), and criteria for determining how clean the Texas Eastern sites would have to be after remediation was completed. (App. 350; App. 351.)

EPA officials, specifically Michael Wood, were clearly displeased with Texas Eastern's continued use of its earthen pits after 1981, the date Texas Eastern claims that it first learned its pipeline liquids were contaminated with PCBs. (App. 350; App. 353.) Texas Eastern explained that the logistics of replacing the earthen pits required a gradual phaseout, and made it nearly impossible to cease all use of the pits at that time. EPA indicated to Texas Eastern that some of the latter's activities, specifically the closing of the pits at its St. Francisville, Union Church, and Clinton compressor stations, by solidifying the PCB liquids with fly ash, (TRSOF ¶ 353), were almost certainly violations of TSCA.

In light of these discussions with EPA, Texas Eastern requested that Weston enlarge its study to include 54 additional compressor station sites (54–site survey). (TRSOF ¶ 354.) During the course of the 54–site survey, Weston communicated some of its findings regarding on-site contamination to some of Texas Eastern's employees, although the specifics of these conversations are not known. (App. 3 at No. 411.) In December 1986, Texas Eastern received a preliminary report of the results of Weston's 54–site survey. (App. 3 at No. 432.) Texas Eastern's attorney admitted at oral argument that the survey gave Texas Eastern reason to believe that off-site contamination had indeed occurred. (Tr. of Hr'g on Mot. for Summ. J., January 13, 1992 at 93–94.) A copy of this initial report was forwarded to EPA in December 1986. (App. 3 at No. 437.) Texas Eastern presented the final results from Weston's 54–site survey to EPA in March 1987. (TRSOF ¶ 391.)

In July 1986, Texas Eastern's Risk Management Department (which included its Insurance Department) was aware of the PCB presence in or on soil located at Texas Eastern's compressor station sites. (Dep. of Stephen Mulliken, App. 261 at 284–87.) At this time, Texas Eastern's Insurance Department requested that Querbes & Nelson, Texas Eastern's insurance brokers, compile a list of all CGL policies issued beginning in 1956. (Dep. of James Farley, App. 359 at 706.) The list was received by the Insurance Department at the end of July or early August 1986. (Id.) Texas Eastern received information regarding claim notification requirements under these policies on or about December 9, 1986. (TRSOF ¶¶ 381, 383.)

On November 5, 1986, Texas Eastern representatives met with representatives from EPA and the Department of Justice to discuss PCB contamination at the compressor station sites. At the conclusion of the meeting, all parties understood that a judicially enforceable agreement would have to be entered into concerning the pit remediation. (TRSOF ¶ 368.)

### 9. Texas Eastern's Problems Become Public Knowledge

On February 21, 1987, several newspaper accounts of Texas Eastern's problems and its discussions with EPA were published. (TRSOF ¶ 387.) Prior to this time, Texas Eastern had not given notice to its insurers that it had entered into negotiations with EPA concerning the PCBs. (SOF ¶ 388.) During meetings held in London, England, in February 1987, concerning the renewal of Texas Eastern's liability insurance, Texas Eastern advised the London Underwriters that it had a PCB problem and that it was not making a claim against the insurers at the time "because the occurrences being investigated by Weston had not yet given rise to suits or claims against Texas Eastern," (App. 4 at 39. See also Dep. of David Fenton, App. 135 at 76–82), and because Texas Eastern believed that no third parties were involved. (Dep. of Stephen Mulliken, TApp. 2 at 304.) Texas Eastern discussed similar issues with representatives of its other lower-level liability carriers in March 1987. (App.

4 at 39.) On March 17, 1987, representatives of Texas Eastern testified before the United States Senate Subcommittee on Superfund and Environmental Oversight concerning the PCB contamination of its earthen pits. (TRSOF ¶ 397; App. 2 at 2.)

### 10. Texas Eastern's Negotiations with EPA

On April 14, 1987, Texas Eastern met with EPA representatives for the purpose of outlining the framework within which a Consent Decree would be negotiated covering the cleanup of Texas Eastern's compressor station sites. (App. 381.) On August 18, 1987, in a letter to David Batson, EPA's chief negotiator, Carol Dinkins, Texas Eastern's attorney, outlined certain proposals made by Texas Eastern on which Ms. Dinkins believed an agreement had been reached. (App. 382.) By the middle of October 1987, both Texas Eastern and EPA came to an "Agreement in Principle" which the parties formally executed in writing in November 1987.

Ultimately, EPA and Texas Eastern entered into a consent decree in an action entitled *United States of America v. Texas Eastern Transmission Corp.* in June 1988. (TRSOF ¶ 411; App. 385.) The Complaint and the Consent Decree were both filed the same day. Pursuant to the Consent Decree, Texas Eastern was obligated to clean up property which it had contaminated with PCBs. All of the property was either owned or operated by Texas Eastern, and none of the property was owned by third parties. (TRSOF ¶ 499.) The Consent Decree required continued monitoring of groundwater under Texas Eastern's land, but did not specifically require or provide for remediation of any groundwater. Although Texas Eastern did not admit liability, it did agree to pay a civil penalty in the amount of $15 million. (App. 385 at 11.) Texas Eastern also agreed to reimburse EPA for costs already expended up to $1.5 million. The estimated total cost of the cleanup is presently in excess of $750 million.

Additionally, in April 1987, Texas Eastern entered into a Consent Decree with the Pennsylvania Department of Environmental Resources (PaDER) wherein Texas Eastern agreed to test soil and groundwater for possible PCB contamination and to remediate any discovered contamination. (Consent Order, App. 227C.) Subsequently, Texas Eastern also agreed to pay a penalty of $5.3 million to settle other PaDER claims that Texas Eastern had violated provisions of the Solid Waste Management Act, (35 Pa.Stat. Ann. § 6018.101 *et seq.*), and the Clean Streams Law, (35 Pa.Stat.Ann. § 691.1 *et seq.*).

Several other states initiated administrative or judicial actions against Texas Eastern alleging violations of state environmental laws, including New Jersey, Mississippi, and Kentucky. (*See* TE's First Am. Compl. ¶¶ 53–56, 65–68, 90–94; App. 227H–I; App. 227J–K; App. 227M–O.) The New Jersey action has been partially resolved, requiring Texas Eastern to pay a civil penalty in the amount of $850,000; however, issues concerning Texas Eastern's potential remediation responsibilities remain outstanding. The Mississippi and Kentucky actions have apparently been resolved by consent decrees.

Finally, as many as thirteen private third-party suits were filed against Texas Eastern alleging property and personal injury damage resulting from the PCB contamination. Only two of these complaints (the *Bondy* and *Atwood* actions) are actually involved in the present litigation, because I have denied Texas Eastern's motion for leave to amend its complaint and add the additional eleven complaints filed after the commencement of this action. (*See supra* pp. 1302–1303.) *Bondy v. Texas Eastern Transmission Corp.,* filed January 29, 1988, was terminated by summary judgment granted in favor of Texas Eastern. (TE's First Am. Compl. at ¶ 104.) *Atwood v. Texas Eastern Transmission Corp.,* filed July 1, 1989, was terminated by a settlement between the parties.[31]

---

**31.** The violations alleged in the state agency actions are in many respects duplicative of Texas Eastern's remediation responsibilities under the EPA Consent Decree. I have, therefore, focused primarily on the Federal Consent Decree in resolving these summary judgment motions. As I observed in my memorandum denying Texas Eastern's motion for leave to amend its plead-

11. *Texas Eastern's Notice to its CGL Carriers*

Texas Eastern first gave formal notice of its negotiations with EPA, and of its "claim" under the various insurance policies, to its third-party liability carriers by letter dated August 19, 1987. (TRSOF ¶ 414.) After a December 9, 1987 meeting, in Houston, between Texas Eastern and the Carriers failed to resolve important questions concerning Texas Eastern's insurance claims, F & C filed suit against Texas Eastern, and as is recounted in the "Procedural History," this multidistrict litigation resulted. According to Texas Eastern, it has continued, at least up to January 1992, to provide the Carriers with copies of all relevant documents regarding the filing and settlement of claims arising out of the PCB contamination.

In sum, Texas Eastern now seeks a declaration that all of its costs incurred to comply with the EPA Consent Decree, the various state decrees and settlements, and the various private third-party actions are covered losses under the CGL insurance policies issued by the Carriers. The Carriers seek a declaration that they are not responsible for these costs. With the undisputed facts in mind, I will now address the issues, which in my view, are at the heart of this insurance coverage dispute.

## IX. OCCURRENCE

The Carriers have moved for summary judgment on the issue of whether the PCB contamination constitutes an "occurrence" under any or all of Texas Eastern's insurance policies. The Carriers contend that Texas Eastern knew or should have known that it was polluting its own property and the property of third parties. Therefore, they argue, there was no "occurrence" pursuant to any of Texas Eastern's insurance policies because Texas Eastern "intentionally" caused all of the damage for which it is now seeking insurance coverage. Texas Eastern denies this allegation, and responds that since material factual disputes exist as to what Texas Eastern and its employees knew and intended,

summary judgment is inappropriate on this issue. For the following reasons, I agree that factual disputes exist which prevent the granting of summary judgment on the "Occurrence" issue.

### A. *The Policy Language*

■ The policies issued to Texas Eastern obligate the Carriers, in some cases, to indemnify the insured for, and in others, to pay on behalf of the insured

> sums which the insured becomes legally obligated to pay as damages because of bodily injury, personal injury or damage to or destruction of property caused by an *occurrence.*

(Ins.' Mot. Summ. J.—No Occurrence at 2) (emphasis original). The definition of an "occurrence" varies among the policies, but the Carriers admit that all of the policies provide coverage for an "accident," and none of the policies provide coverage for intentionally caused harmful acts.

### B. *Texas Law*

■ It is a fundamental principle of insurance law that insurance contracts should provide coverage only when a loss is fortuitous. R.E. Keeton & A.I. Widiss, *Insurance Law* § 5.3(a), at 475 (1988). The principle of fortuity is typically reflected in a liability policy's requirement that the insured's loss arise from an "occurrence" or an "accident." *Republic Nat'l Life Ins. Co. v. Heyward*, 536 S.W.2d 549 (Tex.1976) and *Argonaut Southwest Ins. Co. v. Maupin*, 500 S.W.2d 633 (Tex.1973) establish that Texas law is in accord with these general principles of insurance law. Under Texas law, harm which is the "natural and probable result" of intentional acts is not fortuitous and therefore is not covered by general liability insurance policies.

In *Maupin*, the insured removed some "borrow material" (sand and gravel) from the property of a third party under the mistaken belief that he had the property owners' permission to do so. The property's true own-

---

ings, the private third-party actions raise factual issues which in some cases vary significantly

from those presently involved in this case.

ers subsequently sued the insured for trespassing on the property. The insurance carrier refused to defend the insured in the suit, contending that no covered occurrence had taken place because the suit alleged an intentional act (trespass) and the policies only provided coverage for "accidents" or "occurrences." [32]

The *Maupin* court concluded that the removal of the sand and gravel was neither an accident nor an occurrence because the damage to the property was the "natural result" of the insured's intentional acts: " 'Where acts are voluntary and intentional and the injury is the natural result of the act, the result was not caused by accident even though that result may have been unexpected, unforeseen and unintended.' " *Maupin*, 500 S.W.2d at 635 (quoting *Thomason v. United States Fidelity & Guar. Co.*, 248 F.2d 417, 419 (5th Cir.1957)). That the insured was unaware of the property's true owners had no bearing on whether the trespass was caused by "accident." The insured did what he intended to do when he removed the sand and gravel from the property. The only mistake (or accident) made by the insured concerned the property's true ownership and the court concluded that the insurance policies did not provide coverage for accidents of that type. *Maupin*, 500 S.W.2d at 635.

In *Heyward*, the Texas Supreme Court again addressed the meaning of "accident," this time in the context of an accidental death rider to a life insurance policy. The court held that

> injuries are "accidental" and within the coverage of an insurance policy . . . if, from the viewpoint of the insured, the injuries are not the natural and probable consequences of the action or occurrence which produced the injury; or in other words, if the injury could not reasonably be anticipated by [sic] insured, or would not ordinarily follow from the action or occurrence which caused the injury.

*Heyward*, 536 S.W.2d at 557. It is settled Texas law that injuries which are the "natural and probable consequences" of intentional acts are not fortuitous injuries covered by insurance.

Numerous lower Texas courts are in agreement. For example, in *Baldwin v. Aetna Casualty & Sur. Co.*, 750 S.W.2d 919 (Tex.Ct.App.1988) (writ denied), the insured allegedly damaged state roads by intentionally causing its admittedly overweight trucks to be driven on Texas highways. Citing *Maupin*, the court held that there was no accidental occurrence under the insurance policies because the act of continually sending out the overweight trucks was intentional, although the insured did not necessarily intend to damage the road. *Baldwin*, 750 S.W.2d at 921.

In *Southern Farm Bureau Casualty Ins. Co. v. Brock*, 659 S.W.2d 165 (Tex.Ct.App. 1983) (writ refused n.r.e.), the insured intentionally rammed his truck into a second vehicle to prevent the second vehicle's driver from shooting at someone. The court held that the insured was not entitled to recover for damage sustained by his vehicle under an automobile collision insurance policy covering only "accidental" damage. Citing both *Maupin* and *Heyward*, the court reasoned that the damage was not "accidental" because the insured "knew or should have known that the resulting damage to his vehicle was a natural and probable consequence of his act." *Brock*, 659 S.W.2d at 166–67.

In addition to establishing the Texas courts' definition of "accident" and "occurrence," these cases clearly establish that Texas law determines an insured's intention "objectively" and not "subjectively." Texas courts have consistently framed the occurrence issue as "what the insured knew or *should have known.*" *See, e.g., Brock*, 659 S.W.2d at 166–67; *Sanders v. Prudential Ins. Co.*, 697 S.W.2d 80, 81–82 (Tex.Ct.App. 1985) (interpreting *Heyward* to establish a "reasonable anticipation standard," and not a purely subjective one); *Chen v. Metropolitan Ins. & Annuity Co.*, 907 F.2d 566, 568 (5th

---

**32.** The policy defined "occurrence" as "either (a) an accident, or (b) in the absence of an accident, a condition for which the insured is responsible which during the policy period causes physical injury to or destruction of property which was not intended." *Maupin*, 500 S.W.2d at 634 n. 1.

Cir.1990).[33]

Texas Eastern contends that the objective test is merely a product of the judicial interpretation of specific language in the standard CGL insurance policy defining an occurrence as "an accident which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." It is Texas Eastern's position that courts have developed the objective test by interpreting the policy term "expected." *See, e.g., New Castle County v. Hartford Accident & Indem. Co.*, 685 F.Supp. 1321, 1331 (D.Del. 1988). Texas Eastern urges that because the individual policies at issue in this case do not include the terms "unexpected" or "unintended," the test which should be applied in this case is a subjective one, requiring the Carriers to prove that Texas Eastern subjectively

intended to cause the harm for which the Carriers refuse to provide coverage.[34]

Texas Eastern's contentions do not stand up under scrutiny. Texas Eastern has not offered any Texas precedent which links the inquiry into the insured's intentions to any particular policy language. In my view, the Texas appellate courts have developed an objective test because it flows naturally from the language in *Heyward* directing a court to inquire whether the injury could "reasonably be anticipated by the insured." *Heyward,* 536 S.W.2d at 557. The objective test is additionally beneficial because it avoids the difficult task of determining the actual subjective intent of a party. Texas Eastern has not provided any compelling reason to depart from what I believe is settled·Texas law and I conclude that Texas Eastern's intent should be determined objectively.[35]

> Clearly, then, under Texas law, coverage is precluded only when the harm was intended, or when the harm was a natural and probable consequence of an intentional act.

**33.** Though an objective test is used, it is not such a broad test as to deny coverage for any harm which is a reasonably foreseeable consequence of the insured's acts. Both Texas Eastern and the Carriers agree that, under Texas law, negligent acts are covered by third-party liability insurance policies. *See Massachusetts Bonding & Ins. Co. v. Orkin Exterminating Co.*, 416 S.W.2d 396, 400 (Tex.1967). In *Kentucky Cent. Life Ins. Co. v. Fannin*, 575 S.W.2d 76 (Tex.Civ.App.1978), Mrs. Fannin drove her car at a speed in excess of 100 miles per hour, lost control of the car, and was killed. The court concluded that a jury determination that the death was "accidental" was reasonable because

> there is nothing in the act of driving at an excessive rate of speed and failing to stop at a stop sign, though both be [sic] violations of the law, which *per se* is calculated to produce bodily injury or death to the driver. Under some circumstances, either excessive speed or a failure to stop may result in injury or death, but it cannot be logically said that death is the natural consequence of either act.

*Fannin*, 575 S.W.2d at 81. (emphasis original). "[A]lthough Mrs. Fannin may have been voluntarily exposing herself to some danger," her actions did not invalidate her accidental death benefits. *Id.* at 80.

In *Freeman v. Crown Life Ins. Co.*, 580 S.W.2d 897 (Tex.Civ.App.1979) (writ. ref. n.r.c.), the court permitted the recovery of an accidental death benefit, even though the insured was killed while driving under the influence of alcohol, reasoning that "the ordinary person who is insured by an accident insurance policy would consider his death in an automobile collision accidental even though at the time of the collision he may be intoxicated or otherwise negligent." *Freeman*, 580 S.W.2d at 901.

**34.** Texas Eastern relies on *Dayton Indep. School Dist. v. National Gypsum Co.*, 682 F.Supp. 1403 (E.D.Tex.1988), *rev'd on other grounds sub nom. W.R. Grace & Co. v. Continental Casualty Co.*, 896 F.2d 865 (5th Cir.1990), for the proposition that Texas law would require an insurer to establish that the insured acted either willfully, intentionally, or maliciously for the purpose of causing injury, in order to invalidate coverage on intentional conduct grounds. *Dayton*, 682 F.Supp. at 1408. In reaching the conclusion that Texas would apply a subjective test, the *Dayton* court relied on the Texas appellate court's decision in *Orkin Exterminating Co. v. Massachusetts Bonding & Ins. Co.*, 400 S.W.2d 20 (Tex.Civ.App.1965), *rev'd on other grounds*, 416 S.W.2d 396 (Tex.1967). Because I choose to rely on the more recent decisions of the Texas Supreme Court, *Maupin* and *Heyward*, I respectfully decline to follow the conclusion of the *Dayton* court.

**35.** Texas Eastern also challenges the applicability of the Texas precedent cited by the Carriers, contending that those cases were interpreting "accident" based policies while Texas Eastern's policies were "occurrence" based. Texas Eastern's arguments are without merit. First, Texas courts have concluded that "occurrence" based policies are substantially similar to the older "accident" based policies. *See, e.g., Maupin*, 500 S.W.2d at 634 (analyzing an "occurrence-based" policy under prior decisions based on "accident" policies and describing the two types of policies as similar). Second, Texas Eastern has admitted in its pleadings that the definition of "occur-

■ Under Texas law, there is no insurance coverage for harm which is the natural and probable consequence of an intentional act. The Carriers argue that the evidence of Texas Eastern's knowing and intentional pollution of its own property with pipeline liquids establishes undisputed material facts sufficient to grant summary judgment in their favor and against Texas Eastern on the issue of whether any covered "occurrence" happened.

## C. The Applicable Facts

The application of the law to the undisputed facts would be a simple procedure if the parties agreed on the nature of the harm for which Texas Eastern actually seeks coverage. They do not. The Carriers contend that Texas Eastern is attempting to shift costs which it historically should have paid as normal operating expenses to properly store and dispose of its pipeline liquids. Texas Eastern characterizes the costs for which it seeks coverage as the result of the off-site migration of PCBs which Texas Eastern did not know were in the pipeline liquids and did not know had a tendency to migrate in soil or groundwater. The characterization of Texas Eastern's claim is therefore significant to, and in my view dispositive of, the "Occurrence" issue.

Texas Eastern's claim for coverage is predicated, at least in theory, solely on costs incurred to clean up actual damage to third-party property, and on costs incurred to prevent future damage to third-party property, caused by the past, present, and future migration of PCBs from Texas Eastern's property onto the property of third parties. Indeed, this is the only conceivable claim which would allow Texas Eastern to recover from its third-party liability carriers under any CGL policy. Both parties agree that Texas Eastern has no coverage under its third-party liability policies for damage to its own property which does not, at a minimum, create the possibility of future harm to third-party property. Therefore, for the purposes of this motion, I assume that Texas Eastern is making a claim only for cleanup costs related to actual or potential third-party harm.[36]

To prevail on its motion for summary judgment as to there being no "occurrence," the Carriers must establish, with undisputed material facts, that Texas Eastern intentionally polluted third-party property or acted in a manner which would naturally and probably lead to the off-site migration of PCBs. Based on the present record, the Carriers have not met their burden of proof.[37]

rence" is similar to the definition of "accident" in that both terms require the insured to suffer harm that is unintended. (See App. 4 at 30 (the variations in specific "occurrence" definitions contained in the policies are "irrelevant"); TE's Mot.Summ.J.—Trigger of Coverage at 1300 n. 4 ("The term 'accident' as used in [early accident based] policies is interpreted as the equivalent of 'occurrence.'"))

36. It is worth noting that although I conclude that Texas Eastern has made a potentially cognizable claim for coverage, I have not, and will not, offer an opinion on the ultimate merit of the claim. It is, of course, another question whether Texas Eastern can prove that any of its cleanup costs are actually related to third-party harm and whether it can prove that any of the various policy exclusions would not invalidate its coverage. Although I can conceive of no way that Texas Eastern would be able to prove that a particular portion of its cleanup costs were specifically allocable to actual or potential third-party harm, that issue need not be presently decided. At present, Texas Eastern seems to contend that all of its cleanup costs are attributable to actual or potential third-party harm.

37. The Carriers characterize this case as one where an intentional corporate polluter, motivated exclusively by financial gain, failed to properly handle and dispose of its industrial waste, and is now attempting to "dump" its problem into its insurance carriers' lap. In support of this contention, the Carriers have cited to record evidence tending to show that Texas Eastern was slow to act after it discovered the migration of pipeline liquids from its pits and the venting of lubricating oil out of its vent stacks. In addition, the Carriers have cited to evidence tending to show that senior management at Texas Eastern believed that its PCB problem was a regulatory one and not one for which its third-party liability carriers would provide any coverage.

The Carriers have not, however, established with undisputed facts that at the time Texas Eastern dumped the PCBs it knew or reasonably should have known that the PCBs would migrate onto the property of third-party landowners. Texas law does not require invalidation of coverage for third-party PCB contamination simply because Texas Eastern knowingly dumped pipeline liquids onto its property or knowingly dumped PCBs which it reasonably believed would not migrate off its own property.

#### 1. *Knowledge that the Lubricant was Escaping into the Environment*

The Carriers have produced evidence which establishes that Texas Eastern knew that the seals on its compressor station casings were less than perfect. Specifically, Texas Eastern was allegedly aware, beginning in 1958, that seal oil lubricant was escaping the compressors and entering the compressor case where it was exposed to the natural gas in the pipeline.

As I have previously discussed, Texas Eastern also understood that the passage of some amount of lubricant into the compressor case was an inherent design of centrifugal compressors. Texas Eastern's own internal documents establish that a large amount of lubricating oil was lost between 1958 and 1977. In the Carriers' view, the loss can only be adequately explained by oil escaping from the compressor and either traveling down the pipeline (and mingling with the other pipeline liquids, large amounts of which were later disposed of in open earthen pits) or being vented out of the compressor vent stacks with the natural gas during the start-up and shut-down of the compressors. Importantly, Texas Eastern does not deny that it was aware of the system's occasional failures, choosing instead to dispute only the extent to which senior management knew about the frequency and magnitude of the leaks.

In addition, the Carriers note, and Texas Eastern does not dispute, that Texas Eastern was concerned with the compatibility of the seal oil lubricant and epoxies used to coat the *inside* of the pipeline. The Carriers conclude that Texas Eastern must have known that at least some of the lubricant was getting into the pipeline. Texas Eastern has not adequately responded to this contention.

Texas Eastern does not present a significant amount of evidence to refute the Carriers' allegations. First, Texas Eastern argues that the compressor seal systems were supposed to be "closed systems" with no leakage or "consumption" of lubricant oil. It is clear, however, that numerous employees were working under the opposite assumption.

More significantly, other than observing that it would be counterintuitive for a corporation to waste expensive seal oil, Texas Eastern has presented no evidence to establish that the "closed system" assumption was correct.

Second, Texas Eastern employee Walter Woods testified that significant seal oil consumption took place only during seal failure or malfunction. (Dep. of Walter Woods, TApp. 18 at 295–96.) However, Woods also testified that he realized, no later than 1974, that the compressors did leak seal oil into the cases making them one of the prime consumers of lubricant oil. (Dep. of Walter Woods, App. 670 at 5–6.) Rather than supporting Texas Eastern's argument, Mr. Woods's testimony establishes that at least one member of Texas Eastern's senior management understood that the seal oil did not work perfectly and that a substantial amount of oil was lost to the compressor cases.

In addition, Texas Eastern continues to rely on the fact that its senior management was unaware of the extent of the seal oil failures which occurred, and the amount of oil which ultimately entered into the pipeline. If Texas Eastern's managers, responsible for running the individual compressor stations, knew that the lubricant oil was escaping down the pipeline, then Texas Eastern will be charged with that knowledge. As I previously stated, Texas Eastern will not be allowed to hide behind the fact that its senior management did not know some of the basic aspects of its compressor stations' daily operation.

Texas Eastern also contends that most of the lubricant was vaporized by the heat of the turbine engines much like oil in a car engine. Texas Eastern has not, however, offered any evidence to show that the heat of the turbines could possibly be responsible for such a large amount of consumption.[38]

The Carriers contend that once the oil entered into the cases, there were only two paths which it could follow. It could be blown out the vent stacks with the natural gas or it could be discharged down the pipe-

---

**38.** PCBs are, in fact, known to be highly heat resistant and difficult to remove. This is one of the reasons why cleanups are so expensive. The heat resistant quality was also one of the primary reasons they were used as a seal oil in the compressors.

line with the natural gas. Texas Eastern does not seriously contest this fact.[39] In fact, one of Texas Eastern's employees, J.C. Elmore, wrote in a February 6, 1976 memorandum to Paul Hughen, that Texas Eastern did not actually get rid of its lubricant oil by using it in its compressor stations, but rather distributed the oil throughout the pipeline.[40] (App. 211 at 010021973; Dep. of James Elmore, App. 697 at 166–69.)

Having entered the pipeline, the Carriers contend that Texas Eastern knew or should have known that the lubricant oil intermingled with other pipeline liquids. Texas Eastern responds that it was unaware of PCBs in the pipeline liquids until 1981. The evidence Texas Eastern provides to support this position is the deposition testimony of Texas Eastern employees claiming that they did not know, until 1981, that the oil was mixed in with the other pipeline liquids. (See, e.g., Dep. of Earl Farmer, TApp. 25 at 233; Dep. of Dickran Tefankjian, TApp. 26 at 117–18; internal Texas Eastern memoranda, written after 1981, stating that Texas Eastern did not discover the pipeline liquid contamination until 1981, App. 286 at 1; App. 305 at 1; the Declaration of H. Douglas Church, TApp. 191 at ¶ 6; the testimony before a senate subcommittee of Howard Homeyer, President of Texas Eastern Gas Pipeline Co., that Texas

Eastern was not informed of the pipeline liquid contamination until 1981, App. 2 at 17). This evidence does not refute the Carriers' evidence (SOF ¶¶ 43–47) that certain Texas Eastern managers were aware of the contamination.[41] Thus, Texas Eastern has not created a material dispute on the issue of whether Texas Eastern knew about the fate of the escaped lubricant oil.

Having established that the lubricant oil was knowingly intermingled with other pipeline liquids, the Carriers rely on Texas Eastern's admission that it discharged pipeline liquids into the unlined earthen pits from 1958 until 1984, and Texas Eastern's admission that the migration of PCBs began almost immediately after PCBs were placed in the pits, (see Hart Decl., Ex. 47 (Dep. of John Cherry); Ex. 48 at 215–18 (Dep. of Bradford Cushing)), to establish that Texas Eastern intentionally caused all of the harm for which it is now seeking insurance coverage. The Carriers also rely on the testimony of certain Texas Eastern employees who saw cloudy mists coming from the vent stacks indicating that liquid was being vented along with the natural gas, liquid which the Carriers contend was lubricant oil containing PCBs. (TSOF ¶ 120.)

---

**39.** Texas Eastern does offer one piece of evidence which it contends establishes that most of the seal oil lost to the compressor cases was typically recovered and reused. (App. 80.) This memorandum, dated August 5, 1976, from W.G. Marks to E.C. Riall, Jr., states that there were 3,900 gallons of leakage in the seal oil lubricant system, and that the leaked oil was "normally trapped, filtered and returned to the turbine reservoirs." (Id.)

At his deposition, however, A.B. Jarnagin testified that he compiled all of the information in the memorandum for Mr. Marks, including the figure representing the amount of oil leaked and recovered. In response to questions about what he meant when he wrote the term "leaks," Mr. Jarnagin explained that he was referring to leaks from "the inside of the equipment to the outside of the turbine, through metal joints," and not to leaks through the inner seal rings into the compressor cases. (App. 658 at 326–27.) In light of Mr. Jarnagin's testimony, the memorandum does not create a material dispute as to whether Texas Eastern knew that some oil escaping from the compressor into the compressor case was traveling either down the pipeline or out the vents.

**40.** Texas Eastern challenges the value of this evidence because J.C. Elmore was an employee in a staff position who had no responsibility for Texas Eastern's change-out program. I interpret this to suggest that perhaps this memorandum was not prepared in the "scope of Elmore's employment" and thus cannot be used to impute knowledge to Texas Eastern. Elmore's deposition clearly established, however, that he was involved in the change-out program and that the memorandum expressed his opinion of how the compressor stations worked. This does not suggest that it was necessarily Texas Eastern's corporate opinion that the lubricant oil was escaping down the pipeline or out the vents, only that one of its employees believed this to be the case.

**41.** Texas Eastern cannot be heard to argue that because some of its employees were ignorant of the pipeline contamination that ignorance is imputed to the entire corporation. Since a sufficient number of Texas Eastern managers responsible for the daily operation of Texas Eastern's pipeline understood that lubricant oil was escaping into the pipeline, that knowledge will be imputed to the corporation.

Texas Eastern responds that it did not believe that the discharge of the liquids into the pits was considered a discharge into the environment. It offers evidence that from the viewpoint of its employees, the pits were considered containers which segregated the liquid from the rest of the environment, (TSOF ¶ 76), and destroyed the liquid either by burning, natural evaporation, or by carting the liquid away for permanent disposal. The Carriers challenge Texas Eastern's characterization of the pits as containers, and contend that Texas Eastern understates its knowledge of the pits' shortcomings as containment vessels.

Concerning the viability of using the disposal pits as containment vessels, the Carriers point to significant amounts of evidence establishing that Texas Eastern was aware that the various compressor station sites had a history of discharging liquids from the pits, which occasionally made their way off-site. First, Texas Eastern's Effluent Discharge Survey indicates that only 8 of the 35 compressor station locations burned pipeline liquids in 1973. (App. 118; App. 119.) [42] Thus, not all of the liquids were burned in the pits, as Texas Eastern has suggested. Next, the Carriers point to the same Effluent Discharge Survey to establish that some of the compressor stations reported that pipeline liquids were being absorbed into the ground, thus refuting Texas Eastern's contention that many of the pit sites had been backfilled and were therefore presumed to be safe containers, much like landfill sites. (Id.) Finally, the Carriers rely on evidence that over a twenty-five year period of time, Texas Eastern was presented with complaints from neighboring property owners alleging that pipeline liquids from the pits had overflowed onto their property. (SOF ¶¶ 114, 125, 130; Dep. of Roy Wolfe, App. 60 at 340; App. 137.)

Concerning the mists that were seen during the venting of natural gas from the compressor casings, Texas Eastern offers the testimony of a number of employees who claim that they believed the mist to be water or pipeline liquids and not any of the lubricating oil. (TSOF ¶ 120.) Texas Eastern also relies on the Declaration of H. Douglas Church as evidence that Texas Eastern did not realize until 1987 that it had regularly vented lubricant oil (containing PCBs) in the regular course of business. (Church Decl., TApp. 191 at ¶ 8.) Finally, Texas Eastern contends that even if its employees knew that it was oil, the employees only saw the mist land on Texas Eastern's property and not on the property of third parties. (TSOF ¶ 120.)

Although it is Texas Eastern's position that it never intended to vent lubricant oil along with natural gas during start-up and shut-down of the compressors, various Texas Eastern employees testified that the venting included numerous instances of misty discharges. (TSOF ¶ 120; Dep. of Eugene Riall, App. 56 at 183–86; Dep. of Walter Woods, App. 670 at 812–14; Dep. of A.B. Jarnagin, App. 658 at 208–09.) Texas Eastern has not created a material dispute that it did not know that lubricant oil was vented along with the natural gas. It is still an issue of dispute, however, as to whether any of the vented oil reasonably should have been expected to migrate onto the property of third parties.

The Carriers respond that even if Texas Eastern is correct about the "containment" function of its pits and its lack of knowledge of the oil content of the mists, Texas Eastern does not adequately address the alternate ways in which the PCBs could and did reach the environment. The Carriers point out that there are drains in the basements of each of the compressor stations which directed leaked lubricant into the environment. (Dep. of Robert Salzer, App. 105 at 248–50.) Texas Eastern has not responded with any evidence to challenge this assertion, except the conclusory statement that Texas Eastern employees did not consider Texas Eastern property to be part of the "general" environment. Texas Eastern's argument is spurious. I conclude, as a matter of law, that Texas Eastern's property is part of the "en-

---

**42.** These 8 stations were: Mt. Pleasant, TN; Owingsville, KY; Wind Ridge, PA; Holbrook, PA; Accident, MD; Marietta, PA; Perulack, PA; and Grantville, PA.

vironment." [43] Even if Texas Eastern's belief was reasonable at the time, it would not provide Texas Eastern with a valid defense because, under Texas law, its CGL policies would not provide insurance coverage for mistakes of this type. *See Maupin,* 500 S.W.2d at 635. All of this does not, however, establish that Texas Eastern understood that the PCBs were migrating off its property and onto third-party property.

After considering all of this evidence, I conclude that the Carriers have established, as a matter of law, that Texas Eastern was aware that liquids were escaping from the pits and contaminating the environment, which included both Texas Eastern's property and the property owned by third parties. This does not, however, conclusively establish that Texas Eastern understood that the pipeline liquids contained PCBs.

### 2. *Knowledge that the Lubricant Contained PCBs*

Texas Eastern contends that it was unaware that the seal oil lubricant used in its compressor stations contained PCBs until 1972, at which time Monsanto informed Texas Eastern of this fact. The Carriers have produced very little evidence to refute Texas Eastern's claim and certainly not enough to grant summary judgment on the ground that Texas Eastern knew prior to 1972 that PCBs were escaping from its own property and migrating onto third-party property.

The Carriers rely on the deposition testimony of Earl Farmer, a Texas Eastern employee, who testified that in 1958 he was aware that the composition of some lubricant manufactured by Monsanto, which he believed to be OS–81, was a "chlorinated polyphenyl in a phosphate ester mix." (Dep. of Earl Farmer, App. 19 at 90.) This testimony does not, however, conclusively establish that he knew that the oil Texas Eastern used contained PCBs, or even that any other Texas Eastern official knew or had reason to know that the lubricant manufactured by Monsanto, for use by Texas Eastern, contained PCBs.[44]

The Carriers observe that Texas Eastern employee Walter Woods became aware between 1968 and 1972 that there was growing public concern over PCBs in the environment. Once again, this does not refute Texas Eastern's claim that it was not aware of the lubricant's PCB content until 1972. The Carriers also claim that there is some evidence that Walter Woods was looking to replace Turbinol–153 before Monsanto informed Texas Eastern of its decision to discontinue sales of the lubricant oil. The document which the Carriers rely on is a letter written by Woods dated January 7, 1972.[45] (App. 184.) In the Carriers' view, Woods recommended that Texas Eastern pursue the approval of a particular lubricant as a replacement for the Turbinol–153 because he was aware that Turbinol was a polychlorinated biphenyl based product. (*Id.*) Although this is some evidence from which a fact finder might infer that Texas Eastern knew about the PCBs in the oil earlier than the 1972 Monsanto decision to discontinue the

---

43. Texas Eastern contends that the term "environment" had a different meaning during Texas Eastern's use of the pits as a containment facility. In Texas Eastern's view, pollutants entered the environment only "when they reached rivers and lakes—[but] not landfills." (TE's Mem. in Opp'n Summ.J.—No Occurrence at 14.) Texas Eastern's contention fails for two reasons. First, there is no evidence establishing that Texas Eastern believed all of the property which it owned or used at its compressor stations was not part of the environment. Second, Texas Eastern ignores the evidence that property damage was caused by overflow of the pits, as well as by venting and other sources.

44. The Carriers also offer a June 28, 1968 memorandum from Texas Eastern's Superintendent of Design and Construction, W.M. Stephens, to Texas Eastern's Assistant Chief Engineer, R.E. Moore, indicating that MCS–153 "is formulated with chlorinated polyphenyl (Chlorinated aromatic hydrocarbon) and a phosphate ester." (App. 29 at 010037983.) Again, this evidence is insufficient for me to find, as a matter of law, that Texas Eastern was aware that its seal oil lubricant contained PCBs before 1972.

45. This is the same date that Monsanto proposed that Texas Eastern sign a hold harmless agreement indemnifying Monsanto for any future liability arising out of the sale of Turbinol–153. *See supra* p. 1313. Thus, one explanation for the memorandum is Woods's desire to quickly find a replacement oil, because Monsanto was making it difficult for Texas Eastern to continue to purchase Turbinol–153.

sale of Turbinol–153, it does not conclusively establish that Texas Eastern knew about the PCBs, and it does not identify the specific time between 1958 and 1972 when Texas Eastern allegedly acquired this knowledge.[46]

As a consequence of the Carriers' inability to establish that Texas Eastern knew that PCBs were in the lubricant prior to 1972, Texas Eastern's coverage cannot, at least as a matter of law, be invalidated before the January 7, 1972 date, on the basis that there was no "occurrence." [47]

D. *The Alternative Theory of an Occurrence*

■ Recognizing the difficulty of their task, the Carriers have advanced an alternative theory: Texas Eastern intentionally released pipeline liquids into unlined earthen pits, thereby knowingly polluting the environment with hydrocarbons.[48] Thus, even if Texas Eastern was unaware of the PCBs in the pipeline liquids, it knew that the liquids themselves were environmental pollutants if they migrated off Texas Eastern's property. In the Carriers' view, it is settled Texas law that once an insured intentionally causes harm of any kind (presumably this includes property damage to first or third-party property, personal injury, and bodily injury), all resulting damage is not covered by insurance, because the damage is not fortuitous, regardless of the ultimate scope and magnitude of the harm.

I do not read the Texas cases to require this result. In *National Life and Accident*

---

**46.** The Carriers expend a considerable amount of effort attempting to document that Texas Eastern knew, prior to 1972, that the lubricant oil contained PCBs. Upon review of the evidence, it appears that the Carriers have established that Texas Eastern knew about the potential hazards of PCB use, but they have not shown that Texas Eastern was aware that the oil contained PCBs.

In 1958, Monsanto did warn Texas Eastern that its workers should limit their exposure to the lubricant oil. (TRSOF ¶ 25; App. 47–49.) In the 1960s and 1970s, there was certainly a large amount of public attention regarding the potentially harmful effects of PCBs in the environment and the effects of PCBs in living creatures. In 1970, Monsanto began terminating the sale of PCB-based products and warned its customers not to allow the PCBs to become environmental pollutants. While all of this evidence supports the Carriers' contention that Texas Eastern knew or should have known that PCBs were dangerous if discharged into the environment, it does not establish that Texas Eastern knew or should have known that PCBs were contained in its lubricating oil.

**47.** It is tempting to grant summary judgment on the "Occurrence" issue with respect to damage caused after January 7, 1972. Though the issue is a close one, I will deny partial summary judgment here. The Carriers argue that since it was known that liquids from the pits were escaping to third-party property, as soon as Texas Eastern knew that the liquids contained PCBs, Texas Eastern must have known that PCBs were escaping to third-party property. This is not necessarily the case. Texas Eastern has suggested that it believed that the liquids which were escaping did *not* contain PCBs, even after it knew that PCBs were in the pipeline liquids dumped in the pits. That is, Texas Eastern believed that the PCBs remained entrenched in the pits, and that only

non-PCB substances were entering third-party land. (*See, e.g.,* TApp. 200; Tr. of Hr'g on Mot. for Summ.J., January 13, 1992 at 90 (Texas Eastern did not know until 1987 that PCBs are "enveloped in the hydrocarbon, they don't adhere to the soil because the hydrocarbons pick the PCBs up and move them into groundwater and move them off of the site.")) Although I am personally inclined to agree with the Carriers that simple common sense should have alerted Texas Eastern to the possibility that PCBs were migrating with the lubricant either from the pits, the vent stacks, the drainage swales, or the spraying of the liquids on the fence lines dividing Texas Eastern's property from third-party property, and even though I have concluded in "Late Notice," *infra* p. 1360, that Texas Eastern knew or should have known of off-site PCB migration at least by December 1986, the Carriers have not proved that, as a matter of law, Texas Eastern knew, in January 1972, that PCBs were migrating with the other pipeline liquids, and summary judgment regarding all harm occurring after January 7, 1972 will therefore be denied. Even if I did grant summary judgment on this issue, Texas Eastern would not be precluded from seeking coverage for damage caused prior to January 7, 1972, and Texas Eastern's experts have testified that the vast majority of PCB damage to third-party property occurred prior to 1972 due to the immediate migration of the lubricant oil downward into the subsurface of the pits. (*See* Hart Decl., Ex. 47 (Dep. of John Cherry); Ex. 48 (Dep. of Bradford Cushing); TApp. 203.)

**48.** Texas Eastern admits that in certain concentrations, hydrocarbons are damaging to the environment if they escape containment, which in the present case refers to an escape from the earthen pits. (TE's Mem. in Opp'n Summ.J.—No Occurrence at 16; Dep. of J. Clifton Williams, App. 117 at 235–36.)

*Ins. Co. v. Knapp,* 430 S.W.2d 84 (Tex.Civ. App.1968) (writ refused n.r.e.), the court decided that the intent to shoot an intruder in the leg, which ultimately resulted in the intruder's death, invalidated the shooter's insurance coverage because "[t]he insurer is not required to show that the actor had the specific intention to inflict the particular character of injury that flowed from the act." *Id.* at 90. In other words, the court found that the death of the intruder was an injury of a different magnitude than the result originally intended (mere injury), but was still sufficiently related to the intended harm as to be considered part of the natural and probable consequences of the original act.

In *Carpenter Plastering Co. v. Puritan Ins. Co.,* No. 3–87–2435–R, 1988 WL 156829 (N.D.Tex. August 23, 1988), the insured was aware of minor cracking and water damage due to defective asbestos wall panels, but the damage was later discovered to be much more extensive. The court reasoned that if the insured was aware of the problem, although unaware of the problem's full extent, it would be difficult to consider the accident "'unexpected.'" *Carpenter Plastering,* 1988 WL 156829, at *5. Once again the court was confronted with a situation where the ultimate harm was reasonably related to the expected harm.

These cases are considerably different from the situation alleged to have existed at Texas Eastern. This is not an example of damage which is merely more extensive or of a different magnitude. PCB damage is ordinarily of a completely different character and caused by a different instrumentality than hydrocarbon damage and is therefore unrelated to any hydrocarbon damage which Texas Eastern might have intentionally caused. Indeed, if Texas Eastern reasonably believed that PCBs did not migrate (although all parties agree that the PCBs did migrate), then it might be entitled to insurance coverage for at least some part of the ultimate cleanup costs, absent some other reason to invalidate coverage.

██ I reach the same result on the Carriers' loss in progress argument. The loss in progress principle is intended to invalidate coverage for a loss which the insured under-stood was ongoing and for which it bought insurance coverage while only the extent of the loss was unknown. *See Carpenter Plastering,* 1988 WL 156829, at *5; *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.,* 676 F.2d 56, 63 (3d Cir.1982); *Summers v. Harris,* 573 F.2d 869, 872 (5th Cir.1978).

I have previously concluded that Texas Eastern knew that it was causing some property damage by releasing hydrocarbon liquids into the environment (including damage to third-party property) and that Texas Eastern knew it was releasing PCBs onto its own property. I have not concluded, however, that, as a matter of law, Texas Eastern knew or should have known that the natural and probable result of this activity was the release of PCBs onto third-party property.

If the loss for which Texas Eastern requested coverage was the damage to its own property, or even the damage to third-party property caused by the hydrocarbon liquids, the loss in progress principle would probably apply. However, since it is the damage caused by the PCB migration for which Texas Eastern seeks coverage, the loss in progress principle is inapplicable for the purposes of this motion.

The Carriers have failed to establish by undisputed facts of record that all of Texas Eastern's losses were not the result of an "occurrence" within the meaning of the CGL policies. Texas Eastern has likewise failed to establish by undisputed facts of record that any of its losses were the result of an "occurrence" within the coverage of any of its CGL policies. For these reasons, the Carriers' motion for summary judgment on the "Occurrence" issue will be denied.

## X. DAMAGES

██ Both parties have moved for summary judgment on the issue of whether Texas Eastern's losses are recoverable as "damages" under the specific language of its insurance policies. The Carriers contend that the costs of complying with the EPA Consent Decree and the various state decrees are not recoverable as "damages" which result from "property damage" or "bodily injury." Texas Eastern contends that these costs are

recoverable.[49] For the reasons that follow, I conclude that, under Texas law, the remediation costs and the EPA penalties are potentially recoverable as "damages," and the civil penalties paid to Pennsylvania and New Jersey are not.

The insurance policies issued to Texas Eastern by the Carriers generally provide coverage for "damages because of bodily injury or property damage." The Carriers contend that because the government claims sought only injunctive relief and not monetary compensation, the money expended by Texas Eastern to comply with the injunctions is not recoverable as "damages," which unambiguously refers to monetary relief. Alternatively, the Carriers contend that the government orders requiring expenditures by Texas Eastern are based not on existing or threatened property damage or bodily injury, but rather on regulatory violations, and are therefore not recoverable as "damages" because of "property damage" or "bodily injury."

Texas Eastern responds that costs incurred to satisfy the injunctions are recoverable as "damages" because the term "damages," as it appears in the various insurance policies, is ambiguous and reasonably can be interpreted to include them. Additionally, Texas Eastern contends that the primary focus of the government actions was both actual and imminent property damage and a danger to the environment which would likely have caused bodily injury. As such, Texas Eastern claims that the costs are recoverable under its insurance policies.

## A. *Equitable Relief as Damages*

The question of whether the costs incurred in complying with an injunctive order are "damages" is not a novel one. As with many of the issues raised in this litigation, numerous courts have reached different conclusions. Three circuit courts have reached the conclusion that these costs are not recoverable as "damages." *See, e.g., Continental Ins.*

*Cos. v. Northeastern Pharmaceutical & Chem. Co. (NEPACCO )*, 842 F.2d 977, 987 (8th Cir.) (*en banc *), *cert. denied sub nom. Missouri v. Continental Ins. Cos.*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988) (Missouri law); *Maryland Casualty Co. v. Armco, Inc.*, 822 F.2d 1348, 1354 (4th Cir. 1987), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 703, 98 L.Ed.2d 654 (1988) (Maryland law); *A. Johnson & Co., Inc. v. Aetna Casualty & Sur. Co.*, 933 F.2d 66, 69 (1st Cir.1991) (Maine law).[50] However, at least four circuit courts have recently reached the opposite conclusion. *See, e.g., New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162, 1190–91 (3d Cir.1991) (Delaware law); *Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co. (IPC )*, 944 F.2d 940, 947 (D.C.Cir.1991), *cert. denied sub nom. Certain Underwriters at Lloyd's, London v. Independent Petrochemical Corp.*, — U.S. —, 112 S.Ct. 1777, 118 L.Ed.2d 435 (1992) (Missouri law); *Aetna Casualty & Surety Co. v. Pintlar Corp.*, 948 F.2d 1507, 1513 (9th Cir.1991) (Idaho law); *Avondale Indus., Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1207 (2d Cir.1989), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990) (New York law).

The parties have found one Texas state court decision which addresses the question of whether, in the context of an insurance policy, an injunction can constitute "damages." In *Feed Store, Inc. v. Reliance Ins. Co.*, 774 S.W.2d 73 (Tex.Ct.App.1989) (writ denied), the appellate court concluded that it could not. In *Feed Store*, the issue was whether an insurer was obligated to defend an insured against a trademark infringement suit which requested only prospective injunctive relief. The insurer had refused to defend on the ground that the CGL policy only obligated it to defend "any suit against the insured seeking damages," and the plaintiff in the underlying suit sought only injunctive relief.[51]

---

**49.** The parties agree that this issue does not affect the two private third-party claims which sought monetary damages from Texas Eastern.

**50.** *See also Grisham v. Commercial Union Ins. Co.*, 951 F.2d 872 (8th Cir.1991) (reaffirming its decision in *NEPACCO* ).

**51.** The relevant portion of the policy read:

The appellate court affirmed the lower court's judgment that the insurance company had no duty to defend against the suit. Specifically, the appellate court held that the underlying plaintiff's failure to seek "even one dollar in damages" was compelling, if not conclusive, evidence that the suit was for injunctive relief only, and not for damages. *Feed Store*, 774 S.W.2d at 74. The court reasoned that while the allegations underlying the suit could have supported a claim for damages, the controlling factor was what the complaint actually demanded. *Id.* at 75.

Although the opinion provides some guidance in predicting how the Texas Supreme Court would decide this issue, it is important to highlight the issues which the opinion did not consider. First, the court did not determine whether, under Texas law, the term "damages" was ambiguous or unambiguous. The *Feed Store* court explicitly stated that the parties agreed that the policy was unambiguous and, thus, the settled principle of Texas law requiring resolution of ambiguities in favor of the insured was "quite immaterial to [its] decision...." *Feed Store*, 774 S.W.2d at 75. Second, the court was not faced with the question of whether an insurance company is obligated to defend and indemnify an insured in an action seeking injunctive relief which requires the insured to expend significant amounts of money in order to comply, as is the case in most environmental litigation. It is therefore helpful to review the decisions of other jurisdictions to predict how the Texas Supreme Court would decide the issue.

In *Armco*, an insurer brought a declaratory judgment action to determine whether it had an obligation to indemnify its insured for liability pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act[52] (CERCLA) for response costs and injunctive relief. Applying Maryland law, the Fourth Circuit reasoned that " '[d]amages,' as distinguished from claims

for injunctive or restitutionary relief, includes 'only payments to third persons when those persons have a legal claim for damages.' " *Armco*, 822 F.2d at 1352 (quoting *Aetna Casualty & Sur. Co. v. Hanna*, 224 F.2d 499, 503 (5th Cir.1955)). The court reasoned that this "somewhat narrow, technical definition of damages" was necessary because interpreting "damages" to include injunctive relief would render the term "mere surplusage, because any obligation to pay would be covered" by the contract. *Armco*, 822 F.2d at 1352. Because the suit against the insured sought injunctive relief, *Armco* concluded that the costs of compliance were not covered by the CGL policy.

In *NEPACCO*, the Eighth Circuit, sitting *en banc*, adopted a similar definition of "damages" under Missouri law and concluded that the insurer was not required to cover liability arising out of an EPA CERCLA action. The court conceded that "damages" may be an ambiguous term from the viewpoint of a lay insured, but concluded that the term is not ambiguous in the insurance context, and that the "plain meaning of the term 'damages' ... refers to legal damages and does not include equitable monetary relief." *NEPACCO*, 842 F.2d at 985.

By contrast, the Third Circuit reached the opposite result in *New Castle County*, where the court reasoned that the question of whether cleanup costs incurred pursuant to CERCLA and the Resource Conservation and Recovery Act[53] (RCRA) are "damages" is correctly answered by determining whether "damages" should receive a "legal, technical meaning" or a "plain, ordinary meaning." *New Castle County*, 933 F.2d at 1188. The court reviewed *Armco*, *NEPACCO*, and various other decisions holding that injunctive relief was not "damages" and concluded that those decisions rested on the courts' application of a "technical meaning" which excluded equitable relief from the definition of "dam-

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury or advertising injury to which the insurance applies ... and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such injury....

*Feed Store*, 774 S.W.2d at 74. This language is substantially similar to language found in the insurance policies at issue.

**52.** 42 U.S.C. § 9601 *et seq.*

**53.** 42 U.S.C. § 6901 *et seq.*

ages." Delaware law required that the language in an insurance policy be given its plain, ordinary meaning and, if an ambiguity existed, it should be interpreted against the insurer. *New Castle County,* 933 F.2d at 1188–89. Thus, the court concluded that injunctive relief was insurable under the policies because "damages" could reasonably be interpreted to include such costs.

*IPC* reached a similar conclusion. In *IPC,* the Court of Appeals for the District of Columbia Circuit faced the identical issue decided by the Eighth Circuit in *NEPACCO:* Are response costs recoverable as "damages" under Missouri law? The court recognized that the Eighth Circuit was the "home" circuit for Missouri and was entitled to a degree of deference concerning the interpretation of Missouri law. Nevertheless, *IPC* concluded that under Missouri law cleanup costs were recoverable as "damages" under a liability insurance policy. *IPC,* 944 F.2d at 944–47.

The *IPC* court agreed with the *NEPACCO* court's conclusion that under Missouri law the language of an insurance policy is to be given the meaning that would ordinarily be understood by the lay person who bought and paid for the policy. *IPC,* 944 F.2d at 945. In the court's view, however, *NEPACCO* failed to apply this important principle of law, because it accepted a definition of "damages" used " 'by astute insurance specialists or perspicacious counsel' " rather than one understood by the lay insured. *Id.* at 945 (citation omitted). *NEPACCO* 's reliance on the " 'legal, technical meaning,' " *Id.* (quoting *Armco,* 822 F.2d at 1352), violated Missouri's principles of interpretation and led the court to reach the wrong result. As in *New Castle County, IPC* 's conclusion rests on its interpretation of the plain, ordinary meaning of the contract rather than on a purely technical definition of "damages." [54]

■ Texas Eastern correctly observes that Texas law concerning the interpretation of terms in an insurance policy is analogous to Delaware law (and Missouri law). Texas courts do not permit policy terms to be confined to technical meanings unless they have been specifically so defined in the policy. *See Gonzalez v. Mission Am. Ins. Co.,* 795 S.W.2d 734, 736 (Tex.1990); *United States Ins. Co. v. Boyer,* 153 Tex. 415, 269 S.W.2d 340, 341 (1954) ("[T]he court in construing [an insurance] policy determines the everyday meaning of the words to the general public—the meaning of the words 'in common parlance'—'the usual and popular understanding of the term.' ") (citations omitted); *Garrison,* 765 S.W.2d at 538.[55] As the Third Circuit recognized, resolution of the issue rests primarily on whether the term "damages" is ambiguous. The Carriers rely exclusively on *Feed Store* for the proposition that the Texas Supreme Court would conclude that, under Texas law, the term "damages" is unambiguous and refers only to monetary relief, and not to injunctive relief. *Feed Store,* however, did not consider the ambiguity question. I conclude that the Texas Supreme Court would not follow *Feed Store* and would instead conclude that the term "damages" is ambiguous and can reasonably be interpreted to cover costs incurred to satisfy the Federal and State Consent Decrees at issue in this case.

After reading *Feed Store,* I am not persuaded that the court was faced with the identical issue that is presented in this case. The complaint at issue in *Feed Store* clearly requested only traditional injunctive relief. The court reviewed the complaint and expressly found that the plaintiff had not alleged that it had suffered, or that it was seeking, monetary damages. Significantly, the opinion did not discuss whether the insured was obligated to take corrective action

---

**54.** *See also Hazen Paper Co. v. United States Fidelity & Guar. Co.,* 407 Mass. 689, 555 N.E.2d 576, 583 (1990) ("We explicitly reject the reasoning of some courts that incorporates '[p]revious judicial interpretations' into the insurance contract to narrow the scope of the word 'damages' and thus purport to eliminate any ambiguity. Lay people should not reasonably be expected to know such limitations.") (citations omitted).

**55.** Texas law also instructs a court not to interpret an insurance policy term so as to render a portion of the contract meaningless. In my view, reading the policy to include coverage for an injunction of the type at issue here does not completely divest the term "damages" of meaning. More traditional injunctive relief may still be excluded from the definition of "damages" under CGL policies.

and whether such an expenditure would constitute "damages."

In my view, when a court issues an injunction, requiring a party to act or to refrain from acting, the average individual believes that any of the costs associated with compliance constitute "damages." The court in *NEPACCO* expressly recognized this fact. *See NEPACCO*, 842 F.2d at 985. Because Texas law requires that insurance terms be given their plain, ordinary meaning from the standpoint of the insured, these costs, although incurred as a result of an injunctive order, should be recoverable.[56]

An injunction issued pursuant to TSCA, RCRA or CFRCLA is different in kind from injunctions issued in other contexts. Ordinarily, a court is not free to provide injunctive relief unless a party has established that it lacks an adequate remedy at law. An adequate legal remedy ordinarily takes the form of monetary damages, which would clearly be covered by insurance. In the environmental context, EPA is authorized to seek injunctive relief regardless of the adequacy of other legally sufficient remedies. These injunctions ordinarily require a party to incur large costs to remediate existing environmental damage. This power blurs the line between what might traditionally be considered damages (a remedy at law) and injunctive relief (a remedy in equity).

This distinction does not rely, however, on EPA's ability to choose between its various remedies. A number of courts have relied on the "fortuity" of EPA either (1) choosing to clean up environmental damage and sue the responsible parties for the costs expended by the government; or (2) choosing to sue the responsible party for a mandatory injunction to clean up the pollution in the first instance, to hold that costs expended to comply with injunctions are recoverable as "damages." *See, e.g., United States Aviex Co. v. Travelers Ins. Co.*, 125 Mich.App. 579, 336 N.W.2d 838, 843 (1983). Other courts have relied on the fortuity of EPA requiring a cleanup rather than suing for "environmental damages." While these reasons may add additional support for concluding that "damages" is broad enough to include Texas Eastern's response costs, in my view, the most relevant distinction is based on the injunction's ultimate effect on the insured.[57]

I therefore reject the Carriers' argument that because the EPA Consent Decree sounds primarily in TSCA and RCRA, as opposed to CERCLA[58], Texas Eastern's cleanup costs are *per se* unrecoverable as "damages."[59] The Carriers believe that EPA's inability to remediate environmental harm and sue to recover the cost under TSCA and RCRA requires a different result regarding the insurability of an insured's costs of compliance with the injunction. In the Carriers' view, those courts holding that CERCLA response costs are recoverable as "damages," rely on the fact that EPA might have decided to clean up the contamination and sue for damages, and refused to deny coverage because of the fortuity of EPA's choice. The Carriers conclude that under TSCA and RCRA, the fortuity risk is nonexistent, and that in this case, EPA could not have proceeded under CERCLA because it

---

**56.** I agree with the Third Circuit that "the 'as damages' clause, read in its entirety, collectively conveys a single point—namely, that [an insurer] is obliged to indemnify [an insured] for money expended under the sanction of law to redress harm to property or persons." *New Castle County*, 933 F.2d at 1190 n. 56.

**57.** I stated at the outset of this opinion that my sole task is to interpret the contracts that Texas Eastern and its insurance carriers entered into. In interpreting the term "damages," I believe that the actual effect of a requested remedy on an insured is particularly relevant to the issue of what an average individual would believe the term "damages" to mean. This is not identical to an inquiry into the "reasonable expectations of the insured," a doctrine of insurance contract interpretation not yet adopted in Texas. *See Mary Kay Cosmetics, Inc. v. North River Ins. Co.*, 739 S.W.2d 608, 613 (Tex.Ct.App.1987).

**58.** The parties vigorously dispute whether the EPA Complaint is best characterized as a "CERCLA remediation case" or a "TSCA/RCRA regulatory compliance case." In my view, the terms of the Complaint and the Consent Decree make it clear that EPA moved primarily under TSCA and RCRA to compel Texas Eastern to remediate its property, relying on CERCLA only to recover EPA's oversight costs.

**59.** Of course, Texas Eastern must still establish that the damages are the result of property damage, bodily injury, or both.

never made a finding that an "imminent and substantial danger to health and the environment" existed at the Texas Eastern sites.

These arguments are all beside the point, because I have not grounded my decision on mere fortuity. As the *Feed Store* court explained, the inquiry is not what might have been alleged but what was in fact alleged. No court should engage in a *post hoc* analysis of whether a party might have brought a particular action and I refuse to speculate about whether EPA might have brought an action against Texas Eastern based on grounds other than those stated in the EPA Complaint, or whether EPA might have proceeded under an entirely different statute.

In the present litigation, I am concerned with the issue of whether, under Texas law, the term "damages" is broad enough to include the costs incurred by Texas Eastern in complying with the EPA Consent Decree and various other decrees and settlements. I conclude that an insured's cost of complying with either a demand or an injunction to remediate property damage or bodily injury is the same whether issued under CERCLA, TSCA, or RCRA, and is therefore recoverable as "damages" under Texas Eastern's insurance policies.

B. *Compliance Costs as Property and/or Bodily Injury Damage*

■ The second issue raised by the parties is whether the costs incurred by Texas Eastern are losses due to "property damage" or "bodily injury." The Carriers contend that the EPA Complaint and the resulting Consent Decree merely seek to compel Texas Eastern to come into compliance with various environmental regulations and to remediate damage which has resulted from Texas Eastern's prior violation of those regulations. As such, the Carriers argue that Texas Eastern's costs are not recoverable because the costs of complying with federal and state regulations, and the costs of administering prophylactic measures to ensure future compliance, are not insurable.

Texas Eastern apparently concedes that the costs incurred merely to stay in compliance with regulations are not recoverable from the Carriers. Additionally, Texas East-

ern must concede that any costs of remediating property damage which cannot be significantly linked to third-party harm are not recoverable because its CGL insurance policies only cover harm to third parties. It is Texas Eastern's view, however, that a large percentage of its costs were incurred primarily to remedy and prevent third-party property damage. Although I am doubtful of Texas Eastern's ability to ultimately establish this relationship, I conclude that a factual dispute exists on this issue requiring that both the Carriers' motion for summary judgment and Texas Eastern's motion for summary judgment be denied on this point.

Because factual disputes exist as to whether some of Texas Eastern's costs were or will be incurred to remediate third-party property damage and to prevent future harm to third-party property and third parties generally, I reject the Carriers' contention that the mere fact that the majority of Texas Eastern's expenses were incurred pursuant to TSCA and RCRA establishes that the costs are not recoverable "damages." The Carriers have, however, raised serious issues concerning which of Texas Eastern's costs are potentially recoverable and which are not.

■ Texas Eastern cannot seek recovery of costs incurred solely to comply with federal or state environmental legislation. Even those courts which have allowed the recovery of CERCLA response costs under CGL policies have recognized that liability policies do not provide coverage for the costs of statutory and regulatory compliance. For example, in *Minnesota Mining & Mfg. Co. v. Travelers Indem. Co.*, 457 N.W.2d 175 (Minn.1990), the Minnesota Supreme Court qualified its holding that CERCLA-imposed cleanup costs were recoverable by observing:

> We are not "opening the door," as the insurers assert, to insurance coverage of all business expenses which are mandated by the government.... These types of costs are not covered by the insurance policies simply because no property damage has occurred.

*Id.* at 184.

Indeed, Texas Eastern has admitted that it is not seeking coverage for those expenses

which cannot be linked to property damage or bodily injury. Thus, the costs of complying with (1) TSCA regulations regarding the proper labeling of PCB containers; (2) TSCA regulations requiring the maintenance of adequate records of PCB storage and disposal activities; (3) RCRA regulations requiring notification to EPA that Texas Eastern was managing hazardous waste; (4) RCRA regulations requiring Texas Eastern to obtain permits; and (5) RCRA regulations requiring Texas Eastern to comply with various record keeping and safety requirements are not recoverable.

Although I have previously concluded that the mere fact that EPA's Complaint was grounded on regulatory violations does not automatically preclude recovery of costs associated with compliance, it does make it more difficult for the insured to prove that its costs were incurred primarily because of property damage as opposed to mere regulatory violations. For example, the Carriers persuasively argue that many of the regulatory violations alleged in the EPA Complaint could have resulted in a mandatory injunction regardless of whether any property damage had in fact taken place. It would be Texas Eastern's responsibility to establish that each cost for which it seeks insurance coverage was incurred primarily because of property damage, bodily injury, or both. It would also be Texas Eastern's burden to establish that its costs were incurred not to implement prophylactic measures to prevent future regulatory violations, but only to prevent actual and imminent harm to third-party property.

In short, the fact that I have decided to deny summary judgment on this issue should not be viewed as a positive review of the merits of Texas Eastern's claims. It merely signals that Texas Eastern has offered sufficient evidence that would allow it to go forward and attempt to prove that at least some of its claims are recoverable, although it is my view that Texas Eastern would face a Herculean task in this regard.

60. The parties apparently believe that characterizing Texas Eastern's payments as civil "fines" (the Carriers) or as civil "penalties" (Texas Eastern) will effect the outcome of my decision concerning the payments' insurability. I do not

## C. Civil Fines and Penalties

One category of costs which Texas Eastern seeks to recover merits special attention: civil fines and penalties.[60] To date, Texas Eastern has agreed to pay a $15 million penalty to EPA, a $5.3 million penalty to the PaDER, and an $850,000 penalty to the New Jersey Department of Environmental Protection (NJDEP) for violations arising under federal and state environmental laws. I conclude as a matter of law that the civil penalties assessed by PaDER and NJDEP are not recoverable as "damages"; however, the EPA penalty would be recoverable as damages under Texas Eastern's insurance policies.

### 1. Choice of Law—Fines and Penalties

Although the parties agree that Texas law applies to the majority of the issues in this litigation, the Carriers contend that the question of insurability of civil penalties should be determined pursuant to the law of the issuing jurisdiction. Therefore, the Carriers argue that the insurability of the EPA fine would be decided under the federal common law of insurance, and the insurability of the Pennsylvania and New Jersey fines would be decided under Pennsylvania and New Jersey substantive law, respectively. Texas Eastern responds that Texas law should be applied to decide the entire "Damages" issue and, pursuant to Texas law, civil penalties are insurable as "damages" to the insured. In order to decide this issue, it is necessary to address the choice of law principles followed by both Texas and Pennsylvania.

The parties agree that I must apply the choice of law principles from the two forum states originally involved in this action: Texas and Pennsylvania. *See generally, In re San Juan Dupont Plaza Hotel Fire Litig.*, 745 F.Supp. 79, 81 (D.P.R.1990); *In re Air Crash Disaster at Stapleton Int'l Airport*,

share the parties' view. Because EPA, PaDER, and NJDEP characterize the payments as civil "penalties," I have used this designation throughout the opinion.

720 F.Supp. 1445, 1448 (D.Colo.1988).[61] In choice of law cases, Texas courts will apply "the law of the state with the most significant relationship to the particular substantive issue...." *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 421 (Tex.1984); *W.R. Grace & Co. v. Continental Casualty Co.,* 896 F.2d 865, 873 (5th Cir.1990). The test is set forth in sections 6 and 188 of *Restatement (Second) of Conflict of Laws.*[62] Pennsylvania uses a modified version of the *Restatement (Second)* approach, which combines a relationship and interest analysis. *Compagnie des Bauxites de Guinee v. Argonaut–Midwest Ins. Co.,* 880 F.2d 685, 688 & n. 9 (3d Cir.1989) (citing *Griffith v. United Air Lines, Inc.,* 416 Pa. 1, 203 A.2d 796 (1964)). This test "'takes into account both the grouping of contacts [listed in the Restatement (Second) of Conflict of Laws § 188(2) (1971)] with the various concerned jurisdictions and the interests and policies that may be validly asserted by each jurisdiction.'" *Compagnie des Bauxites,* 880 F.2d at 689 (*quoting Melville v. American Home Assurance Co.,* 584 F.2d 1306, 1311 (3d Cir.1978)). *See also General Star Nat'l Ins. Co. v. Liberty Mut. Ins. Co.,* 960 F.2d 377, 379 (3d Cir.1992) (citing *Cipolla v. Shaposka,* 439 Pa. 563, 267 A.2d 854, 856 (1970) ("Pennsylvania rule requires examination of the significant contacts as they relate to the states' public policies underlying the issue in question."))

Since 1961, Texas Eastern's principal place of business has been Houston, Texas.[63] After moving its headquarters to Texas, Texas Eastern routinely sent its insurance applications and paid its insurance premiums from Houston. Additionally, Texas Eastern appears to have co-brokered the acquisition of its insurance policies through John L. Wortham & Son and Querbes & Nelson, Inc., headquartered in Houston and Shreveport

**61.** In short, the parties contend, and I agree, that the claims in this case which were originally filed under diversity jurisdiction must be resolved under the laws of the forum state, including choice of law rules, in which they were originally filed: Texas and Pennsylvania. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). The two circuit courts to decide the issue of whether courts whose jurisdiction is based on the FSIA would follow the laws of the forum state or use federal common law to determine choice of law questions are split. *Compare Barkanic v. General Admin. of Civil Aviation,* 923 F.2d 957, 959–61 (2d Cir.1991) (the forum's choice of law rules apply) *with Liu v. Republic of China,* 892 F.2d 1419, 1425–26 (9th Cir.), *cert. dismissed,* 497 U.S. 1058, 111 S.Ct. 27, 111 L.Ed.2d 840 (1990) (federal common law choice of law rules apply). Because this court is sitting in diversity on many of these claims, I choose to follow the Second Circuit's view that the forum's choice of law rules apply. To decide otherwise would require an almost impossible separation of the issues in this case.

**62.** Section 6 provides:

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Section 188 provides:

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189–199 and 203.

**63.** In 1961, Texas Eastern moved its headquarters from Shreveport, Louisiana.

respectively. Notice of the claims at issue in this case was made from Texas Eastern's headquarters in Houston.

Republic Insurance Company, Highlands Insurance Company, and Ranger Insurance Company have their principal places of business in Texas. (Ins.' Mot.Summ.J.—Choice of Law at 10.) Although the other insurance carriers have their principal places of business elsewhere, the majority of them do business in the State of Texas. (TE's Mem. in Opp'n Summ.J.—Civil Penalties at 12 n. 15.)

The environmental damage took place in as many as fourteen states including Texas, Pennsylvania, and New Jersey. Finally, to date, penalties have been imposed by EPA, PaDER and NJDEP.

The parties agree that on all other issues, no other state has a more significant contact to the present litigation than Texas, based largely on the fact that Texas Eastern is headquartered in Texas, environmental damage occurred in Texas, and many of the Carriers do business in Texas. The relevant question, therefore, is whether the nature of the civil penalties creates a significant relationship to the assessing state which overrides the Texas contacts.

 The first step in the choice of law analysis is to determine whether the substantive laws of the states which have a possible interest in a particular issue would reach a different result. If the answer is yes, then I must determine whether the various choice of law analyses choose different substantive law. Again, if the answer is yes, I must choose between the competing choice of law analyses.

On the issue of civil penalties, the states which have a significant interest are Texas, Pennsylvania, and New Jersey.[64] Only New Jersey has decided this issue, concluding that civil penalties are not insurable as a matter of public policy. *Township of Gloucester v. Maryland Casualty Co.,* 668 F.Supp. 394, 401–02 (D.N.J.1987) (environmental fines and penalties are not viewed as "damages" and are thus uninsurable); *Blair v. Anik Liquors,* 210 N.J.Super. 636, 510 A.2d 314, 318 (Law Div.1986) (indemnification for fines resulting from violation of Alcoholic Beverage Control laws violates public policy).

Neither Pennsylvania nor Texas has decided whether civil penalties are insurable. The best analogy provided by the parties is to the insurability of punitive damages. Under Pennsylvania law, punitive damage awards are not insurable because insurability would violate public policy. *Martin v. Johns–Manville Corp.,* 508 Pa. 154, 494 A.2d 1088, 1096 (1985). Under Texas law, punitive damages are insurable, at least for conduct which merely rises to the level of gross negligence. *American Home Assurance Co. v. Safway Steel Products Co.,* 743 S.W.2d 693, 704–05 (Tex.Ct.App.1987) (writ denied). Therefore, a conflict appears to exist between the substantive law of the three states with potential interests in this issue.

Having found a conflict in the substantive law, I will apply the choice of law principles of Texas and Pennsylvania and determine whether they would select the same substantive law to be applied. Under Texas choice of law principles (following *Restatement (Second) of Conflict of Laws* § 6(1)), I must first

---

**64.** The Carriers have suggested that the insurability of penalties levied by EPA should be governed by the federal common law of insurance. I believe that the insurability of penalties assessed pursuant to federal environmental statutes should be governed by state law. As one district court recently concluded, "[w]hile environmental matters implicate broad national concerns, there is no authority for creating a federal common law of environmental insurance coverage...." *A. Johnson & Co., Inc. v. Aetna Casualty & Sur. Co.,* 741 F.Supp. 298, 300 n. 2 (D.Mass.1990), *aff'd,* 933 F.2d 66 (1st Cir.1991).

I also reject the Carriers' contention that federal environmental laws preempt the application of state law (if it would permit insurability of civil penalties) because " 'such state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (Ins.' Mot.Summ.J.—Civil Fines & Penalties at 10 n. 6 (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941) (footnote omitted)). The Carriers have made no showing that Congress expressly preempted state law or that an irreconcilable conflict exists between federal and state goals and, as such, the state law continues to apply. *See Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 255, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984) (state law principles are not preempted by a federal regulatory scheme unless they are "expressly supplanted.")

look at Texas Insurance Code article 21.42 which states a preference for applying Texas law to an insurance contract involving a Texas citizen and an insurance company that does business in Texas. *See* Tex.Ins.Code Ann. art. 21.42. For the purposes of this discussion, I assume that Texas Eastern, by virtue of its headquarters in Houston, Texas, is a Texas citizen pursuant to article 21.42. As I have previously indicated, most of the insurance companies involved in this litigation do business in Texas. Thus, it would appear that Texas choice of law rules would apply Texas substantive law to this issue.

The Carriers correctly observe, however, that the statute's application is limited to situations where the article would not give extraterritorial effect to Texas law. *See generally, W.R. Grace & Co.*, 896 F.2d at 883. In my view, the Texas Supreme Court would conclude that relying on article 21.42 to apply Texas law to the issue of civil penalties imposed by other states, or to civil penalties imposed by EPA, would be constitutionally permissible, in light of the fact that this litigation involves a dispute between a Texas insured and insurers who have significant contacts with Texas. Therefore, under Texas choice of law principles, Texas substantive law applies.

Under Pennsylvania's choice of law principles, I must balance the various state interests with the public policies underlying those interests. In my view, Texas's interest is making certain that Texas insureds receive all of the benefits for which they contract with insurance carriers. This includes insurance coverage for civil penalties. Pennsylvania's interest is its ability to effectively enforce Pennsylvania laws.

■ There is little doubt that limiting the insurability of civil penalties does affect Texas's policy concerns. It may well be that Texas Eastern believed it was contracting for coverage of civil penalties that it incurred as a result of operating its natural gas pipeline. However, from Pennsylvania's standpoint, the inability to enforce its laws by the assessment of civil penalties may well hamper its ability to force compliance without resorting to criminal or other more severe sanctions. It would appear that a state can hardly have

a more significant contact with the issue of a fine's insurability than in a situation where a foreign corporation doing business within its borders violates its laws, damages its property and natural resources, and is therefore fined as a punishment for the violation, and as a future inducement to comply with the state's laws. Combined with a public policy against the indemnification of liability incurred as punishment, I conclude that under Pennsylvania's choice of law rules, Pennsylvania's substantive law applies. For the same reasons, New Jersey substantive law would apply to the insurability of the New Jersey fines.

Because the choice of law principles lead to divergent choices of substantive law, I must choose between the two. *See e.g., Dupont Plaza Hotel Fire*, 745 F.Supp. at 87–88. Although I have not found explicit guidance on this point, I will apply federal common law to determine whether to use Texas choice of law principles or Pennsylvania choice of law principles. Federal common law follows the *Restatement (Second) of Conflict of Laws. Schoenberg v. Exportadora de Sal. S.A. de C.V.*, 930 F.2d 777, 782 (9th Cir.1991). Based on Pennsylvania's need to enforce its laws, I believe that Pennsylvania has the most significant contacts concerning the "Fines and Penalties" issue and I will therefore apply Pennsylvania choice of law principles.

### 2. New Jersey Fines

■ As previously explained, under Pennsylvania choice of law principles, the penalty paid to New Jersey would be governed by New Jersey substantive law. As such, they are not insurable, and Texas Eastern would not be entitled to recover these losses from its insurance carriers.

### 3. Pennsylvania Fines

■ Under Pennsylvania choice of law principles, the Pennsylvania penalties would be governed by Pennsylvania law. Relying on Pennsylvania's refusal to permit insurance against punitive damages, I conclude that Pennsylvania would likewise refuse to permit insurance against civil penalties assessed for

the violation of Pennsylvania's environmental laws.

### 4. *EPA Fines*

 Under Pennsylvania choice of law principles, the EPA penalty would be controlled by the substantive law of Texas.[65] No federal common law of insurance exists, and as between Texas and Pennsylvania, Texas has the most significant relationship to the insurability of penalties because of Texas Eastern's contacts with Texas, and because of the lack of any significant Pennsylvania public policy regarding the insurance of federally assessed civil penalties. Relying on Texas law which enforces insurance contracts for punitive damages, I conclude that Texas law would permit insurance against civil penalties.

 One final issue remains concerning Texas Eastern's ability to recover civil penalties under Texas law. I have previously determined that the term "damages" can reasonably be interpreted to mean money expended under sanction of law to redress harm to property or persons. (*See supra* p. 1333 note 56.) Although this definition does not necessarily mean that a reasonable person would conclude that penalties are covered as "damages," *see IPC*, 944 F.2d at 947, it is certainly reasonable that an ordinary person could. I conclude, therefore, that civil penalties can be recovered as "damages" under Texas law. However, as with all of Texas Eastern's claims, Texas Eastern would have the burden of establishing which, if any, of these penalties were imposed primarily to redress harm to third-party property before the Carriers would be obligated to reimburse Texas Eastern.

### XI. OWNED PROPERTY EXCLUSION

 Both the Carriers and Texas Eastern have moved for summary judgment based on the owned property exclusion.[66] Although the precise wording of the owned property exclusion varies, the following provision is representative of the exclusion as it appears in many of the insurance policies:

This policy does not apply

. . . . .

to property damage to:

(1) property owned or occupied by or rented to the Insured,

(2) property used by the Insured, or

(3) property in the care, custody or control of the Insured as to which the Insured is for any purpose exercising physical control; but parts 2 and 3 of this exclusion do not apply with respect to liability under a written sidetrack agreement and part 3 of this exclusion does not apply with respect to property damage (other than to elevators) arising out of the use of an elevator at premises owned by, rented to or controlled by the Named Insured....

Other policies simply exclude coverage for damage to property owned by the insured, or for loss of, or damage to, or destruction of, property owned by the named insured.

Texas Eastern argues that although the owned property exclusion precludes coverage for damage to its own property, the exclusion should not apply to the cost of remediation work on its own property that is aimed at preventing actual and continuing harm to third-party property, and anticipated future harm to third-party property.

Specifically, Texas Eastern contends that the majority of the remediation work in which it is engaged is aimed at stopping the migration of PCB contamination from Texas Eastern's property to third-party property through surface soil, subsurface soil, and groundwater migration. Texas Eastern relies on case law (from jurisdictions other than

---

**65.** Since Texas choice of law principles would also apply Texas substantive law, it is technically unnecessary for me to decide between Texas and Pennsylvania choice of law principles on the EPA penalty issue.

**66.** Not all of the policies contain owned property exclusions, and this section of the opinion only applies to those policies containing such exclu-

sions. Additionally, the parties agree that the owned property exclusion does not apply to groundwater remediation in those states where the groundwater is not the property of the surface landowner. The parties apparently agree that, under present law, groundwater is the property of the surface landowner only in Texas, Indiana, and Mississippi.

Texas) and the various consent orders and decrees into which it has entered to support its assertion.[67]

The Carriers contend that the owned property exclusion is unambiguous, and in accordance with Texas law, must be given its plain, ordinary meaning. In the Carriers' view, any damage to property owned, rented, or controlled by Texas Eastern is not covered by any of the insurance policies which contain an owned property exclusion. In the alternative, the Carriers urge that Texas Eastern be required to prove that any costs for which it seeks insurance coverage were incurred to remediate actual third-party property damage or to prevent future third-party harm which is imminent, immediate, and substantial.

Neither Texas Eastern nor the Carriers have cited a Texas state court decision, or any decision applying Texas law, which has considered the applicability of an owned property exclusion to a situation analogous to the present litigation. However, Texas Eastern has cited numerous cases from other jurisdictions which have concluded that the owned property exclusion does not bar an insured's recovery for cleanup work on its own property when the focus of the cleanup was the prevention of third-party harm.

For example, in *New Castle County v. Continental Casualty Co.*, 725 F.Supp. 800 (D.Del.1989), *aff'd in part and rev'd in part on other grounds, New Castle County v. Hartford Accident & Indem. Co.*, 933 F.2d 1162 (3d Cir.1991), the district court refused to deny coverage for New Castle County's cleanup costs of the Tybouts Corner landfill on the basis of an owned property exclusion. The court noted that the primary focus of the three lawsuits against the County (one by EPA, and two by citizens living near the landfill site) was the release and continuing release of hazardous substances from the landfill to other properties and the surrounding drinking water. *New Castle County,* 725 F.Supp. at 816. On this basis, the court concluded that the property damage at issue was "off-site property damage" not owned, rented, or controlled by New Castle County. Because there was a continuing threat of off-site property damage if the contamination on the insured's property was not remediated, the court held that the owned property exclusion did not bar coverage of the County's claims. *Id.*

In *United States v. Conservation Chem. Co.*, 653 F.Supp. 152 (W.D.Mo.1986) the district court refused to exclude coverage based on an owned property exclusion for remediation costs incurred by the insured, Conservation Chemical Company (CCC), for cleaning up an industrial chemical waste disposal facility located on its own property. The costs were incurred pursuant to a complaint filed by EPA alleging that hazardous wastes which had been disposed of at the site were migrating from the site and posed a danger to public health and the environment. *Conservation Chem.,* 653 F.Supp. at 162.

The court concluded that "coverage of the abatement remedy on the CCC site designed to prevent damage or further damage to third parties cannot be denied on the basis of the owned property exclusion." *Conservation Chemical,* 653 F.Supp. at 200. The court noted, however, that this does not include elements of the CCC claim which relate to a remedy for damage confined to the CCC site itself. "To the extent that all or a portion of the remedy relates solely to damage to the CCC site itself and not to prevent off-site contamination, the 'Owned Property Exclusion' clearly applies, and such damage is not within the coverage provided." *Id.* The court left the determination of which costs were included and which were not for trial.

---

**67.** Although Texas Eastern contends that the state orders, decrees, and settlements into which it has entered require Texas Eastern to remediate third-party property, the vast majority of Texas Eastern's cleanup obligations require Texas Eastern to remediate PCB contamination on Texas Eastern's own property. Any liability which Texas Eastern has incurred pursuant to state orders, decrees, or settlements makes up a very small percentage of Texas Eastern's total response costs, because Texas Eastern is obligated to perform similar remediation work under the EPA Consent Decree. Accordingly, I will treat Texas Eastern's liability pursuant to state actions together with the EPA Consent Decree for the purposes of deciding the "Owned Property Exclusion" issue.

In *Consolidated Rail Corp. v. Certain Underwriters at Lloyds*, No. 84–2609, 1986 WL 6547 (E.D.Pa. June 5, 1986), *aff'd*, 853 F.2d 917 (3d Cir.1988), a Consolidated Rail Corp. (Conrail) train derailed in Pennsylvania, spilling 32,000 gallons of chloroform onto the ground at and surrounding the accident site. The chloroform liquid contaminated groundwater, storm sewers, and a nearby creek. While concluding that the governmentally mandated cleanup was clearly aimed at the prevention and mitigation of third-party harm, and thereby constituted "damages" as defined by Conrail's excess insurance policies, the district court permitted Conrail to recover its cleanup costs despite the fact that some of Conrail's expenditures were for cleanup of Conrail's own property, and Conrail's insurance policies explicitly excluded coverage for damage to property "owned by the named insured." *Consolidated Rail*, 1986 WL 6547, at *4–5.

In *Township of Gloucester v. Maryland Casualty Co.*, 668 F.Supp. 394 (D.N.J.1987), the district court explained why it did not consider an owned property exclusion a bar to coverage of a cleanup which included property owned by the insured, Gloucester Township. The court reasoned that there was an ambiguity in the language of the exclusion concerning whether the exclusion precluded coverage of costs which were linked to both damage to third-party property and the repair of property owned by the insured. *Township of Gloucester*, 668 F.Supp. at 400. The court concluded that because ambiguities should be interpreted against the insurer, and because the cleanup costs were "inextricably linked" to the damage claims of a third-party, the owned property exclusion did not preclude coverage of those costs. *Id.*

Relying on these and other cases, Texas Eastern argues that the owned property exclusion in its insurance policies should not apply to the cleanup costs it has incurred, and will continue to incur, pursuant to the various formally concluded consent orders and agreements. Texas Eastern admits, however, that the Federal Consent Decree does not require it to remediate any off-site property. According to the terms of the Decree, Texas Eastern must remediate sur-face soil contamination, off-site equipment areas (controlled by Texas Eastern), and monitor groundwater contamination levels (but not remediate any groundwater at this time). (App. 385; App. 227A at 95).

In light of these facts, Texas Eastern asserts that the focus of EPA's concern regarding the cleanup of Texas Eastern's property was the migration of PCBs from Texas Eastern's property to the property owned by third parties, and the potential future harm to said properties. The evidence which Texas Eastern proffers to support these assertions is sparse, but is sufficient to create a disputed issue of material fact as to whether Texas Eastern's cleanup costs were incurred *solely* because of damage to its own property, or whether some of Texas Eastern's costs are related to the prevention of third-party damage.

In support of its assertion, Texas Eastern has offered two affidavits sworn by Karen Hammerstrom, a scientist working in EPA's TSCA compliance section who helped prepare risk assessments for EPA regulations concerning healthy PCB levels in the environment, and who prepared risk assessments related to the EPA Complaint and Consent Decree. As previously explained, Texas Eastern offers these affidavits to establish that EPA considered the effects of PCB contamination on third-party property (off-site property) when it decided the level of cleanliness to which it would require Texas Eastern to remediate its property. (First Hammerstrom Affidavit, Hart Decl., Ex. 50 at attachment pp. 6–7; Second Hammerstrom Affidavit, Hart Decl., Ex. 50 at ¶¶ 3–5.) Specifically, Hammerstrom's risk assessment considers what level of *post*-remediation off-site PCB exposure would be acceptable to EPA. (Second Hammerstrom Affidavit, Hart Decl., Ex. 50 at ¶ 3.)

Additionally, Texas Eastern observes that EPA is charged with the protection of the environment and is by definition always concerned with potential third-party harm. In this regard, Texas Eastern offers the deposition testimony of one of its environmental experts, Bradford Cushing, who testified that due to PCB migration from Texas Eastern's property to third-party property and ground-

water, unspecified off-site contamination has in fact occurred. (Dep. of Bradford Cushing, TApp. 223 at 435–36; App. 632 at Table 2.)

The Carriers respond, however, that any actual off-site pollution has not been specifically defined by any of Texas Eastern's experts and contend that if Texas Eastern wants to rely on off-site property damage to procure coverage, it must do so on a site-by-site basis, proving that a particular site has migrating PCBs, or is in immediate danger of migrating PCB contamination onto off-site property, before the Carriers are deemed liable for any of the cleanup costs. Texas Eastern responds that EPA did not require a site-specific cleanup program, choosing instead to require that all sites meet a particular PCB standard, without regard to what the PCB levels were at the time of the Consent Decree. Therefore, Texas Eastern does not know whether every site, or which individual sites, have migrating PCBs reaching third-party property.

The Carriers' primary contention is that the facts of the present case do not fit within the "judge made insurance law" on which Texas Eastern relies. The Carriers observe that the only *actual* damage that can be affected by Texas Eastern's cleaning up of its own property is on-site contamination. Thus, this case is distinguishable from the situation where EPA orders a polluter to remediate third-party harm which includes the cleanup of on-site property as one element of a greater third-party problem. In this case, EPA limited its cleanup order to Texas Eastern's own property.

Having considered these arguments, I conclude that the Texas Supreme court would preclude coverage for Texas Eastern's costs which were not *primarily* aimed at preventing actual, as opposed to purely potential, harm to third-party property.[68] I further conclude that the evidence proffered by the Carriers is insufficient to mandate a finding that *none* of Texas Eastern's expenses incurred pursuant to the EPA Consent Decree, state government decrees, or private third-party actions were due primarily to prevent future third-party harm.[69]

There is little doubt that the majority of courts to consider this issue have concluded that costs incurred to remediate damage on the insured's property in an attempt to prevent future damage to third-party property are not excluded under the owned property exclusion.[70] Having examined these deci-

---

**68.** In other words, Texas law would exclude all coverage if not one PCB had migrated off Texas Eastern's land, but would permit recovery for the cost of remediating actual third-party damage—including the cost of remediating PCBs on Texas Eastern's property—if the PCBs were imminently and substantially likely to migrate. If it were possible to precisely separate the cost of remediating third-party property from the cost of remediating imminently migrating PCBs, I would be inclined to limit Texas Eastern's recovery solely to actual harm. I have, however, made this one concession to practicality because of the near impossibility of absolutely separating the two types of costs.

**69.** I reject the Carriers' contention that the owned property exclusion excludes coverage for the cleanup of any "damage" to the insured's own property. This interpretation of the exclusion necessarily precludes coverage for work done on the insured's property that is "damage" on the one hand, but is performed *primarily* to remediate actual harm to third-party property due to the migration of the same contaminants. Under the Carriers' view, even if Texas Eastern could establish that its response costs were incurred primarily to prevent third-party harm, the costs would not be covered by its liability insurance.

In my view, the definition of "occurrence" is broad enough to include environmental damage which has not harmed third parties, but is imminently, immediately, and substantially likely to do so. Thus, I also reject the Carriers' assertion that only actual third-party damage is recoverable by Texas Eastern under the terms of its liability insurance policies, because the policies' definition of an "occurrence" is not broad enough to cover future harm, regardless of the imminent, immediate, or substantial nature of that harm.

**70.** *See, e.g., Allstate Ins. Co. v. Quinn Constr. Co.,* 713 F.Supp. 35, 40–41 (D.Mass.1989), *vacated,* 784 F.Supp. 927 (D.Mass.1990); *Unigard Mut. Ins. Co. v. McCarty's Inc.,* 756 F.Supp. 1366, 1369 (D.Idaho 1988); *Broadwell Realty Serv. Inc. v. Fidelity & Casualty Co.,* 218 N.J.Super. 516, 528 A.2d 76, 82 (1987); *Banker Trust Co. v. Hartford Accident & Indem. Co.,* 518 F.Supp. 371, 374 *vacated on other grounds,* 621 F.Supp. 685 (S.D.N.Y.1981). *But see Wolf Bros. Oil Co. v. International Surplus Lines Ins. Co.,* 718 F.Supp. 839, 845 (W.D.Wash.1989) (granting defendant insurance carrier's summary judgment motion on the ground that the remediation costs were either not covered under the policy or that they were excluded by the owned property exclusion

sions, I respectfully decline to fully adopt their rationale, and I do not believe that the Texas Supreme Court would choose to either.

In my view, the owned property exclusion is unambiguous. The clause clearly reads that damage to an insured's property is not covered under the CGL policy. This does not mean that all activity taking place on an insured's property is *per se* uninsured. If the activity is *primarily* undertaken to abate an existing risk of harm to a third party, then the owned property exclusion should not apply.

The rationale most often relied on by courts declining to enforce the owned property exclusion is that the failure to allow an insured to recover cleanup costs incurred prior to the *actual occurrence of third-party damage* creates an incentive for the insured to wait until third-party damage occurs before taking any preventive action. *See, e.g., Allstate Ins. Co.,* 713 F.Supp. at 40–41; *Broadwell Realty,* 218 N.J.Super. 516, 528 A.2d at 81; *Consolidated Rail Corp.,* No. 84–26019, 1986 WL 6547, at *5. I find this rationale unpersuasive for three reasons. First, if the insured intentionally allows the damage to occur, no insurance coverage should be available because intentional damage is not insurable as an "occurrence" in a standard CGL policy. Second, even if insurance coverage was made available to pay for the cleanup of third-party property, it does not follow that insurance coverage would automatically become available for the damage to the insured's own property.[71] Third, ample incentives exist to compel the insured to timely report and remediate contamination; the most significant being the potential for

criminal sanctions in addition to civil penalties for intentionally violating federal and state environmental statutes.[72]

An alternative explanation for allowing insurance coverage for potential third-party harm is that in environmental cases cleanup costs are often directly related to the length of time that the contaminant is left unremediated. *See, e.g., Allstate,* 713 F.Supp. at 40–41. Thus, an insurance company benefits by paying for the remediation *before* the pollutant migrates from the insured's property and onto the property of third-parties. *See Bankers Trust Co.,* 518 F.Supp. at 373. Under Texas law, insurance contracts are to be interpreted by the same rules of construction as any other contract. Thus, the terms are to be given their plain, ordinary meaning. It may be true that an insurance company would benefit from the early cleanup, and the parties are free to write a contract that provides for that type of coverage.[73] Texas Eastern and the Carriers entered into contracts which did not provide coverage for damage to the insured's property, and I refuse to alter the agreements which the parties freely made.

Finally, courts have relied on the fact that in the environmental context, the costs of cleanup and prevention of third-party and first-party damage are often inextricably linked, making it virtually impossible to equitably enforce the owned property exclusion. *See, e.g., Gloucester,* 668 F.Supp. at 400. While the task of separating the insurable costs may be difficult in some cases (I have previously indicated that it may be an impossible task in this case), I do not believe this

---

because the cleanup occurred on the insured's property).

**71.** In my view, an insurer in Texas Eastern's position cannot hope to obtain insurance coverage for any more than the cost of cleaning up actual third-party property damage or that portion of harm to its own property which is primarily aimed at the prevention of imminent and substantial third-party harm. Therefore, the extra insurance coverage obtained by the insured provides a minimal incentive to allow the pollutant to migrate to third-party property.

**72.** I also reject Texas Eastern's contention that notions of fairness, equity, or public policy re-

quire a different result. Although I agree that an insured who remediates unintended environmental harm before it contaminates other property has saved its CGL insurance carriers from liability for third-party harm, matters of financial fairness are better addressed in an action for restitution, grounded upon a claim of unjust enrichment, than by rewriting the parties' contracts.

**73.** Texas Eastern might also have applied for Environmental Impairment Liability (EIL) Insurance which specifically provides coverage for environmental damage. There is some evidence which suggests that Texas Eastern considered such a purchase but later rejected the idea. (*See* App. 301.)

difficulty is sufficient to invalidate the owned property exclusion. It is the insured's responsibility to present the insurer with claims that are covered by insurance. This responsibility includes the identification of costs which are recoverable and those which are not. The insured should not reap an additional benefit simply because damages are difficult to prove. If Texas Eastern cannot segregate its damages, then, under Texas law, it fails to satisfy a condition precedent to recovery under its insurance contracts, and the Carriers' obligation to indemnify will never mature.

Texas Eastern contends that no showing of any significant link between the third-party risk and the first-party remediation need be made before a court will allow recovery of the entire cleanup cost. To the contrary, many of the cases considering this issue, and on which Texas Eastern relies, have held that the threat of third-party damage must be significant before a court will allow the insured to recover the cleanup costs for damage to its own property. For example, a number of cases have limited their holding to situations where the danger is both imminent and substantial. In *Broadwell Realty,* the court summarized its holding: "We are thus convinced that abatement remedies designed to prevent imminent and immediate damage to third parties cannot be denied on the basis of the owned-property exclusion." *Broadwell Realty,* 218 N.J.Super. 516, 528 A.2d at 82.[74]

Other courts have failed to expressly limit their holdings, but have reached their conclusions in situations where the danger to third-party property was clearly imminent, substantial, or both. *See, e.g., Allstate,* 713 F.Supp. at 41 (finding that the gas leak from the insured's property constituted a "demonstrated danger" to third-party property); *Conservation Chem.,* 653 F.Supp. at 175 (finding that the release of the hazardous substances constituted an " 'imminent and substantial endangerment to the public or welfare of the environment' "); *Consolidated*

*Rail,* 1986 WL 6547 (32,000 gallons of chloroform was spilled on the insured's property and the property of third parties, clearly creating a substantial danger of third-party harm).

Further, many of these courts explicitly recognized that the insured does not automatically receive coverage for all of its remediation costs. As one court explained, "[t]o the extent that all or a portion of the response expenses pertain solely to damage to the [insured's property] and not to prevent off-site contamination, the owned property exclusion clearly applies, and such damage is not within the coverage provided." *Broadwell Realty,* 218 N.J.Super. 516, 528 A.2d at 82. *See also Conservation Chem.,* 653 F.Supp. at 200.

Although I agree with Texas Eastern that no consensus exists regarding the precise showing that an insured must make in order to secure coverage for costs incurred on its own property, my reading of the cases leads me to conclude that the insured must at a minimum establish that the costs of cleaning up its own property are significantly related to the cleanup of actual third-party harm or the prevention of future imminent and substantial third-party damage.

In the present case, Texas Eastern relies almost exclusively on the affidavits of Karen Hammerstrom to support its contention that the damages it suffered because of the EPA Consent Decree were the result of EPA's concern for potential off-site third-party harm. This evidence is sufficient to support the contention that the damage on Texas Eastern's own property is related to third-party harm for the purposes of deciding the present motions. Therefore, the Carriers' motion for summary judgment will be denied on the "Owned Property Exclusion" issue. I want to make it clear, however, that if this issue ever came to trial, Texas Eastern would have to establish that each dollar for

---

**74.** *See also Summit Assocs., Inc. v. Liberty Mut. Fire Ins. Co.,* 229 N.J.Super. 56, 550 A.2d 1235, 1240 (App.Div.1988) (requiring the trial court, on remand, to determine whether the threat to third-party property was "immediate and imminent or whether it was an 'undefined and speculative future loss' which should be excluded from coverage.")

which it seeks insurance coverage is substantially related to third-party harm.[75]

## XII. POLLUTION EXCLUSION

 Both the Carriers and Texas Eastern have moved for summary judgment on the issue of the applicability of two types of pollution exclusion clauses contained in a number of Texas Eastern's insurance policies. Texas Eastern seeks a ruling that pollution caused over a "period of years" can still have been "sudden and accidental" as required by the language of both pollution exclusions. The Carriers contend that pollution caused by intentional discharges over a period of years cannot be considered either "sudden" or "accidental" and that the undisputed facts conclusively establish that Texas Eastern's PCB discharges occurred over a period of almost thirty years, thus precluding any insurance coverage for Texas Eastern's remediation costs. For the following reasons, I agree with the Carriers and will therefore grant summary judgment in favor of those Carriers whose insurance policies contain a pollution exclusion. Texas Eastern's motion will be denied.

Many, but not all, of the insurance policies contain a pollution exclusion. In the policies that do contain such an exclusion, the exclusion generally takes one of the following two forms:

1. This policy does not apply to—bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

2. This insurance does not cover any liability for—Personal Injury or Bodily Injury or loss of, damage to, or loss of use of property directly or indirectly caused by seepage, pollution or contamination, provided always that this paragraph ... shall not apply to liability for Personal Injury or Bodily Injury or loss of or physical damage to or destruction of tangible property, or loss of use of such property damaged or destroyed where such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this insurance.

I will refer to the first type of exclusion as an "ISO exclusion" and the second version as a "London Market exclusion."

 Under the terms of the ISO exclusion, the discharge of a pollutant invalidates any insurance coverage for bodily injury or property damage [76] resulting from the

---

**75.** I have explained on two other occasions that I doubt Texas Eastern will be able to make such a showing. Making Texas Eastern's burden even more difficult is evidence establishing that Texas Eastern believed that off-site migration was not an imminent or substantial danger. For example, Bradford Cushing testified at his deposition that EPA made a determination that "the [PCB] sites did not present an eminent [sic] and substantial endangerment requiring immediate action." (Dep. of Bradford Cushing, App. 304 at 446–47.) Likewise, Carol Dinkins testified that Texas Eastern represented to EPA that the PCBs did not represent a substantial endangerment. (Dep. of Carol Dinkins, App. 275 at 159–60.) It is clear to me that EPA would have ordered Texas Eastern to remediate the PCBs on its property whether or not the PCBs posed an immediate threat to third parties or the environment. Evidencing this is the fact that EPA discussed the pit remediation with Texas Eastern long before EPA realized that off-site migration had occurred. While this would not necessarily preclude coverage for some of the claims, it is further evidence that third-party harm was not the

primary focus of the EPA complaint and of the EPA Consent Decree.

**76.** Texas Eastern has additionally requested a ruling that the government and private third-party actions which underlie this litigation seek damages for "personal injury" as well as for property and bodily injury. Specifically, Texas Eastern alleges that the migration of PCBs onto the property of third parties can be considered personal injury under the provisions of its various insurance policies. Having considered Texas Eastern's arguments, I reject this interpretation of the insurance policies.

Contemporaneous with this opinion, I have filed a memorandum and order denying Texas Eastern's motion for leave to file an amended complaint which includes new private third-party lawsuits filed against Texas Eastern arising out of the PCB contamination. This litigation is therefore primarily concerned with the government actions requiring Texas Eastern to remediate the PCB contamination and to pay certain civil penalties. The EPA Consent Decree is

discharge. The exclusion contains an exception which restores coverage in the event that the discharge is both "sudden and accidental." Under the terms of the London Market exclusion, no insurance coverage exists for bodily injury, personal injury, or property damage caused by pollution or other contamination. The exclusion restores coverage in the event that the damage is caused by a "sudden, unintended, or unexpected happening."

As should be clear from my discussion of the facts, I have concluded that all of the damage in this litigation was caused by Texas Eastern's long-term and continuous release of PCBs on its own property. There can be no material dispute that absent the applicability of the relevant exception, those insurance policies which contain either of the two pollution exclusions provide no coverage to Texas Eastern.

The Carriers contend that they have offered undisputed facts which establish that Texas Eastern intentionally discharged pipeline liquids contaminated with PCBs into unlined earthen pits, intentionally discharged pipeline liquids into the atmosphere during the start-up and shut-down of the compressor units, and intentionally discharged pipeline liquids onto weeds and dirt roads during a twenty-five year period beginning in 1958. The Carriers move for summary judgment on the ground that the two pollution exclu-

sions bar coverage and Texas Eastern cannot offer evidence sufficient for a reasonable jury to conclude that its conduct comes within the exception to either the ISO or London Market exclusion.

Texas Eastern responds that its discharges can be characterized as "sudden and accidental," or as "sudden, unexpected, and unintended." In support of this contention Texas Eastern argues that the term "sudden" is ambiguous and can be interpreted to have more than one meaning. One meaning is a temporal one, as in "quick" or "abrupt." The second meaning is one without regard to the timing of the event, as in "unexpected" or "unintended." If "sudden" means "unexpected," then the mere fact that Texas Eastern's discharges occurred over a long period of time is not relevant to the applicability of the ISO or London Market exclusions. Texas Eastern further contends that its various discharges can be characterized as "accidental," and therefore both "unexpected and unintended," and fall squarely within the exceptions to both exclusions.

■ Concerning the ISO exclusion, there are two principal questions which must be addressed: (1) should the focus of the pollution exclusion analysis be on the discharge of the pollutant into the environment or on the resulting environmental damage, and (2) must "sudden" have a temporal meaning akin

grounded primarily on RCRA and TSCA claims, although it clearly includes an element of a CERCLA claim. The state claims are based primarily on state environmental laws which are similar to the federal statutes.

It is Texas Eastern's position that the EPA claims are codifications of common law trespass and nuisance causes of action and are therefore covered under the personal injury provisions which provide coverage for "wrongful entry" and in some cases "other invasion[s] of the right of private occupancy." I have read EPA's Complaint and can identify no claim expressly based on either trespass or nuisance. I reject Texas Eastern's contention that because one of the many motivations behind the federal legislation was the codification of the common law causes of action, a RCRA or TSCA action is thereby transformed into one for either trespass or nuisance.

It may well be appropriate in some cases to look behind the express pleadings of a complaint to determine whether an insurance carrier must

defend or indemnify an insured for a particular claim, but I do not believe that Texas law requires a court or an insurance company to examine the legislative history of a federal or state statute to determine whether a particular statutory claim can be recharacterized as a covered common law cause of action.

Concerning the state government actions, Texas Eastern has provided insufficient evidence to allow me to conclude that there is any allegation of damage for personal injury in the common law form of nuisance or trespass. To the extent that Texas Eastern sought rulings that the nature of the EPA or other state government claims includes personal injury, its motion will be denied. The two private third-party actions do allege personal injury and the ISO pollution exclusion does not apply to those causes of action. The London Market exclusion does apply to personal injury, see supra pp. 1345–1346, and coverage for the private third-party complaints is barred by any insurance policies containing a London Market type pollution exclusion.

to "quick" or "abrupt," or can it also have a non-temporal meaning?

On the first issue, courts have been virtually unanimous in concluding that the focus of the pollution exclusion inquiry is on the initial discharge of the pollutant into the environment. For example, the Third Circuit recently concluded that "the plain language of the 'sudden and accidental' exception focuses on the nature of the discharge, not on the resulting environmental damage." *New Castle County*, 933 F.2d at 1202 (Delaware law). *Accord, Liberty Mutual Ins. Co. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1157 (4th Cir.1992), *petition for cert. filed* June 1, 1992, (No. 91–1945) (New Jersey law); *Broderick Inv. Co. v. Hartford Accident & Indem. Co.*, 954 F.2d 601, 607 (10th Cir.1992) (Colorado law); *Hartford Accident & Indem. Co. v. United States Fidelity & Guar. Co.*, No. 91–4057, 1992 WL 87828, at *6 (10th Cir. April 30, 1992) (Utah law).

▬▬ In my view, reading the pollution exclusion to focus on the resulting environmental damage, rather than on the discharge of the pollutant, merely repeats the restriction of coverage created by the definition of an "occurrence": the policy provides insurance coverage only for unintentional damage.

This interpretation is contrary to the long standing Texas principle that, wherever possible, meaning should be given to all clauses of an insurance policy. I conclude, therefore, that the Texas Supreme Court would require that the "discharge" of the PCBs, and not the resulting environmental damage, be both "sudden and accidental" [77] in order for Texas Eastern to avoid the bar of the ISO pollution exclusion.[78]

As I have previously explained, Texas Eastern bears the burden of establishing either that the occurrence does not come within an exclusion *or* that it can meet the requirements of the exception to the exclusion. The applicability of the exclusion has been established, and the only question to be decided is whether Texas Eastern's loss falls within the narrow exception to the exclusion.

Under the terms of the ISO exclusion, Texas Eastern must prove that the discharge of pipeline liquids (contaminated with PCBs) was both "sudden and accidental." Texas Eastern contends that "sudden" has more than one reasonable interpretation and, pursuant to Texas law, must be considered an ambiguous term. Under Texas law, if a term in an insurance contract has more than one reasonable meaning, it is ambiguous as a

---

**77.** *See Ogden Corp. v. Travelers Indem. Co.*, 924 F.2d 39, 42 (2d Cir.1991) (concluding that the terms of the pollution exclusion require that the discharge meet both the "sudden" and "accidental" provisions in order to satisfy the exception to the exclusion). Texas Eastern apparently admits at page six in its memorandum in opposition to the insurers' motion for summary judgment that the focus should be on the discharge and not on the damage which the discharge ultimately causes.

**78.** Texas Eastern has raised the additional arguments that it is entitled to a trial on the issues of (1) whether PCBs constitute a "pollutant" as defined by the insurance policies, and (2) whether depositing pipeline liquids into pits and spraying liquids into the atmosphere constitutes a "discharge" as defined by the insurance policies.

It is undisputed that Texas Eastern intentionally deposited pipeline liquids containing PCBs into its unlined earthen pits. As a matter of law, I conclude that this act is a "discharge, dispersal, release or escape" as defined by the ISO exclusion. It is also undisputed that Texas Eastern released pipeline liquids into the atmosphere during the start-up and shut-down of the compressor units. I conclude that these acts were

either "discharge[s], dispersal[s], release[s] or escape[s]" as defined by the ISO pollution exclusion. Finally, Texas Eastern's intentional spraying of pipeline liquids to kill weeds and to wet down dirt roads is clearly covered by the plain language of the exclusion. Likewise, these events clearly constitute "happenings" as required by the London Market type exclusion. Therefore no disputed issue exists for trial.

It is equally clear that PCBs are covered by the plain language of the ISO and London Market exclusions. It is beyond dispute that PCBs are a toxic chemical. As such, the release of PCBs into the environment satisfies the language of both exclusions. If Texas Eastern had discharged a small amount of PCBs into a contained area, there might be a dispute as to whether that release constituted either "pollution" or "contamination." However, the undisputed facts reveal that substantial amounts of PCBs were released into the unlined earthen pits, dispersed into the air, and sprayed onto the ground over a long period of years. Texas Eastern has offered no reasonable argument to support its contention that the release of PCBs into the environment did not constitute "pollution" or "contamination" and thus the language of the ISO and London Market exclusions is satisfied.

matter of law, and must be interpreted against the insurer and in favor of providing insurance coverage. Texas Eastern argues that "sudden" can reasonably be interpreted to mean "unexpected" or "unintended," without any reference to the duration of the occurrence. Thus, an event can be "sudden" without necessarily starting or ending "quickly," and can occur over a long period of time.

Texas Eastern's interpretation has some support in the case law. Of the numerous courts in jurisdictions other than Texas that have considered this question, approximately one-half have concluded that "sudden" need not necessarily have a temporal meaning. *See New Castle County*, 933 F.2d at 1195 n. 60 & n. 61 (collecting cases). The fact that other courts have concluded that "sudden" is susceptible to more than one reasonable meaning is some evidence that "sudden" may be an ambiguous term, but does not automatically require a finding of ambiguity. *Hartford Accident & Indem. Co.*, 1992 WL 87828, at *4; *New Castle County*, 933 F.2d at 1196. Indeed, it is my view that the split in authority is not particularly relevant because my sole responsibility is to attempt to ascertain what the Supreme Court of Texas would conclude.

The dictionary definition of "sudden" lends further support to Texas Eastern's position. For example, *Black's Law Dictionary* 1284 (1979) defines "sudden" as "[h]appening without previous notice or with very brief notice; coming or occurring unexpectedly; unforeseen; unprepared for." At the same time, *Webster's II New Riverside University Dictionary* 1157 (1984) defines "sudden" as "[t]aking place without warning"; "hasty: abrupt"; "brought about in a short time"; or "very quickly and unexpectedly." Clearly the two definitions cannot easily be fully reconciled.

Courts disagree, however, on the significance of these conflicting dictionary defini-

tions. For example, when faced with a similar issue, the Michigan Supreme Court recently refused to give any weight to the conflicting dictionary definitions presented to it as evidence that "sudden" was an ambiguous term. The court explained that if courts reasoned that dictionary differences on the definition of "sudden" is evidence in and of itself that the term is ambiguous, "it would be virtually impossible to write a contract that was unambiguous." *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 476 N.W.2d 392, 398 n. 8 (1991).

■ I agree with those courts holding that dictionary definitions are not significantly helpful in determining whether a term has two reasonable definitions. It will often be the case that different people reading different dictionary definitions of the same word will reach different and unique interpretations of that word. That does not automatically mean that every definition is itself reasonable. In the present case, it is certainly reasonable for a person to conclude from reading dictionary definitions that "sudden" need not have a temporal meaning. In my view, however, it is nevertheless an unreasonable and unacceptable interpretation of the term.[79] I will therefore accord the conflicting dictionary definitions little weight.[80]

Finally, Texas Eastern relies on the drafting history of the pollution exclusion to support its contention that "sudden" can have a non-temporal meaning. (*See* Hart Decl., Exs. 19–31.) The Carriers have urged, in their motion to strike, that I not consider this evidence because Texas law forbids the consultation of extrinsic evidence in determining whether a contract term is ambiguous. I have reviewed Texas law on this issue and conclude that it is appropriate to consider the wording of a contract in light of surrounding circumstances. *See Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 731 (Tex.1981):

---

**79.** It is significant that Black's Law Dictionary has the unreasonable definition of the term. Black's relies on case law, not laymen's understanding, to form its definitions.

**80.** Although the Third Circuit found the dictionary definition of "sudden" persuasive evidence,

it agreed that conflicting definitions did not require a finding of ambiguity: "[W]e agree ... that the existence of more than one dictionary definition is not the *sine qua non* of ambiguity. If it were, few words would be unambiguous." *New Castle County*, 933 F.2d at 1193.

If, in the light of surrounding circumstances, the language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing. Consideration of the facts and circumstances surrounding the execution of a contract, however, is simply an aid in the construction of the contract's language. *Id.* Having examined the drafting history of the pollution exclusion, I conclude that it is indeed evidence that some of the pollution exclusion drafters considered the meaning of "sudden" to be "unexpected and unintended." In fact, the Third circuit concluded in *New Castle County* that similar drafting history implied that an interpretation of the term "sudden" which included a non-temporal meaning "is at least plausible, if not plainly correct." *New Castle County,* 933 F.2d at 1198.

More significantly from my perspective, however, is the lack of evidence linking this non-temporal meaning of "sudden" to the parties to these particular insurance contracts. For example, there is no evidence that the parties ever discussed the meaning of the term "sudden" or referred to the original intent of the drafters at the time of contract. There is little credible evidence even tending to show that the Carriers or Texas Eastern were aware of the drafters' explanation of the ISO pollution exclusion at the time Texas Eastern and the Carriers entered into their contracts of insurance.

Given the tangential relationship of the drafting history to the actual contracts entered into by the Carriers and Texas Eastern, I do not believe that the drafting history is persuasive evidence of the "facts and circumstances surrounding the *execution* of [the insurance] contract[s]." *Sun Oil Co.,* 626 S.W.2d at 731 (emphasis added). I will therefore consider it as some, but not persuasive, evidence that "sudden" can reasonably mean "unexpected and unintended" without any temporal restriction.

The parties have cited only one case applying Texas law which specifically addresses the meaning of the term "sudden" in the context of a pollution exclusion. In *National Standard Ins. Co. v. Continental Ins. Co.,* No. CA–3–81–1015–D, slip op. (N.D.Tex. October 4, 1983), the district court held that under Texas law, discharges of pollutants over "a period of years" could not be considered " 'sudden and accidental.' " *National Standard,* No. CA–3–81–1015–D, slip op. at 9.

*National Standard* involved a tort action for bodily injury caused by exposure to chemical carcinogens released into the atmosphere by the insured. In holding that the pollution exclusion [81] precluded coverage under the policies, the court explained:

> These claimants assert only that they were exposed to the chemicals through the atmosphere. Regardless of the legal theory used, each of the causes of action they allege would require proof that the defendants discharged the chemicals into the atmosphere. Moreover, they assert that the harmful conditions continued over a period of years, and thus there is no basis in the allegations for describing the chemical discharges as "sudden and accidental." Accordingly, the insurers whose policies otherwise place them on the risk for these claimants, but which policies contain the pollution exclusion, have no obligation to defend these suits.

*National Standard,* No. CA–3–81–1015–D, slip op. at 9. I interpret this case to support my conclusion that under Texas law, (1) the focus of the analysis under the pollution exclusion is the discharge of the pollutant into the environment, and (2) "sudden" has a temporal meaning akin to "quick" or "abrupt."

It is worth repeating what should already be clear: my principal responsibility is to predict what the Supreme Court of Texas would conclude about the meaning of the term "sudden." I have been provided with some guidance from the district court in *National Standard.* I have also given significant thought to the issue and conclude that, if faced with this issue, the Texas Supreme Court would decide that "sudden" is unambiguous and cannot reasonably be divorced

81. The pollution exclusion was the ISO type exclusion.

from "swiftness," "quickness," or all temporal significance.[82]

I reach this decision keeping in mind the strong presumptions in Texas law that a court must not create an ambiguity in a contract when none exists and must give effect to each term in an insurance contract. Having considered all of the evidence, I believe that a definition of "sudden" which divorces it from the meaning of "swift" and "abrupt" is an unreasonable and tortured interpretation and not one which the Supreme Court of Texas is likely to adopt. Having already concluded that the damages for which Texas Eastern seeks coverage was not caused "quickly" or "abruptly" (because Texas Eastern discharged PCBs into the environment over a long period of years), I find that the ISO exclusion bars coverage for Texas Eastern's claims.

The London Market exclusion is also clearly unambiguous and therefore bars coverage. This exclusion bars coverage of any liability for property, bodily, or personal injury caused by seepage, pollution, or contamination, unless such seepage, pollution, or contamination is caused by a "sudden, unintended and unexpected happening." In the context of this exclusion, "sudden" clearly has a temporal meaning. To interpret "sudden" to mean that the discharge must only be "unintended and unexpected" would create an obvious redundancy in the policy.

■ Although my finding that the discharges were not "sudden" is sufficient to bar coverage under either exclusion, the discharges were also clearly not "accidental." To the contrary, the discharges were intentional and deliberate. Texas Eastern contends that the discharge of PCBs was "accidental" because Texas Eastern was, at least during the earlier years in question, unaware

of the PCB content of its discharges and that it did not know it was discharging a pollutant. I believe that the Texas Supreme Court would rule that where, as here, the substance, regardless of its content, is discharged intentionally, lack of knowledge of the substance's pollutant content does not make the discharge "unintentional" or "accidental."

■ Texas Eastern also suggests that the relevant "discharge" occurred when the liquids migrated onto third-party property and that this was "accidental." It is the insured's initial discharge, however, not the resulting damage or pollution, that is the focus of the inquiry under the pollution exclusion clauses. In this case, the relevant discharge occurred when the PCBs, whether known or unknown, were released and emitted from Texas Eastern's compressors. Those discharges were neither "sudden" nor "accidental" within the plain meaning of the ISO and London Market pollution exclusion clauses.

For all of these reasons, the policies that contain an ISO or London Market pollution exclusion clause do not afford coverage to Texas Eastern, and as to those policies, summary judgment will be granted to the respective Carriers.[83]

## XIII. LATE NOTICE

Both the Carriers and Texas Eastern have moved for summary judgment on the issue of "Late Notice." The Carriers contend that the August 19, 1987 notice provided by Texas Eastern violated a condition precedent to insurance coverage, thereby relieving the Carriers of the duty to defend or indemnify any of the claims against Texas Eastern. Additionally, the Carriers contend that Texas Eastern's late notice prejudiced their ability to adequately evaluate the nature of the

---

**82.** In this regard, it is useful to recall the Fifth Circuit's statement about a lawyer's ability to create ambiguity: "As necessity is the mother of invention, so is ambiguity the father of multiple reasonable constructions, and where lawyers are involved, one never lacks an eager parent of either gender." *Ideal Mut. Ins. Co.,* 783 F.2d at 1238.

**83.** I note that with respect to one policy issued by Aegis, effective from March 1, 1975 to March

1, 1981, Texas Eastern contends that the pollution exclusion was deleted by endorsement for the entire effective period of the policy, while Aegis contends that the exclusion was deleted only from 1978 to 1981. Because I will grant summary judgment under all policies on the issue of late notice, I do not decide whether this policy contained a pollution exclusion from 1975 to 1978.

claims. Texas Eastern denies that the notice was late and further denies that the Carriers have suffered any appreciable prejudice due to the timing of the notice. I conclude that Texas Eastern's notice was late as a matter of law, and that the Carriers were prejudiced by such late notice. Therefore, the Carriers' motion for summary judgment will be granted as to all claims, and Texas Eastern's motion will be denied.

### A. The Policy Terms

All of the insurance policies issued to Texas Eastern contain a condition precedent requiring Texas Eastern to give notice to the Carriers of both an "occurrence" and of a "claim or suit." The insured's duty is typically to provide notice of an "occurrence as soon as practicable," and to forward every demand, notice, summons, or other process, with regard to a claim or suit, "immediately."

The excess policies typically require notice only of an "occurrence which appears likely to result in liability under" the excess policies themselves. In addition, some of the excess policies contain a provision which provides that the failure to give timely notice does not prejudice the insured's rights under the policy if the insured initially believed that the "occurrence" was unlikely to involve that policy.[84]

Texas Eastern's primary insurance coverage was provided by the F & C policies. Under the policies in effect from July 1967 to January 1981, the duty to notify the insurer arises only after notice of the "occurrence has been received by the Insurance Department or executive officer of the Insured." In the F & C policy effective from January 1981 to April 1988, the duty to notify arises only after notice of the "occurrence has been received by the Insurance Department of Texas Eastern Corporation."

### B. Accrual of Texas Eastern's Obligation to Notify its CGL Insurers

The Carriers' allegations concerning the precise time when Texas Eastern's obligation to provide notice accrued are vague. The Carriers' motion cites numerous events, beginning in 1981, which arguably triggered Texas Eastern's notice obligations.[85] As I have previously discussed, the most relevant events for determining the accrual date of Texas Eastern's notice obligation are those events which establish an awareness of off-site migration. Events involving on-site PCB contamination are also relevant because they establish that Texas Eastern was, or should have been, aware of the magnitude of its PCB problem and, thus, affect the determination of what a "reasonable time" for notice after the accrual of the obligation should be. I will briefly outline the relevant events.

#### 1. 1981

The first significant event of which the Carriers allege Texas Eastern should have provided notice was the 1981 discovery of PCBs in a residential gas meter in Long Island, New York. Although claims were made against Texas Eastern for contribution to the costs incurred by gas distribution companies for cleaning up the PCBs, Texas Eastern provided notice of the claims only to one excess liability carrier but not to its primary or other excess insurance carriers. Texas Eastern contends that the distribution companies' intentions to seek contribution for their costs were not considered "claims," (App. 267), and also that Texas Eastern is not now seeking coverage for any money paid to reimburse its customers' costs. In addition, Texas Eastern observes that it was only one of a number of natural gas suppliers to the Long Island site, and that it was never conclusively established that Texas Eastern was the sole source of the PCB contamina-

---

84. Record evidence establishes that prior to April 1987, Texas Eastern's senior management understood that cleanup costs would likely exceed $100 million. Although Texas Eastern has not strenuously argued that the excess carriers were entitled to notice some time later than F & C, its knowledge of the probable cleanup costs would foreclose such an argument.

85. In fact, the Carriers have contended that Texas Eastern knew, beginning in 1958, that it had a significant PCB-related problem, suggesting the possibility of a notification obligation many years prior to the actual date of notice.

tion, thus rendering the validity of such claims doubtful.[86] (Dep. of Willard Young, TApp. 20 at 431–36.) Nevertheless, the Carriers plausibly argue that this was an "occurrence" likely to (and which in fact did) result in a claim by third parties.

### 2. *1982*

In August 1982, Texas Eastern entered into two Consent Agreements with EPA, obligating Texas Eastern, *inter alia*, to test the lubricating oil in its compressors for the presence of PCBs. (App. 289; App. 290.) Texas Eastern contends, not too convincingly, that it did not give notice to the Carriers because it did not believe that this was a claim as defined by its CGL insurance policies. The Carriers observe that many of these costs are similar, if not identical, to the remediation costs for which Texas Eastern is now seeking insurance coverage. Examples of the costs include the installation of source control equipment, testing of pipeline liquids, and disposal of the PCBs.

In addition, Texas Eastern learned, in 1982, that an unlined earthen pit at its St. Francisville station was contaminated with PCBs and might require remediation. (TRSOF ¶¶ 291, 293). There is no evidence, however, that Texas Eastern then knew that any of the PCBs were migrating off its own property. The inherent danger (migration of any liquid from unlined earthen pits) is, however, so obvious, that prudence should have guided Texas Eastern to notify its numerous insurance carriers of potential claims in the future.

Indeed, it certainly could be argued that the known PCB contamination in Texas Eastern's pits, which Texas Eastern insists was unintended, was an event which, in light of federal statutes and EPA's probable re-

quirement of remediation, was likely to result in a claim by EPA. Although Texas Eastern attempts to ground its obligation to notify entirely on the likelihood of a claim resulting from migration of PCBs onto third-party property, it is clear that the major cause and basis of Texas Eastern's present claims is cost associated with the EPA mandated cleanup of PCBs on Texas Eastern's own property. Thus, the CGL carriers certainly would have expected to be notified of this event "as soon as practicable" if, as now, Texas Eastern seeks to recover these costs from its insurers.[87]

### 3. *1983*

Texas Eastern admits that it partially prepared a generic Environmental Impairment Liability (EIL) insurance application in which it listed PCBs in its compressor lubricant as a possible source of a future claim. (TSOF ¶¶ 92–94; App. 301 at 000602547). The application was never completed or actually submitted to any insurance company and Texas Eastern contends that its Insurance Department never reviewed the application. Of course, an event which is likely to give rise to a claim pursuant to an EIL policy is not necessarily synonymous with an event likely to give rise to a covered claim pursuant to a CGL insurance policy.[88] This does establish, however, that as early as 1983, Texas Eastern was aware of the potential for future claims.

### 4. *1984*

It is undisputed that EPA, in late November or early December 1984, (App. 306), issued a complaint against Texas Eastern's subsidiary gas pipeline company, Transwestern, which serviced areas not involved in this litigation. At that time, Texas Eastern was

---

**86.** Doubtful claims, however, do not do away with an insured's duty to notify its insurer.

**87.** Texas Eastern cannot have it both ways. If I were to accept Texas Eastern's argument that the owned property exclusion does not apply to environmental harm of this type, then Texas Eastern would have to prove that notice was not late with respect to claims for cleaning up its own property. Since it knew of this so-called occurrence as early as 1982, the notice was late as a matter of law.

Conversely, if I accept Texas Eastern's argument that notice is only required when there is a likelihood of a claim by a third party based on PCB contamination, Texas Eastern is all but admitting that the owned property exclusion applies to virtually all of these claims.

**88.** However, "Texas Eastern's Insurance Department believed that Texas Eastern already enjoyed the equivalent of EIL coverage under its general liability policies." (TSOF ¶ 94.)

completing, or had completed, the sale of the Transwestern pipeline to Houston Natural Gas (HNG).[89] In April 1985, Transwestern entered into a Consent Agreement with EPA, requiring Transwestern to clean up PCB contamination found in its earthen pits. (App. 306.) Texas Eastern subsequently entered into an agreement with Transwestern to pay for a percentage of Transwestern's remediation costs to be incurred prior to December 31, 1987, up to an aggregate amount of $2 million. Texas Eastern contends that it did not consider this a "claim or occurrence" pursuant to its insurance policies, (TRSOF ¶ 309), and is not seeking insurance coverage for these costs in the present action.

### 5. *1985*

In a January 10, 1985 phone conversation, EPA representative Mike Wood told J.C. Williams, Texas Eastern's Director of Technical Services, that the Transwestern system pit cleanup would require a settlement agreement which would include, among other things, "the method of cleanup, a time schedule (i.e. how soon), to what PCB concentration, etc." (App. 286 at 2.) Texas Eastern admits that Wood advised Texas Eastern that it should make assessments of potential contamination at other Transwestern system locations also using pits. (*Id.*) Texas Eastern contends that it did not report this to its insurance carriers because it did not consider the Transwestern system contamination, or the suggestion to investigate potential contamination at other sites, to be a claim against Texas Eastern. It seems clear, however, that Texas Eastern knew that there was a likelihood of claims by EPA and state environmental agencies concerning the cleanup of Texas Eastern's pits. It is at least arguable that these events were "occurrences" likely to give rise to a claim and therefore triggered an obligation to notify many of the Carriers "as soon as practicable."

In August 1985, EPA issued a Notice of Non–Compliance to Texas Eastern's Delmont station for violations of TSCA regulations concerning the marking, storage, disposal, and record-keeping of PCBs. (App. 317.) A copy of this letter was forwarded to Texas Eastern Vice President, H. Douglas Church. (*Id.*) In a subsequent meeting with EPA, Texas Eastern discussed its plans for the closing of its unlined earthen pits.

In November 1985, Texas Eastern hired Roy F. Weston, Inc. to determine the nature and extent of the PCB contamination around the pits, and to devise a remedial plan. (App. 323.) Texas Eastern began to receive results of Weston's initial six-site survey, which began with sampling in December 1985, almost immediately. (App. 3 at No. 400.)

It is undisputed that by this time Texas Eastern understood that it would have to remediate many of its pits to clean the PCB contamination. (Dep. of Howard Homeyer, App. 449 at 134.) In this litigation, it now seeks to recover these remediation costs. A document prepared for Henry King, Texas Eastern's President, by his administrative assistants, dated November 5, 1985, states that "TE's insurance does not cover any costs of clean-up but any accident or emergency involving PCB's [sic] would be covered under the Corporation's liability insurance." (App. 324 at 2.) It is disputed whether this information was provided by Texas Eastern's Risk Management Division, but it does establish that Texas Eastern's senior management did consider the potential insurance ramifications of an on-site remediation of PCB contamination.

The Carriers observe that the Special Master[90] concluded that Texas Eastern anticipated litigation with EPA no later than May 1985, and entered into negotiations with EPA no later than August 1985. (Special Master's "Report and Recommendation No. 2" at 14, Document No. 383.) The Carriers assert that this evidence establishes that

---

89. As late as January 11, 1985, however, Texas Eastern continued to operate the Transwestern system during the change of ownership. (App. 286.)

90. Arlin Adams, formally a judge on the Third Circuit Court of Appeals, was the special master assigned to this case for the purpose of resolving certain discovery disputes involving claimed attorney-client and work-product privileges.

Texas Eastern knew, or should have known, that EPA was making a claim against Texas Eastern because of an occurrence which was *likely* to give rise to a significant claim. Texas Eastern responds that these negotiations did not involve "occurrences" as defined by its insurance policies, and that no notice to the insurance carriers was required, because any potential litigation would *not* have concerned third-party damage. (Cody Decl., TApp. 214 at ¶¶ 7, 8.) Although Texas Eastern disavows that it is claiming indemnity for the cleanup costs unassociated with third-party damages [91], it is clear from all of its submissions that Texas Eastern is seeking complete indemnification for all costs it has incurred and will incur in the actual PCB cleanup. Thus, it would appear that at least by May 1985, Texas Eastern should have notified its primary and excess CGL carriers of the likelihood of a claim or claims, if it is to recover any of these remediation costs.

### 6. *1986*

By February 18, 1986, Weston delivered a draft report of the six-site survey to Texas Eastern. (App. 341.) The report clearly establishes that PCBs were found in the drainage swales and surface water bodies of the unlined earthen pits, and that the potential for off-site migration existed. (*Id.* at 001363937.) This is uncontradicted evidence that Texas Eastern was, at a minimum, aware of the potential for off-site migration as of February 1986.

Texas Eastern met with EPA officials on April 30, 1986, to present the results of Weston's investigation and expressed an interest in entering into a consent agreement to clean up the pits. (App. 76.) Texas Eastern maintains, however, that this settlement, and EPA's concern about the pits, did not include any consideration of off-site migration or off-site remediation.[92] Texas Eastern's knowledge that PCBs were found in the swales and

surface liquids of the pits, and its knowledge that, over the course of years, pit liquids had migrated onto third-party properties, for which claims were made and compensation paid (albeit not expressly for PCB contamination), certainly alerted Texas Eastern to the potential for PCB contamination claims being made in the future. Although Texas Eastern claims that it did not know PCBs could or would migrate from the pits, certainly, in light of all that it did know, it had reason to suspect the *potential* for migration and the likelihood of future claims by third-party landowners.

In May 1986, Texas Eastern requested that Weston expand its pit survey to include 54 additional compressor station sites. (TRSOF ¶ 354.) Texas Eastern received the initial results of this 54-site survey in December 1986, and ultimately forwarded the final results to EPA in March 1987. The March 1987 report clearly indicated that off-site contamination had occurred at a number of compressor station sites. (*See, e.g.,* Dep. of Bradford Cushing, App. 654 at 367–72 (relying solely on the March 1987 Weston 54-site survey final report to support his opinion that off-site migration of PCBs had occurred at the Wheelersburg, Ohio compressor station.)) In the Carriers' view, the only reasonable inference that can be drawn from the March 1987 final report is that Texas Eastern knew, or should have known, based on the December 1986 preliminary report, that off-site PCB migration had occurred. Supporting the Carriers' view is Texas Eastern's admission, at oral argument, that the initial results should have alerted Texas Eastern to the fact that off-site PCB contamination had occurred at a number of compressor station sites. (*See infra* p. 1360 note 97.)

In December 1986, Texas Eastern proposed a cleanup plan to EPA. (TRSOF

---

**91.** Texas Eastern, of course, believes that all costs incurred pursuant to the EPA Consent Decree are associated with third-party damage. I reject this view as discussed under "Owned Property." *See supra* part XI.

**92.** In fact, it is Texas Eastern's position that EPA did not make any specific cleanup demands at any time prior to April 1987. (Church Decl.,

TApp. 191 at ¶ 9.) EPA's failure to demand an immediate cleanup may be explained, in part, by the fact that the Weston report which Texas Eastern presented to EPA intentionally and deliberately deleted all of the references to potential off-site migration contained in the February 1986 draft. (Ins.' Mem. in Opp'n Summ.J.—Late Notice at 10–11.)

¶ 375; App. 3 at No. 437.). Justice Department representatives made it clear to Texas Eastern that it would require a judicially enforceable consent decree to result from these discussions. (Dep. of Carol Dinkins, App. 362 at 46.) By this time, Texas Eastern was committed to remediating the PCB contamination in its unlined earthen pits and the only material dispute between Texas Eastern and EPA was the extent of the cleanup and the form of the agreement which would be required.

In 1986, Lester Rosenberg, one of Texas Eastern's insurance brokers, began to assemble a list of CGL insurance policies purchased by Texas Eastern beginning with July 1, 1963. (App. 360.) The Carriers contend that this is evidence of Texas Eastern's intent to notify the Carriers of the remediation agreement with EPA. Texas Eastern responds that this was only part of a routine Texas Eastern Insurance Department practice to prepare historical summaries of insurance coverage. Neither party has offered evidence sufficient to establish the authenticity of either explanation.

The Carriers have further suggested that on July 3, 1986, a Texas Eastern Insurance Department employee discussed Texas Eastern's PCB problem with Mr. Rosenberg, stating that there was third-party damage at multiple sites. (Ins.' Mot.Summ.J.—Late Notice at 13.) At Mr. Rosenberg's deposition, he did not remember having such a conversation and the parties have offered no other evidence which establishes, with undisputed facts, whether such a conversation ever took place. (See SOF ¶ 363; App. 355; Dep. of Lester Rosenberg, App. 302 at 1106–10.)

In December 1986, Texas Eastern received, from its insurance agents Querbes & Nelson, a list of claim notification information and a summary of policy limits and insurers. (TRSOF ¶ 383; App. 366.) Despite this, notice was not given to the Carriers for another eight months.

### 7. *1987*

On February 21, 1987, the Houston Chronicle published an article detailing Texas Eastern's PCB-related problems. (App. 370.) Having read the article, the Carriers contend that John Dwinell, an Aegis claims attorney, contacted Texas Eastern Claims Manager, Maynard Williams. Mr. Williams informed Mr. Dwinell that the reported PCB matter did not concern Aegis. (Dep. of John Dwinell, App. 373 at 36–37.) Mr. Williams testified that he did not recall the exact conversation, but he testified that "it would be sort of ludicrous of me to tell someone that they are not going to be involved in something." (Dep. of Maynard Williams, TApp. 34 at 235.) He also stated that he recalled Dwinell telling him that Aegis would cover third-party actions but not anything on Texas Eastern's own property. (*Id.* at 236.)

Texas Eastern's Insurance Manager, James Farley, testified that Texas Eastern considered giving notice in February 1987, (Dep. of James Farley, App. 459 at 600–05), and that the Risk Management Department was being briefed weekly on the progress of the EPA discussions. (*Id.* at 606–07.) However, precisely what the Insurance Department was receiving notice of is hotly disputed by the parties and there are no undisputed facts on which to rely.[93]

Texas Eastern contends that its Insurance Department personnel were unaware of any third-party threat in late 1986 and early 1987. Stephen C. Mulliken, the Manager of Texas Eastern's Insurance Department, testified at his deposition that in 1987 he understood that Texas Eastern was negotiating with EPA about the cleanup of PCBs on Texas Eastern's own property and that this would not involve the Corporation's third-party liability policies. (Dep. of Stephen Mulliken, TApp. 2 at 252, 284–89.) James Farley expressed a similar opinion at his deposition. (Dep. of James Farley, TApp. 1 at 153–57, 164, 179, 472, 499.) It was only in April and May 1987, that the Insurance Department began to consider the PCB problem as a potential insurance matter.[94]

---

93. This is relevant because certain F & C policies required notice only after Texas Eastern's Insurance Department became aware of an "occurrence or claim." (*See supra* p. 1351.)

94. Apparently, it is undisputed that the Insurance Department was aware that Texas Eastern

On March 17, 1987, Texas Eastern officials testified before a United States Senate Subcommittee concerning Texas Eastern's PCB problem and the status of its settlement discussions with EPA. (App. 2 at 1, 13.) Shortly thereafter, the Carriers contend that settlement negotiations with EPA became intensive. Texas Eastern responds that prior to April 1987, EPA never insisted that Texas Eastern consider any risks of off-site contamination, and never insisted that cleanup levels be based on EPA's "risk assessment" with respect to harm caused or threatened to human health and the environment. According to Texas Eastern, this was also the first time that EPA demanded that Texas Eastern enter into formal negotiations to discuss specific cleanup demands. (TSOF ¶ 111; Church Decl., TApp. 191 at ¶ 9.) Even at this late date, Texas Eastern delayed notifying its insurance carriers for over four months.

On August 18, 1987, Carol Dinkins, Texas Eastern's attorney and chief negotiator, wrote a letter to David Batson, EPA's Chief Negotiator, outlining certain proposals made by Texas Eastern to settle the pit remediation issues with EPA. (App. 382.) I would not characterize this as an "agreement," but it clearly establishes that Texas Eastern had given the remediation issue significant consideration by this time in 1987.

According to Texas Eastern, after the Senate hearings, the Insurance Department began an investigation to determine the extent of the PCB contamination and to determine what insurance coverage was potentially available for the Corporation. (Dep. of James Farley, TApp. 1 at 436-37.) On August 19, 1987, Texas Eastern finalized its "notice of claim" letter, and mailed the letter to the Carriers several days later. (TRSOF ¶ 414.) This was the first formal written notice that any of the insurance carriers received.

Texas Eastern was, at a minimum, obligated to give the Carriers written notice (1) "as soon as practicable" upon the happening of an "occurrence" if it appeared likely to give

rise to a claim—even if no claim had yet been presented to Texas Eastern, and (2) "with full particulars" of a claim "on account of such occurrence," once a claim was made. Texas Eastern admittedly did neither until August 19, 1987.

## C. Texas Law

■ Texas law views the notice requirement as a condition precedent to coverage and "failure to perform the condition constitutes an absolute defense to liability on the policy." *Dairyland County Mut. Ins. Co. v. Roman,* 498 S.W.2d 154, 157 (Tex.1973). This is true even if the insurer has actual notice of the loss. *Dairyland,* 498 S.W.2d at 157; *Employers Casualty Co. v. Mireles,* 520 S.W.2d 516, 518 (Tex.Civ.App.1975) (writ refused n.r.e.).

■ The burden is on the insured to show that it has fulfilled all conditions precedent contained in the policies. *Trevino v. Allstate Ins. Co.,* 651 S.W.2d 8, 11 (Tex.Ct. App.1983) (writ refused n.r.e.). *See also Dairyland,* 498 S.W.2d at 158. Thus, Texas Eastern must establish by admissible evidence that it gave notice in accordance with the policy provisions, or provide a reasonable explanation for its delay. Texas Eastern contends that its notice requirement accrued in April 1987 and that it provided notice "as soon as practicable" in August 1987.

■ The terms "as soon as practicable" or "immediately," as used in a notice provision, have been construed to require notice "within a reasonable time." *Broussard v. Lumbermens Mut. Casualty Co.,* 582 S.W.2d 261, 263 (Tex.Civ.App.1979); *McPherson v. St. Paul Fire & Marine Ins. Co.,* 350 F.2d 563, 566 (5th Cir.1965). *See also, New Amsterdam Casualty Co. v. Hamblen,* 144 Tex. 306, 190 S.W.2d 56, 58 (1945). I interpret this to mean that the insured must display the degree of diligence which a reasonably prudent person would exercise under the same or similar circumstances. This necessarily requires an inquiry into what was reasonable under the circumstances of this par-

---

had an on-site PCB problem. The reasonableness of the Insurance Department's action, after

its personnel learned about the potential off-site harm, should take that knowledge into account.

ticular case. *See Broussard,* 582 S.W.2d at 263 ("[W]hat is a reasonable time depends upon the facts and circumstances in each particular case.")

■ In this regard, "[t]he age, experience, capacity and knowledge of the insured are ... circumstances to be considered in determining whether the required notice was given as soon as practicable." *Dairyland,* 498 S.W.2d at 158. *See also McPherson,* 350 F.2d at 567. Texas Eastern is a sophisticated corporation with a large Risk Management Department. Therefore, it should be held to a high standard when interpreting the reasonableness of the delay in providing notice to the Carriers.[95] Texas Eastern knew about the potential for third-party claims and had assembled all CGL policies potentially involved by no later than December 1986, a period of eight months before notice was given.

■ Even a sophisticated insured is not expected to give notice until it knows of an "occurrence" that is likely to give rise to a claim under its insurance policies. *Ogden Corp.,* 924 F.2d at 43; *Employers Casualty Co. v. Scott Elecs. Co.,* 513 S.W.2d 642, 645–46 (Tex.Civ.App.1974). Under Texas law, whether an insured knows or should have known of an occurrence is determined by an objective test. *Texas Glass & Paint Co. v. Fidelity & Deposit Co.,* 244 S.W. 113, 114–115 (Tex.Comm'n App.1922).

Courts in Texas have repeatedly ruled that relatively short delays can be unreasonable, and that the insurer is, therefore, excused from defending and indemnifying the insured. *See, e.g., Klein v. Century Lloyds,* 154 Tex. 160, 275 S.W.2d 95, 97 (1955) (thirty-four day delay in providing notice does not constitute notice given as soon as practicable); *Allen v. Western Alliance Ins. Co.,* 162 Tex. 572, 349 S.W.2d 590, 594 (1961) ("We hold that as a matter of law the failure to give notice for 107 days, under the circumstances of this case, did not constitute the giving of notice 'as soon as practicable' after

the accident."); *Trinity Univ. Ins. Co. v. Weems,* 326 S.W.2d 302, 304 (Tex.Civ.App. 1959) (three and one half month delay does not constitute notice given as soon as practicable); *Mireles,* 520 S.W.2d at 522 ("In the absence of waiver or special circumstances not present here, [the insured's] delay of over six months [six and one half months] is not notice as soon as practicable as a matter of law."); *Broussard,* 582 S.W.2d at 263 ("The delay of twenty months in giving notice of [the claim] to the insurance companies did not constitute giving notice 'as soon as practicable' as required by the insurance policies."); *Kellum v. Pacific Nat'l Fire Ins. Co.,* 360 S.W.2d 538, 542 (Tex.Civ.App.1962) (writ refused n.r.e.) (one year delay not notice "as soon as practicable"). *See also McPherson,* 350 F.2d at 565–67 (fifty-four days is not notice "as soon as practicable").

Courts in other jurisdictions have strictly enforced notice provisions in environmental cases. In *American Home Assurance Co. v. Republic Ins. Co.,* 788 F.Supp. 214 (S.D.N.Y. 1992), American Home Assurance Company (American), a primary insurer, sued Republic Insurance Company (Republic) and United National Insurance Company (United), excess carriers, for contribution to a settlement agreement entered into by American on behalf of the insured. In granting the excess carriers' motion for summary judgment on the ground of late notice, the district court held that a "ten month delay from the insured's knowledge of its exposure to the notification of its insurers violated the timely notice of occurrence requirement of those policies." *American Home Assurance,* 788 F.Supp. at 218.

The court further observed that "even a one month delay" between the time that American was advised of a likely recovery and when it sent notice to Republic and United of the claim "failed to meet the policies' requirement that notice be afforded 'as soon as practicable,' particularly because during that time settlement negotiations ob-

---

**95.** The question of whether notice is reasonable is usually a question of fact but if the facts are undisputed the question then becomes one of law. *Klein v. Century Lloyds,* 154 Tex. 160, 275 S.W.2d 95, 97 (1955); *Broussard,* 582 S.W.2d at

262; *Continental Sav. Ass'n v. United States Fidelity & Guar. Co.,* 762 F.2d 1239, 1243 (5th Cir.), *amended on other grounds,* 768 F.2d 89 (5th Cir.1985) (citing *Klein,* 154 Tex. 160, 275 S.W.2d at 97).

viously bearing on [Republic and United] were being conducted without their knowledge...." *American Home Assurance,* 788 F.Supp. at 218. Similarly, the Carriers have claimed in the present litigation that Texas Eastern conducted extensive negotiations with EPA long before it gave notice to either its primary or excess insurers.

In *Olin Corp. v. Insurance Co. of N. Am.,* 743 F.Supp. 1044 (S.D.N.Y.1990), *aff'd,* 929 F.2d 62 (2d Cir.1991), the district court concluded that an insured's one year delay in providing notice constituted a violation of the terms of the insurance policy's notice provision. *Olin,* 743 F.Supp. at 1055. As in *Olin,* the Carriers contend that Texas Eastern was aware of its potential liability long before it notified its Carriers. According to the Carriers, at a minimum, Texas Eastern should have provided notice at least by August 1985, when it began negotiating with EPA about the remediation of some of its unlined earthen pits.

### D. *The Applicable Facts*

The parties' inability to agree on the nature of Texas Eastern's claim makes Texas case law difficult to apply in the present case. Texas Eastern has repeatedly asserted that it is not claiming recovery for any of the costs which it did not, or will not, incur because of third-party property damage, third-party personal injury, or third-party bodily injury. I have previously concluded that the relevant occurrence that could trigger liability in this litigation is third-party damage. Thus, providing Texas Eastern with the maximum possible extension of time, the duty to notify would mature no later than when Texas Eastern knew of actual off-site PCB migration or of the likelihood that off-site PCB harm or contamination had occurred. Unreasonable delay will, for the purposes of the present motions, be decided from that point forward. However, in determining what is a reasonable time, the known magnitude of the problem and Texas Eastern's own knowledge of the long existing on-site PCB contamination are relevant factors.

The undisputed evidence is insufficient to establish that EPA made a "claim" against Texas Eastern during the years 1981 through 1985. A claim is the assertion of a legal right through a specific demand, not merely notice of a potential problem. *Winkler v. National Union Fire Ins. Co.,* 930 F.2d 1364, 1367 n. 4 (9th Cir.1991). Although EPA was actively discussing Texas Eastern's future responsibilities regarding the pits, the evidence does not conclusively establish that EPA demanded that Texas Eastern clean up any property.

The Carriers have offered insufficient undisputed evidence to establish that Texas Eastern was aware that PCBs were migrating off-site and contaminating third-party property prior to April 1986. The Carriers have, however, provided ample evidence that Texas Eastern was aware, for at least five years prior to giving notice to the Carriers, that it had a significant on-site PCB problem. Therefore, once Texas Eastern understood that PCBs were actually migrating, or understood the reasonable likelihood of migration, its obligation to provide notice should have accrued very shortly thereafter.

The first time Texas Eastern appears to have considered the potential migration of PCBs was in its initial meetings with representatives of Weston in late 1985. The initial six-site sampling program was designed to determine the extent of PCB contamination in Texas Eastern's pits, including the potential for off-site migration. (Dep. of Manmohen Bhatla, App. 651 at 19–20, 98–99.) The suggestion to check for migration was apparently made by Weston representatives. (*Id.*) Notes from the initial discussions between Texas Eastern and Weston establish that the parties also discussed the depth of groundwater and the proximity of groundwater to streams at various locations. (App. 328 at 2.)

Bradford S. Cushing, Texas Eastern's environmental expert, testified that the possibility of off-site migration was discussed with Texas Eastern representatives, including H. Douglas Church and Robert Salzer. (App. 653 at 373–76, 379–82, 675–81.) Mr. Cushing also testified that the results of the initial six-site survey indicated that there was the possibility of PCB migration to areas off the compressor station sites. (App. 653 at 679.)

Texas Eastern responds that it did not know of any off-site migration during this time. It offers H. Douglas Church's letter to EPA, dated April 25, 1986, in which he explains that Texas Eastern had installed silt fencing to prevent migration of contaminated sediment to surface water bodies. (App. 171 at 5.) This letter confirms that Texas Eastern, at a minimum, understood the *potential* for, if not the probability of, off-site migration, by April 1986. In addition, the Carriers offer what is represented to be an earlier draft of this letter in which Texas Eastern wrote:

> The presence of PCBs in the surface waters and drainage swales indicates that *PCBs may be migrating from station sites.* Remedial actions were initiated the week of April 14, 1986 *to reduce further off-site migration potential* through the installation of filter fabric, a sedimentation control measure, at three sites identified by the pilot study.

(App. 339 at 7) (emphasis added.) This draft certainly suggests that Texas Eastern's senior management understood that off-site migration was probably taking place at some of its compressor station sites as early as April 1986; over one and one-third years before Texas Eastern provided notice to the Carriers.[96]

This evidence clearly contradicts the litigation affidavits offered by Texas Eastern to establish that it did not have any knowledge of off-site migration until April 1987. For example, H. Douglas Church declared that until 1987, Texas Eastern did not recognize that actual off-site migration had occurred. (Church Decl., TApp. 191 at ¶ 8). However, the draft of his April 25, 1986 letter to the EPA explicitly contradicts this. Derrill Cody, Executive Vice President of Texas Eastern Corporation from June 1986 through December 1989, declared that it was not his understanding that Weston's initial sampling program indicated off-site PCB contamination. (Cody Decl., TApp. 214 at ¶ 5.) The February 1986 draft report of the Weston

six-site survey clearly shows that Mr. Cody was mistaken.

Texas Eastern also consistently downplays the Carriers' offers of record proof establishing that Texas Eastern was aware of at least some "isolated" instances where Weston samples discovered off-site migration. First, Texas Eastern argues that there is no evidence that Insurance Department personnel were aware of these findings. I will explain, *infra* pp. 1360–1361, that in most cases the actual knowledge of the Insurance Department is not relevant because Texas Eastern had a continuing duty to keep its Insurance Department advised of relevant corporate information which should have included information concerning the off-site migration of PCBs.

Second, Texas Eastern often relies on the fact that, in its view, the potential for off-site migration and third-party harm was minute, insignificant, and extremely localized and therefore did not trigger any duty to notify the Carriers. (*See, e.g.,* TE's Reply in Supp. Summ.J.—Late Notice at 14: "[T]here is no evidence that any operational employee considered the potential for offsite PCB migration to be significant: the silt fences were merely a routine precaution against soil erosion, which was then thought to be the only way that PCBs could move offsite.") As I have explained, Texas Eastern was aware that it had a significant on-site PCB problem many years prior to the discovery of even the potential for off-site contamination, and Texas Eastern knew that EPA would require a costly cleanup. Thus, even the slightest hint of off-site migration would have required Texas Eastern to provide the Carriers with prompt notice because of the potential magnitude of the PCB contamination problem and the likelihood of a future claim.

It is therefore established, by undisputed record evidence, that Texas Eastern both understood the potential for off-site migration, and knew, at least as of April 1986, that *some* off-site migration had *probably* oc-

---

**96.** On March 30, 1987, it appears that Texas Eastern gave notice to an insurance company not party to this litigation (A.C.E.) of a potential claim arising out of the discovery of PCBs in drinking well water near one of Texas Eastern's

compressor stations. (App. 367.) This is approximately five months before Texas Eastern gave the Carriers involved in this litigation notice of any "occurrence."

curred. These events are highly relevant in establishing the time when Texas Eastern's obligation to provide notice accrued, because they specifically relate to the off-site, as opposed to on-site, migration of PCBs. Although I am tempted to conclude, as a matter of law, that Texas Eastern should have provided notice in April 1986, I have instead chosen December 1986, the date on which Texas Eastern received the results of Weston's 54–site survey, as the date on which Texas Eastern's notice obligation matured, because that is the date on which Texas Eastern should have clearly understood, as a matter of law, the potential for off-site PCB migration and the likelihood that such migration had actually occurred.[97]

■ It is my duty to determine whether, after the obligation to provide notice had accrued, the insured provided notice within a reasonable amount of time under the circumstances. I will therefore address Texas Eastern's arguments in support of its allegation that notice was provided within a reasonable time.

First, Texas Eastern contends that the August 1987 notice was provided within a reasonable time because, in Texas Eastern's view, no "occurrence," as defined by its insurance policies, took place until after it had notice of the likelihood that off-site harm was taking place. This argument is inapposite, as I have concluded that Texas Eastern need not have provided notice before it was aware of the likelihood of off-site migration.

Second, Texas Eastern contends that at least as to the F & C policies effective from 1967 to 1981, the August 1987 notice was provided within a reasonable time because notice to the Carriers was required only after notice of a "claim or occurrence" was received by its Insurance Department or by a Texas Eastern executive. The undisputed facts completely undermine Texas Eastern's argument. Although the Insurance Department might not have been on notice in the early 1980s, at least by April 1986, executive officers at Texas Eastern had notice of actual and potential third-party migration. (*See supra* pp. 1358–1359.)

Third, Texas Eastern contends that as to the F & C policies effective from 1981 to April 1988, the August 1987 notice was provided within a reasonable time because notice to the Carriers was required only after notice of a "claim or occurrence" was received by Texas Eastern's Insurance Department. Texas Eastern appears to believe that this policy language relieves it of the duty to inform its Insurance Department of those facts which are relevant to the performance of the Insurance Department's corporate task. It does not. Texas Eastern had a continuing duty to keep its Insurance Department informed of relevant corporate activities so that it could keep track of Texas Eastern's potential insurance claims.[98]

Given the extensive nature of the known on-site PCB problem, Texas Eastern admits that it certainly would have been *prudent* for its senior management to have kept the Insurance Department informed of the PCB problems in the mid–1980s. (*See* Dep. of H. Douglas Church, App. 568 at 933–36.) In any event, once Texas Eastern's senior management understood that the PCBs were migrating off the compressor station sites, Texas Eastern's own guidelines would have required that the Insurance Department be

---

97. This point was made clear at oral argument in the statements of Mr. Nickels, counsel for Texas Eastern, in response to my questions:

THE COURT: And when was that, the Weston [54–site survey] report?

MR. NICKELS: It was presented formally to the EPA, I believe, in March or April of 1987.

THE COURT: Well, when was it presented to Texas Eastern?

MR. NICKELS: December, '86.

THE COURT: All right. Now, at that time you certainly knew that they [PCBs] were emanating off-site, didn't you, or had reason to believe that they were?

MR. NICKELS: We have reason to believe that, that is right your Honor.

Tr. of Hr'g on Mot. for Summ.J., January 13, 1992 at 93–94.

98. The policy requirement that the Insurance Department be informed of the claim or occurrence must be read to include a duty on Texas Eastern's part to make its Insurance Department aware of relevant corporate activities. Otherwise, insureds could easily build "Chinese walls" around their insurance departments for the sole purpose of defeating insurance carrier defenses to coverage.

informed.[99] For all of these reasons, I conclude that the Insurance Department was "informed" of the occurrence of off-site migration at least by the time Texas Eastern's senior management became aware of the migration.[100]

When all of the facts are taken into consideration, it is clear to me that Texas Eastern has provided no credible explanation for the eight month delay [101] (December 1986 to August 1987) in providing the Carriers with notice of the off-site migration and the potential claims that would likely arise out of that "occurrence." Texas Eastern was aware of the magnitude of its on-site PCB problem and it was aware of the likelihood for off-site migration by the end of 1986. Notice should have been provided to its Carriers at that time. Eight months thereafter is, as a matter of law, not "as soon as practicable" and not within a reasonable amount of time.[102]

### E. *Prejudice*

■ Under Texas law, the Carriers contend that they do not need to demonstrate that they have been prejudiced by Texas Eastern's failure to provide timely notice. However, the Texas State Board of Insurance approved an "Amendatory Endorsement" which is "applicable to all general liability policies issued or delivered in Texas" which states that a notice provision is operative only where an insurer proves that it has been prejudiced by the delay. (App. 460.) The effective date of the endorsement is April 1, 1973. *Members Ins. Co. v. Branscum,* 803 S.W.2d 462, 467 (Tex.Ct.App.1991). The Carriers contend that, by its terms, the endorsement does not apply to excess liability policies, or general liability policies neither issued nor delivered in Texas. I do not decide this issue, because I conclude that Texas Eastern's failure to timely notify the Carriers prejudiced them as a matter of law.[103]

■ The Carriers bear the burden of proving that they were prejudiced by Texas Eastern's late notice. *Branscum,* 803 S.W.2d at 467. "The purpose of the notice requirement is to enable the insurer to promptly investigate the circumstances of an accident so that it can prepare to defend any claim that may arise." *Stonewall Ins. Co. v. Modern Exploration, Inc.,* 757 S.W.2d 432, 435 (Tex.Ct.App.1988). This includes the ability to interview witnesses while the facts are still fresh in their minds, to prevent fraud, and to enable it to form an intelligent

99. Stephen Mulliken, Director of Texas Eastern's Risk Management Department, testified at his deposition that Texas Eastern had guidelines in effect which required that all accidents, occurrences, or events that may lead to a claim, whether a formal claim was presented or not, should be immediately reported through the field offices to the Claims Department in Houston. (Dep. of Stephen Mulliken, App. 261 at 258.)

100. Texas Eastern contends that only the Insurance Department had the requisite skill to make the subjective determination of when a claim was "likely" to involve a particular excess policy. Nothing in the policy language requires this result and I find Texas Eastern's argument to be wholly without merit. Senior management was qualified to make decisions concerning the likely involvement of excess carriers on individual claims. In addition, the duty to inform the Insurance Department of important corporate matters would include informing it of the known off-site migration of pollutants and contaminants.

101. It should be clear that December 1986 merely represents the latest possible date on which undisputed evidence establishes that Texas Eastern's notice obligation accrued. I previously indicated that April 1986 could, in all likelihood, also have been chosen.

102. Even if Texas Eastern's unsupported contention that it did not learn about the off-site migration of PCBs until April 1987 is accepted, I would still conclude that notice was late as a matter of law. Texas Eastern was clearly aware of the magnitude of its PCB problem in April 1987, and was negotiating with EPA to settle the issue of pit remediation. Although four months may appear to be a short period of time, Texas Eastern has advanced no meritorious explanation for the delay. The period from April to August 1987 was a crucial time for the Carriers to be involved in the settlement process and Texas Eastern's delay deprived the Carriers of this opportunity. Under Texas law, Texas Eastern had a duty to promptly notify the Carriers. Notice, after a four month delay, fails to be notice within a reasonable time. (*See* cases cited *supra* pp. 1357–1358.)

103. Prior to the 1973 enactment of the endorsement, no showing of prejudice was required. Thus, as to those policies written prior to April 1973, no prejudice need be shown.

opinion of its rights and liabilities under the policy. *Stonewall,* 757 S.W.2d at 435.

Courts in other jurisdictions have emphasized the importance of allowing the insurance company to control the proceedings including investigation, settlement, and litigation. For example, in *Metal Bank of Am., Inc. v. Insurance Co. of N. Am.,* 360 Pa.Super. 350, 520 A.2d 493, *appeal denied,* 517 Pa. 607, 536 A.2d 1332 (1987), the court explained that "the reason for [requiring] timely notice to the insurer is to enable it to gain early control of the proceedings and give it an opportunity to investigate and acquire information about the case." *Metal Bank,* 360 Pa.Super. 350, 520 A.2d at 498. On the facts before it, that court concluded that the insured's late notice had denied the insurer all of this, particularly because a settlement between the insured and EPA was a *fait accompli* by the time the insured provided notice.

In *West Bay Exploration Co. v. AIG Specialty Agencies,* 915 F.2d 1030 (6th Cir.1990), the court concluded that the insured's failure to notify its insurer before disposing of the contamination source responsible for the damage for which the insured was seeking coverage, prejudiced the insured by denying it the opportunity to investigate the claim. The court noted that each of the insurance policies contained a pollution exclusion; by removing the pollution source, the insured "materially compromised the [insurers'] ability to present their most powerful defense to liability under the policy." *West Bay,* 915 F.2d at 1037. The court's rationale raises an additional purpose of the notice requirement: to allow the insurer to investigate an accident in order to determine whether *it* need provide the insured with any coverage at all. *See also Stonewall,* 757 S.W.2d at 435 (notice provision allows the insurer to ascertain *its* rights and liabilities under the policy).

The Carriers contend that Texas Eastern has waited so long to give them notice that important witnesses can no longer recall important events.[104] More importantly, Texas Eastern's delay foreclosed any opportunity for the Carriers to play a meaningful role in the discussions with EPA and state agencies,

participate in the development of the remedial and investigatory programs, or control in any way the costs for which Texas Eastern is now seeking indemnification. The Carriers have also suggested that Texas Eastern waived certain defenses to EPA's claims in the course of their initial negotiations.

Texas Eastern vigorously denies that the Carriers have established prejudice. First, Texas Eastern asserts that the negotiations between Texas Eastern and the EPA grew strained during August 1987 and came to a standstill at the end of the month, when EPA declared that it was preparing to file litigation. (TApp. 172.) According to Texas Eastern, in mid-September, only after having been assured that Texas Eastern's negotiating team would be "authorized to recommend a conceptual agreement" to Texas Eastern's management, EPA advised Texas Eastern that it would postpone the filing of litigation "for a short while" in order to permit continuation of the settlement discussions. (TApp. 173.) The parties subsequently entered into a non-binding "Agreement in Principle" on November 9, 1987. The EPA Consent Decree was filed in June 1988. (App. 474 at 10–11.) Thus, Texas Eastern contends that the Carriers had ample time after they received notice to participate in the negotiation process.

Texas Eastern's contentions are unavailing. The simple fact that negotiations became strained in August 1987 did not undo all of the work done prior to that date. Certainly Texas Eastern knew that it faced very substantial liabilities, and that EPA would not release it from those liabilities absent a settlement agreement or litigation. As Texas Eastern admitted, shortly after the "impasse," Texas Eastern resumed negotiations with EPA, and within months settled on an Agreement in Principle. By the time the Carriers received notice, the matter was for all intents and purposes a *fait accompli,* or in more modern vernacular, it was a "done deal."

In a September 2, 1987 letter to EPA, Carol Dinkins summarized "the relative positions of the parties as of August 28, 1987."

---

**104.** Portions of depositions give credence to this argument. (*See, e.g., supra* pp. 1354–1355.)

(App. 646.) The letter included a list of thirty-five items on which agreement had been reached, and Ms. Dinkins commented that the "list is impressive, both for the number of items that it contains and the magnitude of the undertaking that it represents." (App. 646 at 001371187.) Texas Eastern had already agreed to pay a civil penalty and oversight costs, although the amount was yet to be agreed upon. (*Id.* at 001371184–85.) Given these undisputed facts, I am convinced that the Texas Supreme Court would hold, as a matter of law, that the Carriers were prejudiced by Texas Eastern's late notice.

Second, Texas Eastern contends that even if the Carriers establish that they have suffered some prejudice, the Carriers must prove that they could have changed the result had proper notice been provided. This is not the law of Texas. Texas may require prejudice, but it has expressly rejected the application of a "substantial prejudice" standard. *Branscum*, 803 S.W.2d at 467. Under Texas law, an ordinary showing of prejudice is sufficient to invalidate coverage.

Third, Texas Eastern contends that it did not receive the first of many private third-party claims until after August 1987, and it received most of the governmental claims (state agency claims) after that date as well. Therefore, the Carriers could have participated in the defense of these lawsuits after they received notice.

The Carriers respond that Texas Eastern entered into a voluntary consent decree with the Commonwealth of Pennsylvania in April 1987, in which Texas Eastern agreed to "assess any contamination at the Pennsylvania sites and to remedy that contamination expeditiously." (App. 227C at 6.) Thus, prejudice has clearly been established concerning the Pennsylvania claim. More importantly, however, I conclude that the Carriers were sufficiently prejudiced by Texas Eastern's handling of the EPA Complaint and the resulting EPA Consent Decree, the cost of which constitutes the majority of Texas Eastern's claim against its insurance carriers, that isolated instances where the ·Carriers may have received timely notice of the actual filing of a claim are insufficient to cure the overall prejudice which the Carriers initially suffered.[105] By the time Texas Eastern gave notice, remedial efforts, testing, and monitoring had begun, and schedules and methodologies to characterize the sites had been established. Most importantly, Texas Eastern had already presented to EPA its proposed settlement terms, and thus completely destroyed any meaningful opportunity for the Carriers to shape the negotiations with EPA. The record makes it abundantly clear that Texas Eastern never wanted the Carriers to interfere with what was a carefully negotiated settlement with EPA and waited until the settlement was substantially agreed upon before providing any notice to the Carriers.

Texas Eastern failed to provide the Carriers with timely notice of the "occurrences," the claims, and the likelihood of claims arising from the "occurrences," thereby violating a condition precedent to receiving insurance coverage. The carriers have established that they have suffered prejudice because of this delay. Texas Eastern has failed to provide an adequate excuse, or even any plausible explanation, for the unreasonable delay.

---

**105.** For example, it is clear from the record that Texas Eastern likely relied on the environmental studies and its consultations with EPA concerning the contamination on its own property to form its opinions about the contamination which was the subject of the state agency and private third-party claims. The Carriers should have had an opportunity to participate in the decisions concerning the studies and the overall approach which Texas Eastern decided to employ with regard to its PCB contamination problems. Texas Eastern's late notice denied the Carriers this important opportunity and thereby prejudiced the Carriers.

As for the private third-party claims, all but two of these claims are not presently before this court. However, because Texas Eastern was aware, for a long period of time, of the likelihood of private third-party claims by reason of the admitted off-site migration of PCBs, even if the exact identities of the claimants were unknown, the Carriers were equally prejudiced by being unable to make their own investigation and take action to minimize future private party claims. *See, e.g., Olin Corp. v. Insurance Co. of N. Am.,* No. 91–9155, 1992 WL 114441, *5 (2d Cir. June 1, 1992) (The filing of an initial lawsuit "would surely have alerted a reasonable person to suspect that other claims by varied plaintiffs ... might follow.")

For all of these reasons, the Carriers' joint partial motion for summary judgment on the issue of "Late Notice" will be granted and Texas Eastern's cross-motion will be denied. By reason of the late notice, all of Texas Eastern's claims must fail.

## XIV. DUTY TO DEFEND

■ Texas Eastern contends that Fidelity had a duty to defend it against the threatened EPA action and the various state and private third-party actions, and has moved for summary judgment on this ground.[106] Fidelity responds that under Texas law it had no duty to defend because the claims made against Texas Eastern were not covered by its insurance policies, and even if it did have a limited duty to defend, that duty would be defined by its duty to indemnify Texas Eastern against losses, thereby making Texas Eastern's motion for summary judgment premature.

### A. The Policy Language

Although Texas Eastern and F & C vigorously disagree about whether all or some of the eight insurance policies which F & C issued to Texas Eastern, beginning in 1961 and ending in 1988, require F & C to defend Texas Eastern, both parties agree that if the duty to defend exists at all, it exists pursuant to the policies written between 1961 and 1973, which contain a duty to defend clause which can correctly be characterized as "traditional."[107]

The language of the policies can be summarized as follows:

With respect to such insurance as is afforded by this policy, the company shall ... defend any suit against the insured alleging such injury or destruction and seeking damages on account thereof, even if such suit is groundless, false, or fraudulent....

### B. Texas Law

■ Under Texas law, an insurer's contractual duty to defend is ordinarily determined solely from the face of the pleadings without reference to the truth or falsity of such allegations and without reference to facts outside the pleadings. *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.*, 387 S.W.2d 22, 24–25 (Tex.1965); *Rhodes v. Chicago Ins. Co.*, 719 F.2d 116, 119 (5th Cir.1983). The duty arises when a comparison of the complaint and the insurance policy reveals that at least one of the allegations, if proven to be true, would state a cause of action within the terms of the policy. *Rhodes*, 719 F.2d at 119. In applying this "pleadings only" or "four corners" rule, "the court may indulge the most liberal interpretation of the allegations of which they are susceptible and doubts as to the import of the allegations are to be resolved in favor of the insured and coverage." *Continental Sav. Ass'n v. United States Fidelity & Guar. Co.*, 762 F.2d 1239, 1243–44 (5th Cir.), *amended on other grounds*, 768 F.2d 89 (5th Cir.1985); *Heyden*, 387 S.W.2d at 26.

In the ordinary situation, an insurer must make a determination after a complaint has been filed against its insured as to whether any of the stated allegations, if ultimately found to be true, could potentially state a claim that would result in a covered loss under the insurance policy. If the insurer determines that a colorable claim has been made, then the duty to defend arises. If the insurer properly determines that no covered claim has been made, then there is no duty to defend.

The Texas courts have deviated from an orthodox application of the four corners rule, and looked beyond the pleadings in order to determine whether the insurer has a duty to

---

**106.** No claim is being asserted against the excess insurance carriers on this ground.

**107.** The parties dispute what the precise nature of Fidelity's duty was under the insurance policies issued from 1973 to 1988. The contracts are so confusing that counsel for Texas Eastern professed to staying up all night before oral argument attempting to understand them but was unable to do so. Having read the contract lan-

guage, I have little doubt that counsel was telling the truth. Because I conclude that F & C had no duty to defend even under a more traditional duty to defend clause, I do not reach the issue of F & C's obligations under these later clauses, which were clearly more restrictive and limited than the usual duty to defend clauses contained in CGL policies.

defend, in cases where the issue is whether the claims, even if proven true, would not be covered under the policy of insurance. For example, in *Gonzales v. American State Ins. Co.*, 628 S.W.2d 184 (Tex.Ct.App.1982), the court explained:

> Where the insurance company refuses to defend its insured on the ground that the insured is not liable to the claimant, the allegations in the claimant's petition control, and facts extrinsic to those alleged in the petition may not be used to controvert those allegations. But, where the basis for the refusal to defend is that the events giving rise to the suit are outside the coverage of the insurance policy, facts extrinsic to the claimant's petition may be used to determine whether a duty to defend exists.

*Gonzales*, 628 S.W.2d at 187. In *McLaren v. Imperial Casualty & Indem. Co.*, 767 F.Supp. 1364 (N.D.Tex.1991), *aff'd in part and rev'd in part on other grounds*, 961 F.2d 213 (5th Cir.1992) (unpublished opinion), the district court surveyed Texas law and concluded that the application of the allegations of the complaint rule

> is limited in [Texas's] reported cases to two kinds of situations. One is where the insurance company seeks to avoid the defense obligation on the ground that extrinsic facts establish that the insured is *not liable* in the underlying suit....
>
> The second situation ... is where the underlying complaint affirmatively alleges a set of facts that fall within an exclusion to the policy coverage or are otherwise outside of the coverage.

*McLaren*, 767 F.Supp. at 1372–73. The court explained that the rule had no application in situations where the insurer attempted to prove that it had no defense obligations at all. *Id.* at 1374. *See also, Blue Ridge Ins. Co. v. Hanover Ins. Co.*, 748 F.Supp. 470, 473 (N.D.Tex.1990) ("The status of the 'insured' is to be determined by the true facts, not ... incorrect facts that might be alleged by a personal injury claimant....")

The New Jersey Supreme Court reached a similar conclusion under New Jersey law. In *Hartford Accident & Indem. Co. v. Aetna Life & Casualty Ins. Co.*, 98 N.J. 18, 483 A.2d 402 (1984), the New Jersey Supreme Court observed that " '[t]he duty to defend is not a product of statute or of common law. It is solely a contractual undertaking of the insurer and it can be as limited or as broad as the insurer sees fit to provide through its policy.' " *Hartford*, 483 A.2d at 405 (quoting the trial court's opinion.) [108] In interpreting the standard duty to defend clause, the court concluded that " 'the duty to defend extends only to claims on which there would be a duty to indemnify in the event of a judgment adverse to the insured.' " *Id.*

The *Hartford* Court recognized that the general approach to the duty to defend problem obligated an insurer to defend an action whenever the complaint alleges a basis of liability within the covenant to pay. However, the court explained that when the duty " 'depends upon a factual issue which will not be resolved by the trial of the third party's suit against the insured, the duty to defend may depend upon the actual facts and not upon the allegations in the complaint.' " *Hartford*, 98 N.J. 18, 483 A.2d at 406. In these cases, the court concluded that it was appropriate for a court to review facts outside of the complaint in order to determine whether the insurer has a duty to defend.

Texas Eastern urges me to reject this view of the duty to defend because it defeats the primary purpose of the four corners rule in that an insured will have to defend against the third-party claim and at the same time will have to prove to its insurance company that the allegations are potentially covered by its insurance. In Texas Eastern's view, an insured should not have to bear this burden at a time when what it needs most urgently is a competent defense against the third-party claimant.

I agree that an insured needs a competent defense; the question that I address here, however, is who should provide it. If the insurer has no duty to indemnify the

---

**108.** Texas law is in accord with this view of the duty to defend. *See, e.g., Whatley v. City of Dallas*, 758 S.W.2d 301, 304 (Tex.Ct.App.1988) (writ denied) (the duty to defend is ordinarily a contractual undertaking defined by the insurance policy).

insured because the allegations, even if true, would not be covered by insurance, then the insurer has every contractual right to refuse to defend its insured. If the insurer chooses, it may, of course, defend its insured with a reservation of rights concerning its ultimate responsibility to indemnify the claims if the claimant (against the insured) is victorious. The mere fact that the third-party claimant has failed to allege facts which would conclusively establish that the insurer does not have a duty to indemnify a particular claim should not alter the insurer's ability to prove that it has no contractual duty to defend. This is particularly true in a case such as the instant one where the insured's initial defense demand, concerning the EPA action, came before any formal complaint was ever filed, and thus the precise nature of the allegations was unknown.

As the New Jersey Supreme Court explained in *Hartford,* " '[t]his is not to free the carrier from its covenant to defend, but rather to translate its obligation into one to reimburse the insured if it is later adjudged that the claim was one within the policy covenant to pay.' " *Hartford,* 483 A.2d at 406. Although this alters the nature of the duty to defend, it is an appropriate result because the contractual duty to defend is only one to defend suits involving claims which the carrier would have to pay if the claimant prevailed in the action. Although the Texas Supreme Court has never expressly adopted this test, I am convinced that it would do so if faced with this particular question.

This result is particularly appropriate given the unique nature of Texas Eastern's defense demand. In Texas Eastern's view, notice to F & C that it was involved in protracted negotiations with EPA concerning the resolution of imminent PCB-related claims was sufficient to invoke F & C's de-fense obligations. In the typical case, the defense obligation arises when a complaint is filed and the insurer is able to compare the complaint with its insurance contract and determine whether any of the allegations could potentially lead to a covered claim. Due to the nature of the claim involved in the instant case, F & C did not have the benefit of seeing the complaint before it was filed in June 1988, simultaneous with the filing of the Consent Decree.

In fact, even if F & C had the benefit of seeing the complaint, it is not entirely clear that it would have stated a covered cause of action. The complaint relies almost exclusively on allegations that Texas Eastern violated TSCA and RCRA provisions and thereby caused PCB environmental contamination on property owned and operated by Texas Eastern. The complaint clearly indicates that the contamination occurred over a period of years. The complaint does not even mention or suggest damage or imminent risk to third-party property or third-party injury.[109]

I have heretofore concluded that there are issues of fact as to whether there was an "occurrence" within the coverage of the CGL policies, thereby precluding summary judgment in favor of the Carriers on the "Occurrence" issue. Ordinarily this would lead to the conclusion that the EPA Complaint stated a potentially covered claim thereby triggering a duty to defend upon demand and notice by Texas Eastern.

However, when I consider extrinsic evidence available to F & C at the time its duty to defend arguably accrued, it is clear that it had no duty to defend Texas Eastern against the claims made by EPA. I have concluded that the notice provided by Texas Eastern to its Carriers, including F & C, was

---

**109.** Texas Eastern argues for an orthodox application of the four corners rule on the duty to defend issue, even though it relies very heavily on extrinsic evidence to prove that the complaint and the Consent Decree caused it to incur liability which can be linked to some third-party injury that is nowhere alleged in the EPA Complaint. Its reliance on the Hammerstrom affidavits is a good example. Texas Eastern relies heavily on these two affidavits to establish that EPA considered potential harm to third-parties when it de-termined the acceptable levels of contamination that could safely remain on Texas Eastern property after the remediation was complete. The affidavits were submitted to the court in support of the Consent Decree, not as a part of the original complaint. An application of the four corners rule would prevent the consideration of this piece of evidence, which I believe is crucial in order for Texas Eastern to establish that any of its response costs are recoverable from its third-party liability carriers.

late and prejudicial to the Carriers as a matter of law, and will grant the Carriers summary judgment on this issue. As was explained in "Late Notice," *supra* part XIII.C, timely notice is a condition precedent for an insured to be entitled to coverage for any claim. Late notice makes all claims, whether or not potentially covered, uninsurable. *Klein,* 154 Tex. 160, 275 S.W.2d at 96; *New Amsterdam,* 144 Tex. 306, 190 S.W.2d at 58; *McPherson,* 350 F.2d at 566. As a result, no duty to defend ever accrued on or after the date of the late notice on August 19, 1987.[110] Although F & C did not expressly move for summary judgment in its favor on the "Duty to Defend" issue, granting summary judgment on the "Late Notice" issue, in favor of all the Carriers, will eliminate any duty to defend that F & C might otherwise have had to defend Texas Eastern. Summary Judgment will therefore be entered in favor of F & C on the "Duty to Defend" issue.[111]

Finally, concerning the Pennsylvania state agency action, I have found no evidence that Texas Eastern made a defense demand on F & C before settling with the PaDER in April 1987. As such, no duty to defend could have accrued. As to the other state and private third-party actions which are still a part of this litigation, I have previously concluded that the prejudice suffered by the Carriers due to the late notice affected more than just their ability to defend against the EPA claim. The late notice prevented them from adequately defending against all claims which followed. Specifically, the late notice prevented the Carriers from participating in Texas Eastern's initial cleanup decisions and from participating in the majority of Texas Eastern's negotiations with EPA. Although a number of the state and third-party claims were filed after Texas Eastern first provided notice to the Carriers, it would be inequitable to allow Texas Eastern to recover costs expended to defend against allegations in state or private third-party complaints which are, in large part, identical to allegations in the EPA Complaint, when I have prevented Texas Eastern from recovering its defense costs in the EPA action. As such, F & C has no duty to defend against any of the claims presently included in this litigation.

An appropriate order follows.

### ORDER AND FINAL JUDGMENT[1]

For the reasons set forth in the accompanying opinion, it is hereby ORDERED that:

**110.** For the same reasons, any F & C policy containing a pollution exclusion clause also defeats Texas Eastern's contention that F & C has a duty to defend.

**111.** I have concluded that F & C had no duty to defend Texas Eastern. However, a number of issues raised by the parties regarding F & C's liability in the event it is determined that it breached its duty to defend require brief comment.

In Texas Eastern's view, F & C's failure to defend would obligate F & C to pay all defense costs, and to pay all damage claims, including those claims not covered by the insurance policies, up to, and perhaps even exceeding, the policies' limits. In addition, F & C would be prohibited from challenging the reasonableness of the settlements entered into by Texas Eastern.

Texas law does not support the majority of these assertions. While it is apparently true that an insurer cannot challenge the reasonableness of a good faith settlement entered into after a breach of the duty to defend, an insurer is free to litigate the issue of coverage for the settlement. *See Employers Casualty Co. v. Block,* 744 S.W.2d 940, 943 (Tex.1988). Moreover, Texas Eastern's reliance on *Rhodes* for the proposition that F & C must pay all damages assessed, including those

not covered by the policies, is unavailing. *See Rhodes,* 719 F.2d at 120 n. 5. As the Fifth Circuit recently observed, "[h]opeful insureds under Texas law cite this footnote [*Rhodes,* 719 F.2d at 120 n. 5] in vain.... The insured does not win [unlimited] indemnification merely by showing that the insurer did owe it a defense in the underlying cause of action. Even an unfaithful insurer may not be bound to an insurance contract it did not write." *Enserch Corp. v. Shand Morahan & Co., Inc.,* 952 F.2d 1485, 1493 n. 13 (5th Cir.1992).

1. It has come to my attention that Southern American Insurance Company (one of the many London Market Insurers) is currently undergoing Liquidation proceedings. On March 26, 1992, Judge Anne M. Stirba of the Third Judicial District in and for Salt Lake County, State of Utah ordered that "[n]o suit, action, proceeding, or claim at law or in equity of any kind shall be brought, maintained, or further prosecuted [against Southern American Insurance Company] without proper authorization of the Liquidator...." The Liquidator is Utah Insurance Commissioner Harold C. Yancey. Therefore, neither this order nor the accompanying opinion apply to Southern American Insurance Company.

1. The Carriers' motion to strike is GRANTED IN PART AND DENIED IN PART—Exhibits eight (8) through eighteen (18) in the Declaration of Laird Hart and Texas Eastern Transmission Corporation's (Texas Eastern) "Statement of General Background Facts" are stricken. All other evidence offered by any party to this litigation remains part of the official record;

2. The Carriers' supplemental motion to strike is DENIED;

3. The Carriers' motion for summary judgment on the "Occurrence" issue is DENIED;

4. The Parties' cross-motions for summary judgment on the issue of "Damages" are GRANTED IN PART AND DENIED IN PART. Losses incurred due to an injunctive order are compensable as "damages" under Texas Eastern's insurance policies. Civil penalties assessed by the United States Environmental Protection Agency are compensable as "damages" under Texas Eastern's insurance policies (excepting those policies which expressly exclude coverage for civil fines or penalties). Civil penalties assessed by the Pennsylvania Department of Environmental Resources and the New Jersey Department of Environmental Protection are not compensable as "damages" under Texas Eastern's insurance policies. In all other respects, the cross-motions are DENIED;

5. The Parties' cross-motions for summary judgment on the issue of the "Owned Property Exclusion" are DENIED.

6. The Carriers' motion for summary judgment on the issue of the "Pollution Exclusion" is GRANTED. No coverage will be provided for losses incurred by Texas Eastern under insurance policies containing either an ISO or London Market type pollution exclusion clause. Judgment in favor of all the Carriers whose insurance policies contain either of the two pollution exclusions and against Texas Eastern is entered on this issue;

7. Texas Eastern's motion for summary judgment on the issue of the "Pollution Exclusion" is DENIED;

8. The Carriers' motion for summary judgment on the issue of "Late Notice" is GRANTED. No insurance coverage is available for any of Texas Eastern's losses under any of its CGL insurance policies identified in this litigation, whether primary, excess, or umbrella policies, because Texas Eastern failed to provide the Carriers with timely notice of the claims for which it seeks insurance coverage. Judgment is entered in favor of all the Carriers and against Texas Eastern on the "Late Notice" issue;

9. Texas Eastern's motion for summary judgment on the issue of the "Duty to Defend" is DENIED. Fidelity & Casualty Company of New York (Fidelity) has no duty to defend Texas Eastern in any of the claims involved in this litigation. Judgment is entered in favor of Fidelity and against Texas Eastern on the "Duty to Defend" issue.

It is further ORDERED that, because I have concluded that Texas Eastern provided the Carriers with late notice of all the claims for which Texas Eastern seeks insurance coverage, final judgment is entered in favor of all the Carriers and against Texas Eastern. All remaining outstanding motions in "Texas Eastern Transmission Corporation PCB Contamination Insurance Coverage Litigation," MDL Docket No. 764, that are not determined by this order are hereby DENIED as moot due to the entry of final

I have also been informed that the following insurance companies: Kingscroft Insurance Company Ltd. (formally known as Dart Insurance Company Ltd., Kraft Insurance Company Ltd., and Dart & Kraft Insurance Company Ltd.), El Paso Insurance Company Ltd., Lime Street Insurance Company Ltd. (formally known as Lousiville Insurance Company Ltd.), and Mutual Reinsurance Company Ltd. (collectively known as the "KELM Companies") are currently under a Temporary Restraining Order, dated May 8, 1992, entered by the United States Bankruptcy Court for the Southern District of New York, which prohibits "commencing or continuing any judicial, administrative or regulatory action or proceeding against Kingscroft, El Paso, Lime Street and/or Mutual or any of their property in the United States...." Sherman & Sterling has informed the court that at least one of the KELM Companies is a party to the present litigation. Therefore, neither this order nor the accompanying opinion apply to the any of the KELM Companies which are parties to this litigation.

judgment on all claims in favor of all insurance carriers.